IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RICHARD ALLEN MASTERSON,  §
                          §
         Petitioner       §
                          §
     -VS-                 §        CIVIL NO. 4:08-CV-02371
                          §
NATHANIEL QUARTERMAN,     §
Director, Texas Department of §
Criminal Justice, Correctional §
Institutions Division,    §
            Respondent    §

**PETITION FOR WRIT OF HABEAS CORPUS**
*28 U.S.C. § 2254* **- DEATH PENALTY**

TO THE HONORABLE DISTRICT COURT:

COMES NOW, Petitioner Richard Allen Masterson, by and through his attorney

of record, Patrick F. McCann, and  presents this First Amended Petition for Writ of

Habeas Corpus pursuant to *28 U.S.C. § 2254*.  In support, petitioner shows the following:

I.

Mr. Masterson was charged by indictment with the offense of capital murder,

proscribed by Texas Penal Code § 19.03.  The indictment alleged that the petitioner

intentionally caused the death of Darin Shane Honeycutt during the course of robbery.

(CR1 9).  A jury found petitioner guilty of capital murder and answered the special issues

in a manner resulting in a punishment of death.  (CR2 317).  The conviction and sentence

were affirmed on direct appeal to the Texas Court of Criminal Appeals on February 2,

2005. *Masterson v. State*, 155 S.W.3d 167 (Tex.Crim. App. 2005).

Sidney Crowley represented Mr. Masterson at the state habeas level pursuant to Texas Code Crim. Proc. art. 11.071. The writ was filed on February 26, 2004, in the 176th District Court, which forwarded the application to the Texas Court of Criminal Appeals in Writ cause Number WR-59481-01. No hearing was held on the writ in state district court, but the state habeas judge filed findings of fact and conclusions of law, recommending denying relief. *Ex parte Richard Masterson*, No.WR-59481-01. On August 20, 2008, the Texas Court of Criminal Appeals denied relief, in a brief unpublished opinion that adopted the trial court's findings and conclusions. *Ex parte Richard Masterson*, No. 2008 WL 3855113, filed August 20, 2008. Undersigned counsel were appointed to represent Mr. Masterson in this federal proceeding.

## II.
## JURISDICTION

Mr. Masterson invokes the jurisdiction of this Court pursuant to 28 U.S.C. § 2254.

## III.
## CUSTODY

Mr. Masterson is a citizen of the United States and a resident of the State of Texas. He is presently in the respondent's custody at the Polunsky Unit in Livingston, Texas, pursuant to a judgment of conviction and sentence of death.

## IV.
## STANDARD OF REVIEW

**Standard of Review: § 2254(e)(1) & § 2254(d)**

AEDPA provides standards for the review of the merits of Mr. Masterson's claims

through the provisions of 28 U.S.C. §§ 2254(d) & 2254(e)(1):

28 U.S.C. § 2254(d) provides that:

(d) An application for a writ of habeas corpus . . . shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to or involved an unreasonable application of clearly established Federal law . . . ; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

It is important to note that § 2254(d) is a bar to the grant of habeas relief, rather than to the Court's review.

Therefore, for the Court to apply § 2254(d), it must first determine whether Mr. Masterson's claims merit relief when reviewed *de novo*. Only then does the Court examine whether relief is barred under § 2254(d). *See Ramdass v. Angelone*, 530 U.S. 156 (2000) and *Weeks v. Angelone*, 528 U.S. 225 (2000) (each thoroughly discussing the merits of the claims prior to discussing the applicability of § 2254(d)).

28 U.S.C. § 2254(e)(1) provides that:

(e)(1) In a proceeding instituted by an application for a writ of habeas corpus . . . a determination of a factual issues made by a State court shall be presumed to be correct. That Petitioner shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

The AEDPA's presumption of correctness is similar to that in previous law. Prior to the passage of the AEDPA, the law also provided that the federal courts were to presume state court fact findings correct, absent convincing evidence. *See Sumner v. Mata*, 440

U.S. 539, 550 (1981); *Bell v. Lynaugh*, 663 F.Supp. 405, 411 (E.D. Tex. 1987). The statute appears to be a codification of the Supreme Court's habeas jurisprudence in *Sumner*, and § 2254(e)(1) places no greater burden on a petitioner than existed prior to the enactment of the AEDPA.

*Presumption Suspect?*

In the instant case, the findings signed by the trial court are titled, "Respondent's Proposed Findings of Fact and Conclusions of Law." The court did even rename the findings to "Trial Court's Findings." Additionally, the two affidavits of trial counsel for Mr. Masterson are absolutely identical, save for the introductory information describing the lawyer's experience and background. For both attorneys to have the identical recollection of the trial along with using the *exact* same wording for all the substantive portions gives great pause to their reliability and the great deference the trial court applied

## CLAIMS FOR RELIEF

### GROUND FOR RELIEF ONE

**MR. MASTERSON WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE PHASE OF THE TRIAL WHEN TRIAL COUNSEL FAILED TO CONSULT WITH A PATHOLOGIST AND OFFER EXPERT MEDICAL TESTIMONY ON THE CAUSE OF HONEYCUTT'S DEATH.**

### GROUND FOR RELIEF TWO

**MR. MASTERSON WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF THE TRIAL WHEN TRIAL COUNSEL FAILED TO ADEQUATELY DEVELOP AND PRESENT MITIGATING EVIDENCE.**

### GROUND FOR RELIEF THREE

**MR. MASTERSON WAS DENIED HIS RIGHT TO TRIAL BY JURY AND TO DUE PROCESS OF LAW GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN A JUROR SLEPT THROUGH CRITICAL TESTIMONY GIVEN BY THE MEDICAL EXAMINER.**

### GROUND FOR RELIEF FOUR

**MR. MASTERSON WAS DENIED DUE PROCESS WHEN THE TRIAL COURT REFUSED TO CHARGE THE JURY ON THE LESSER-INCLUDED OFFENSE OF NEGLIGENT HOMICIDE, WHICH WAS RAISED BY THE EVIDENCE, INCLUDING MR. MASTERSON'S TESTIMONY.**

## GROUND FOR RELIEF FIVE

**MR. MASTERSON'S FIFTH AMENDMENT RIGHT WAS VIOLATED BY THE ADMISSION OF HIS CONFESSION WHICH WAS GIVEN IN EXCHANGE FOR A PROMISE BY POLICE.**

## GROUND FOR RELIEF SIX

**MR. MASTERSON'S FIFTH AND SIXTH AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF HIS CONFESSION, WHICH WAS GIVEN AFTER POLICE CONTINUED TO QUESTION HIM AFTER HE HAD INVOKED HIS RIGHT TO COUNSEL.**

## GROUND FOR RELIEF SEVEN

**THE STATE FAILED TO CARRY ITS BURDEN OF PROVING THAT MR. MASTERSON WOULD BE A CONTINUING THREAT TO SOCIETY WHEN BASED ON HIS OWN TESTIMONY IT WAS APPARENT THAT HE WOULD SPEND HIS TIME IN CONFINEMENT UNDER SUCH RESTRAINT THAT HE COULD NOT BE A DANGER TO SOCIETY.**

## GROUND FOR RELIEF EIGHT

**MR. MASTERSON WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE TRIAL COURT REFUSED THE DEFENSE REQUEST TO ARGUE LAST AT PUNISHMENT ON THE ISSUE OF MITIGATION.**

## GROUND FOR RELIEF NINE

**THE "12-10" RULE IS UNCONSTITUTIONAL AS APPLIED IN THIS CASE BECAUSE THE JURY FINDINGS IT REQUIRES AND THE SCHEME IN WHICH IT IS APPLIED VIOLATE THE EIGHT AMENDMENT TO THE UNITED STATES CONSTITUTION.**

## GROUND FOR RELIEF TEN

**MR. MASTERSON'S CONSTITUTIONAL RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED IN THIS CASE BY THE TRIAL COURT'S REFUSAL TO INFORM THE JURY THAT A HUNG JURY WOULD RESULT IN A LIFE SENTENCE.**

## GROUND FOR RELIEF ELEVEN

**TRIAL COUNSEL [AND BY EXTENSION HABEAS COUNSEL] PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS FOR FAILING TO INTRODUCE EVIDENCE OF ORGANIC BRAIN DYSFUNCTION THAT COULD WOULD HAVE BEEN ADMISSIBLE UNDER *JACKSON V. STATE* IN TEXAS COURTS THAT THAT BEEN DISCOVERED.**

## GROUND FOR RELIEF TWELVE

**THE TRIAL COUNSEL [AND BY EXTENSION HABEAS COUNSEL] WERE INEFFECTIVE UNDER *ROMPILLA V. BEARD* FOR FAILING TO ADEQUATELY INVESTIGATE AND PREPARE A REBUTTAL AGAINST THE STATE'S USE OF JUVENILE RECORDS DURING THE PUNISHMENT PHASE OF HIS TRIAL.**

## GROUND FOR RELIEF THIRTEEN

**THE TRIAL COUNSEL [AND BY EXTENSION HABEAS COUNSEL] PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN THEY FAILED TO PRESENT AND DEVELOP MITIGATING EVIDENCE ON THE FACT THAT MR. MASTERSON HAD BEEN SHOT AS A YOUTH.**

## GROUND FOR RELIEF FOURTEEN

**THE TRIAL COUNSEL [AND BY EXTENSION HABEAS COUNSEL] WERE INEFFECTIVE UNDER *STRICKLAND V. WASHINGTON* FOR FAILING TO INVESTIGATE AND DEVELOP EVIDENCE OF SEIZURE DISORDER WHICH COULD HAVE BEEN BROUGHT FORWARD AT THE GUILT STAGE OF MR. MASTERSON'S TRIAL ON CAPITAL MURDER.**

# STATEMENT OF FACTS

Many of the facts concerning the actual death of the victim will be summarized under Mr. Masterson's claim concerning the raising of the lesser-included offense of criminally negligent homicide, but the surrounding facts are summarized here to provide context for his claims for relief:

The victim was Darin Shane Honeycutt. (Reporters Record18 15). His friend Larry Brown testified that Shane sometimes went to gay bars dressed as a woman, named Brandy Houston. ( RR18 30). Brown talked to Shane one Thursday evening, and knew he would be going out that night. Brown never talked to Shane again. (RR18 32-3). On Saturday morning he went to Shane's apartment, where the landlord let him in, and Brown found Shane dead. (RR18 38). The victim was naked. Brown testified that it was Shane's habit when he had gone out as Brandy to undress immediately when he came home. (RR18 61, 39). The victim was lying on the bed. The bed was neatly made, the bedspread not messed up. (RR18 60). Brown also noted that Shane's car was missing. (RR18 36).

An investigating officer testified there was no sign of forced entry to the apartment and everything was neat except that a drawer had been pulled out of a jewelry cabinet. (RR18 77, 79).

Morgan Potter was a construction manager for whom Richard Masterson's brother James worked. (RR18 109). As a consequence, Morgan knew Richard too. On a day in January, 2001, Richard came by the job site looking for his brother. (RR18 110). Morgan

noticed that Richard was edgy and nervous. (RR18 111). He said, "I think I put somebody to sleep." (RR18 112). Morgan had heard Richard say before that he knew how to apply a sleeper hold, so he assumed that was what he meant. (RR18 112). But Richard said this time had been "more than that. [He] really put someone to sleep." (RR18 112).

Richard Masterson was driving a red Ford Escort, and said he was driving to Georgia, but he had no money. (RR18 114). Morgan bought him some gas.

Later Morgan learned about the murder, and contacted police . He told police what he knew, and picked Richard out of a photo spread. (RR18 117-18, 121). Morgan testified that Richard had never said he knew how to kill someone. (RR18 124).

Police officers put out an alert for the victim's car. It was located in Emerson, Georgia, but Mr. Masterson was not driving it. (RR18 138, 139). Houston police learned that Richard Masterson was in custody in Florida, and sent Officer Scott Null to bring him back. (RR18 144).

James Masterson testified that his brother Richard had been living and working with him in January of 2001, until James kicked him out. (RR18 164, 168). One day that month Richard called and said of someone he had just met that he "put him down." (RR18 170). James told him to call the police and clear the matter up. Richard said he had the guy in a headlock, until he went limp. (RR18 174).

James also mentioned that Adam Tanturri was his nephew. (Adam had been arrested driving the victim's car in Georgia.) (RR18 174-75). Sergeant Parish of the Houston Police

Department told James that if Richard would say something, they would let Adam go. (RR18 181).

An assistant medical examiner who had performed the autopsy on the victim testified to petechial hemorrhages around his eyes. (RR18 193, 198). A sleeper hold was a hold that would block the veins on the sides of the neck. Such a hold would create pressure that would cause such hemorrhages. (RR18 201).

The doctor did not find any fractures in the deceased's neck. (RR18 203).

The cause of death was the constriction of the windpipe along with neck compression, which cuts off the oxygen to the brain. (RR18 205, 207-08). The complainant did have heart disease in one artery, but he didn't die of a heart attack. (RR18 222-23, 207). The cause of death was consistent with a sleeper hold, which blocks the arteries, as opposed to a choke hold, which cuts off air. (RR18 226-27, 229).

The doctor did not believe this was part of an autoerotic asphyxiation, because the person kept strangling the victim after he was unconscious. (RR18 231-32).

A DNA analyst had taken some samples from the complainant. She found semen from his penile swab and a spot on his thigh. (RR18 246). She did not find any blood under the victim's fingernails. (RR18 247-48).

A different analyst testified that it was the deceased's own semen on his penile swab and thigh. (RR18 261).

During a break in the trial, the defense requested a mistrial because one of the defense

attorneys had seen one juror sleeping on at least two occasions. (RR19 5, 7). The request was denied by the trial court, as was the defense's request to seat an alternate juror in place of the sleepy one. (RR19 7).

A police officer from Emerson, Georgia, testified he had pulled over Charles Tanturri driving a 1997 Ford Escort. (RR19 10, 11). When the officer inventoried the car, he found a billfold with identification for Shane Honeycutt. (RR19 13).

Events concerning the dismissal of charges against Turturri, Mr. Masterson's nephew, will be related under the claims for relief involving Mr. Masterson's confession.

An officer from Florida testified to having arrested Mr. Masterson in Florida on the Harris County warrant. (RR19 49). Houston Police officer Scott Null then flew to Marion County, Florida, where he met Mr. Masterson in jail. (RR19 59). Officer Null returned to Houston not only with Mr. Masterson, but with his confession. Those details will also be set out under the confession grounds for relief.

The primary evidence against Mr. Masterson, his taped confession, was played for the jury, after it was admitted over objection. (RR19 68, 70-89). Much of this will be the basis for Mr. Masterson's ground for relief concerning the denial of his request for a lesser-included offense. In short, he said that he met Brandy in a bar and went home with "her" (while knowing Brandy was actually a man). (RR19 72-4). In the complainant's apartment, he got undressed, then "grabbed him around the neck, put him to sleep." (RR19 75). "I put his throat in the pit of my arm. He never struggled, never did nothing, just went to sleep."

(RR19 76).

Asked whether he intended to kill the deceased, Mr. Masterson answered, "Um, yeah, I think so." (RR19 77). He never intended to have sex with the deceased. It had not originally been his intention to kill him, though. (RR19 78). "I don't know why I did it, something just told me in my mind that – and I just said to myself that I was going to kill him." (RR19 78).[1]  Afterwards, he took a VCR, to make it look like a robbery, and gave the VCR away to someone on the street. (RR19 78, 82).

The State rested after Officer Null's testimony. A motion for instructed verdict was denied. (RR19 107).

The defense made a motion to allow the defendant to testify without being impeached with his prior convictions, which was denied. (RR19 109-110). However, Mr. Masterson testified in his own behalf anyway.

First, he admitted to prior convictions for burglary, 1992, theft in 1996, and two assaults in 1999 and 2000. (RR19 115). These convictions were in other states.  He came to Houston in October of 2000.

Mr. Masterson met the complainant for the first time in that bar on January 5th.  They met at about 1:45 a.m., just before the bar closed at 2. (RR19 117, 118). He asked the complainant for a ride home. (RR19 119). Shane obliged, after first giving someone else a ride home.  When they were alone, the complainant invited Mr. Masterson to come home

---

[1]Mr. Masterson would later deny much of this confession in his direct testimony, saying he had been embarrassed to tell the officer he had gone with the deceased to have sex with him.

with him, in a way that made Mr. Masterson think they were going to have sex. (RR19 120).

In Shane's apartment, Shane came out of the bathroom undressed. Richard also undressed,

and they began having sex. (RR19 123-24). Richard put his arm around Shane's throat to

asphyxiate him, because Shane asked him to do so. (RR19 126). But something went wrong.

Shane fell forward gurgling. Richard left the room, then came back to find Shane dead.

(RR19 129).

He hadn't intended to kill the victim. Panicking, he decided to run. (RR19 130). He

drove to Georgia, stayed there five days, then heard that Houston police were looking for

him. (RR19 132-33). He called Sergeant Parish and told him there was a mistake, he hadn't

been in Houston. (RR19 133).

After he was arrested, and met with Officer Null, Richard asked him to get the case

against his nephew dropped. The officer said he'd try. (RR19 136). Then Richard confessed

to intending the murder, adding elements that would elevate the case to capital murder,

because he'd rather die than have to serve a life sentence. (RR19 137-38, 140).

The defense rested. (RR19 178). In rebuttal, the state called Steven Drew, after a

hearing outside the jury's presence to test whether his testimony would be admissible. (RR19

180). The trial court ruled that it was, and also that it was more probative than prejudicial.

(RR19 192, 193).

Before the jury, Drew testified that he lived in Florida. The night of February 3 - 4,

2001, he met Richard Masterson in a bar. (RR19 200). Richard asked Drew if he owned a

car, because Richard didn't have one. (RR19 203). At about 1 a.m., Drew invited Richard to his place. (RR19 204). Inside the apartment, Drew went to the bathroom, then to his closet to change clothes. (RR19 206). Richard was behind him, and put a headlock on him. Drew testified that this act was really violent, not sexual at all. (RR19 207). He struggled to break free, but couldn't, and passed out. (RR19 208, 210). When he came to he found his wallet and car gone. (RR19 210, 211). He called police, made a report, and police recovered the car six or seven days later. (RR19 212).

A deputy in Florida testified he had arrested Mr. Masterson in connection with a stolen car from Tampa. Steven Drew told him Mr. Masterson fit the description of his attacker. (RR19 226, 227-28).

Both sides closed. (RR19 231).

After arguments, the jury returned a guilty verdict. (RR20 39).

In punishment, Cheryl Shook testified that Mr. Masterson is the cousin of her ex-boyfriend. (RR21 7). At a social gathering in 2000, Mr. Masterson threw a beer bottle through her screened front porch, hitting her in the mouth. (RR21 9). The blow knocked out two of her teeth and sent her to a hospital. (RR21 13). She couldn't remember why Richard had done this. (RR 21 14). He didn't seem intoxicated at the time. (RR21 20). She didn't think he meant to hurt anyone, and she wasn't afraid of him now. (RR21 21-22, 25).

An officer who saw her injury, though, testified that Ms. Shook was scared at the time. From the injury, the officer thought this one of the most violent acts he had seen. (RR21 29,

30). The victim gave conflicting stories, saying both that Mr. Masterson had done it and that her boyfriend had. (RR21 33, 32, 35).

Another investigating officer, the one who arrested Mr. Masterson and had him charged with assault, said from the other broken bottles at the scene, Ms. Shook might have thrown one at Mr. Masterson first. (RR21 40, 43, 46).

An officer in the Harris County Jail testified to a fight between Mr. Masterson and another inmate. (RR21 61). The other inmate got the worst of it, with deep lacerations over his eyes, while Mr. Masterson was uninjured. (RR21 52, 53). Mr. Masterson said the other inmate had disrespected the Aryan Brotherhood, so he took care of him. (RR21 53-4). But the officer didn't know who had started the fight. (RR21 61).

Another officer testified that on an occasion in 2002, Mr. Masterson threw his food tray on the floor and became very belligerent. (RR21 66). When the officer threatened to write him up, Mr. Masterson said, "I'll choke you like I choke my victims." (RR21 67, 68-9).

In another incident from Mr. Masterson's confinement in Michigan, a corrections officer testified that he responded to a call to a cell that Mr. Masterson shared with another inmate. (RR21 113). The other inmate asked to be removed. At that point Mr. Masterson started hitting the other inmate in the face. (RR21 114). The officer broke this up by spraying Mr. Masterson with pepper spray, after three punches that produced very minor injuries. (RR21 115). The officer didn't see what had started the fight. No charges were filed. (RR21 116).

The most extensive punishment testimony came from Deedra Foster, 31, a woman who met Richard Masterson during a visit to her sister in South Carolina, dated him briefly, then invited him to come home with her to Michigan. (RR21 119-21). This was in August of 1999; at first Deedra thought Richard a "really great guy." They lived together. (RR21 121, 122). But one evening she got a phone call from someone who hung up, and Richard got angry, accusing her of cheating on him. (RR21 123-24, 125). He ripped the phone off the wall and threw it at her. The phone hit her in the head. Mr. Masterson told her if she called police he'd kill her. Deedra, of course, left. (RR21 126). When she returned home about 5 p.m., Mr. Masterson was gone.

Deedra went to sleep, but was awakened about 3:35 a.m. when she heard a noise. She found Mr. Masterson trying to climb in through a bathroom window. (RR21 127). She pushed him out and ran. (RR21 128). Next she heard him kick the back door open, so she ran to the bedroom and called 911. (RR21 129). Mr. Masterson kicked the bedroom door open too. When he saw that she'd called 911 he became even angrier, said, "I warned you," pulled that phone out of the wall, and hit her in the head with his fist. (RR21 130). He said he was going to beat her to death before the cops came. Deedra thought she was going to die. (RR21 132).

But suddenly Mr. Masterson stopped, hugged her, and said he was sorry. (RR21 133). At that point she saw blue police lights and told him to run, but he was arrested. (RR21 133-35). Deedra said she didn't want to press charges. Two weeks later she heard that Mr.

Masterson had been released. She returned to South Carolina, terrified of him. (RR21 135-36).

In April of 2000 she was in a house in South Carolina with her kids, when Mr. Masterson walked in with his cousin. He smiled and said, "I found you." (RR21 137-38). He only stayed a few minutes, but later that night he knocked on her door. Deedra didn't let him in and he left. (RR21 138-39). She ran away and moved to Houston. (RR21 139).

The next day, during a brief break in the punishment proceedings, the trial court questioned Mr. Masterson about his decision to appear in court in his orange jail jumpsuit instead of the suit he'd been provided. Mr. Masterson replied that at this point everyone knew he was in jail, so what was the point of pretending otherwise. (RR22 5-7). Trial proceeded.

On cross-examination, Deedra Foster testified that she and Mr. Masterson had become intimate a couple of days after their first meeting. (RR21 9). He had been "great" with her children. (RR21 11).

The last State's witness was James Eddinger, a police officer in Big Rapids, Michigan. (RR22 20). He was one of the officers who had responded to Deedra Foster's assault call. (RR22 21). Upon arrival, he'd seen Mr. Masterson with his fists clenched, saying you might as well arrest me now. (RR22 22). The officers did so. (RR22 23). When the officer returned to his squad car after looking around the house, he discovered that Mr. Masterson had managed to get his hands, which had been handcuffed behind his back, in front of him.

(RR22 26).  He had also kicked the door frame until it bent. In the car, he said he had been in jail for beating a woman before. (RR22 27).

After the State rested, Mr. Masterson presented extensive defense testimony, including his own. A Harris County detention officer testified that he had worked all the previous year in the cell block where Mr. Masterson was held. (RR22 32). He never had any trouble with Mr. Masterson, who never refused a request from him. (RR22 33). The witness had, however, heard of incidents Mr. Masterson had with other deputies, and testified his reputation for being peaceable was "not great." (RR22 41).

Another Harris County deputy testified he had interacted with Mr. Masterson for a year in the jail, and never had any difficulties with him. (RR22 43, 45). Mr. Masterson never refused orders or made threats; if you showed him respect he would do the same in return. (RR22 45). However, the deputy acknowledged that other deputies had problems with Mr. Masterson. (RR22 49-50).

Ramona Weiss, Mr. Masterson's sister, testified to their violent and neglected upbringing. In 1975, their father kidnaped their mother and took her to Florida, leaving their eight children in Texas for a month. (RR22 56). Richard Masterson was three years old at this time. Their sixteen-year-old sister took care of the family.

Their father beat their mother. She got away and returned to Texas, but was put in jail for having abandoned her children. (RR22 57).

When they did all live together, their father would come home drunk at night, pick one

of the children apparently at random and beat him or her, including the young Richard. (RR22 58).

After their mother's arrest, the father returned and took them all to Florida. (RR22 58-9). Richard was four or five years old at this time. By the age of eleven or twelve, he was no longer attending school regularly.

The children never received any affection from their father. However, Richard was close to his mother. (RR22 60).

Ramona testified that after she left home, the other children were put in foster care. (RR22 61). She also testified that her brother Richard could be non-violent in a controlled environment. (RR22 62). If you showed him respect he would do the same. (RR22 69).

In a hearing outside the jury's presence, the State objected to the defense's expert witness on future dangerousness. (RR22 70-71). After the expert testified on *voir dire*, however, that Mr. Masterson had a "high probability" of future dangerousness, the State withdrew its objection and the defense declined to call the witness. (RR22 75).

Next Mr. Masterson himself was questioned about his decision to testify. (RR22 76). His lawyers had told him it wouldn't be a good idea, but he wanted to do so anyway. (RR22 77).

In his punishment testimony, Mr. Masterson denied or explained much of the State's punishment evidence. He admitted to having thrown the bottle in the vicinity of Cheryl Shook, but hadn't intended to hit her. (RR22 78-9). The inmate in Michigan he'd punched

had kept "running his mouth." The other one he had beaten up had hit Mr. Masterson first. (RR22 79-80).

Deputy Drew, the one who'd testified that Mr. Masterson had thrown down his tray, had lied about everything. (RR22 80). He also downplayed the attack on Deedra Foster. (RR22 82).

In his most damaging testimony, Mr. Masterson answered the punishment questions for the jury:

> ...they have to answer two questions, am I going to be a future danger? Am I going to protect myself by any means necessary? Yes, I am. That makes me a future danger, yes, I am.
> Second issue, is there any mitigating circumstances? I don't think so. Everybody lives and dies by the choices that they make. None of my family out there could control what I did. I did what I did because I wanted to do it, not because they made me do it, or because I got my ass whooped... Just like now, there's a time when people just got to say, I did it, I accept responsibility for it. So whatever your decision is, I accept that. You found me guilty, you must believe I'm guilty. And if you send me to prison, for life, the chances are, in the Texas Department of Corrections the chances are I'm going to have to defend myself, and like I said, I will defend myself, whether it's against a guard or inmate or anybody else by any means necessary.

(RR22 84-85).

He went on to say, though, that Deputy Drew was "pretty much the only deputy I ever had problems with." (RR22 85).

On cross-examination, Mr. Masterson still denied that he killed the complainant to steal his car. (RR22 92). As for the punishment issues, the prosecutor characterized his testimony as having said that "you think the jury should answer the special issues in such

20

a way that you get the death penalty, right?" Mr. Masterson answered, "If they're following the law, yes." (RR22 99). What he meant was that if there was a case of "me protecting myself or my property, yes, I'm a future danger." A minute later, the defense rested and both sides closed. (RR22 100).

Predictably, after argument the jury answered the special issues questions in such a way that the judge assessed a sentence of death. (RR22 118, 119).

## GROUND FOR RELIEF ONE

**MR. MASTERSON WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE GUILT-INNOCENCE PHASE OF THE TRIAL WHEN TRIAL COUNSEL FAILED TO CONSULT WITH A PATHOLOGIST AND OFFER EXPERT MEDICAL TESTIMONY ON THE CAUSE OF HONEYCUTT'S DEATH.**

Dr. Paul Schrode, the Assistant Medical Examiner who performed the autopsy of Honeycutt, offered testimony on behalf of the State that was critical to the prosecution's contention that Mr. Masterson had intentionally caused Honeycutt's death and that it could not have been an accident. Trial counsel, through cross-examination, attempted to establish that the death could have occurred accidentally as a by-product of a phenomenon known as autoerotic asphyxiation.

Dr. Schrode repeatedly stated that the scenario described by the defense was not possible. He was asked:

> Is it possible that a consensual sex act involving something like that occurred, that consciousness was lost and that because of Mr. Honeycutt's special circumstances in his cardiovascular system that he went into that arrhythmic state and ultimately expired?

(R.R. 18 - 232). Dr. Schrode completely and overwhelmingly rejected that notion based upon his determination that the complainant had "significant collateral support that his heart muscle had from the other arteries." (R.R. 18 - 232). Dr. Schrode testified that it was not possible that the findings could have been consistent with consensual autoerotic asphyxiation. (R.R. 18 - 232-34). He emphatically stated based upon a reasonable degree

22

of medical certainty that "I don't see the purpose of continuing to compromise the blood flow to the head after the person's passed out." (RR18 234) He stated that his conclusion was that the blood flow was impeded after the neck was compressed for some time after Honeycutt passed out. He would rule out autoerotic asphyxiation because he did not see the point of continuing to compromise the blood flow after a person had passed out. (RR18, 231-234)

In short, Dr. Schrode's testimony was devastating for the defense. On state habeas, a forensic pathologist was consulted whose testimony could have contradicted Dr. Schrode. Dr. Paul Radelat, whose affidavit is attached here to (Appendix D herein and in the State writ)[2], reviewed the autopsy report on Honeycutt and the trial testimony of Dr. Schrode and Mr. Masterson. Dr. Radelat found that, as Dr. Schrode testified, the sleeper hold applied by Mr. Masterson resulted in a partial reduction in cerebral blood flow, producing brain hypoxia and partial of not complete unconsciousness.

His affidavit was presented to the trial court and stated that he had reviewed pertinent testimony and the autopsy report of the complainant. In his opinion:

> Based upon the material available for my review and upon my forty plus years of training and experience in pathology, it is my opinion that the choke hold/sleeper hold applied to the neck of Darrin Shane Honeycutt by Defendant Richard Masterson produced a partial reduction in cerebral blood flow thus producing brain hypoxia and partial if not complete unconsciousness. Simultaneously with the brain hypoxia, there was compression on the carotid sinuses with increased heart rate and systemic

---

[2] For clarity sake, the affidavits will be lettered the same as the State writ, therefore some might be "missing" if not utilized in this federal petition.

hypertension. In reasonable medical probability, these additional stresses on the heart superimposed on the adrenergic effects of sexual excitement led to a fatal cardiac arrhythmia in Darrin Shane Honeycutt arising out of his unforeseeable pre-disposition to such an arrhythmia because of the coronary atherosclerosis demonstrated at post-mortem examination.

In his opinion, based upon a reasonable medical probability, the additional stresses on the heart, superimposed on the effects of sexual excitement, led to a fatal cardiac arrhythmia arising out of Honeycutt's unforeseeable predisposition to such an arrhythmia because of coronary arteriosclerosis. Dr. Radelat was of the opinion that the "sleeper hold" could have produced the desired erotic effect while almost simultaneously producing the cardiac arrhythmia. The transition to cardiac arrhythmia may not have been recognizable to Mr. Masterson, who may not have reversed the hold quickly enough to avert the irreversible consequences. Most importantly, Dr. Radelat was of the opinion that this particular sequence of events would have been consistent with Mr. Masterson's trial testimony.

In Mr. Masterson's case, the sole defense raised in Mr. Masterson's testimony was that Honeycutt's death occurred accidentally during a sexual practice known as autoerotic asphyxiation. Mr. Masterson's conviction for capital murder hinged solely on the jury's decision as to whether Mr. Masterson intentionally caused Honeycutt's death. Mr. Masterson, in his taped statement given to Sergeant Null, had mentioned nothing about autoerotic asphyxiation but he subsequently, in testimony, explained his motives for omitting that information. Mr. Masterson chose to take the stand and present his version

under oath to a jury of his peers. He explained that he gave the original untrue statement because he was afraid of what would happen to his nephew. (RR19 136-139). Mr. Masterson was concerned that the officer would drop the charges against his nephew and that was the only reason he decided to even give a statement. (RR19 - 135-138). And he admitted on the stand, that the statement he gave left out certain portions regarding homosexual activity. (RR 19 - 139-40). He did not tell the police officer because he was embarrassed to admit he had been having sex with a man. (RR 19 - 139-40). He also stated that he wrote to the court before the trial and offered the truth and that was also what he testified to before the jury. (RR19 - 139-40).

At trial, Dr. Schrode supplied the only expert medical testimony relative to Honeycutt's cause of death. His testimony undermined the credibility of Mr. Masterson's defense that the death was accidental as a result of autoerotic asphyxiation. The jury, without any medical training, would naturally accept Dr. Shrode's testimony that the death was not accidental. The evidence of Dr. Radelat was unavailable because the defense had failed to find a proper forensic pathologist. Dr. Radelat's testimony would have directly contradicted that of Dr. Shrode and added much needed scientific support to Mr. Masterson's version of what happened. The failure to present this defense testimony was sufficient to undermine confidence in the outcome of the guilt phase of the trial, and deprived Mr. Masterson of the effective assistance of counsel.

***Trial Court's Findings Rebutted***

In order to best illustrate how much the trial record and the trial court's findings diverge, the Petitioner offers the following direct excerpts from the trial court's findings with a rebuttal offered immediately afterwards. The findings are numbered in the order they appear in the state trial court's findings for convenience and ease of reference.

30.     The Court finds, based on the credible affidavits of trial counsel, that trial counsel prepared and filed pre-trial motions, interviewed witnesses, talked to the applicant's family about possible mitigating evidence, visited the scene of the offense, visited the bar where the applicant met the complainant, obtained discovery, reviewed the State's file, employed an investigator, and talked to the applicant about the offense, potential witnesses, pending the trial, and his background and life. See State's Exhibits A and B, affidavits of trial counsel Robert Loper & Layton Duer, respectively.

*Rebuttal*: Mr. Masterson has specific claims regarding the failure to utilize an expert pathologist and the presentation of mitigation evidence. As much as this is an all-encompassing assertion that Mr. Masterson received effective assistance of counsel, that is rebutted herein specifically below.

CAUSE OF DEATH

31.     The Court finds, based on the appellate record, that the trial counsel conducted an extensive cross-examination of Harris County Assistant Medical Examiner Schrode; that Schrode acknowledged during cross-examination that a sleeper hold could have been applied to the complainant from the rear during a sexual intercourse, a scenario fitting the applicant's testimony about choking the complainant; that it was possible for an individual to go into an arrhythmic state and die without evidence of a heart attack occurring; that the complainant could have been in an unconscious, arrhythmic state and the position of the

complainant's body could have contributed to compromised blood flow due to the flexion of the neck; and, there was nothing in Schrode's post-mortem findings that would differentiate an external compression intentional strangulation from a sexual asphyxiation accidental strangulation, other than Schrode's opinion that someone would stop compressing another person's neck in sexual intercourse after the other person lost consciousness. (XVIII RR at 204-05, 210-239)

*Rebuttal* The record does show that there was cross-examination of Dr. Schrode by defense counsel. But there was absolutely no impeachment with evidence from an expert, such as Dr. Radelat, that indeed, with a reasonable medical probability, the defense story *could* have been correct. The defense cross- examined Dr. Schrode but had nothing to challenge him with.

32.     The Court finds, based on the credible affidavits of the trial counsel, that counsel consulted cardiologist Robert Walmsley, M.D., regarding the complainant's manner of death; that Walmsley provided areas that the trial counsel needed to address; that trial counsel were able to effectively prepare for cross-examination of assistant medical examiner Schrode through their consultation with expert Walmsley; and, that trial counsel agreed it was unnecessary for Walmsley to testify after Schrode conceded the points about which Walmsley would have testified. See Exhibits A and B, affidavits of trial counsel Robert Loper & Layton Duer.

*Rebuttal:* The trial attorneys stated they consulted a cardiologist in order to prepare to cross examine the medical examiner. While helpful, clearly the specialities are uniquely different and counsel should have had an expert of its own forensic pathologist, especially in light of what Dr. Radelat affirmed. This finding is unreasonable.

33.     The Court finds that the speculative assertions on the habeas affidavit of Paul Radelat, M.D., were essentially presented to the applicant's jury through trial counsel's cross-examination of Schrode: the idea that the applicant's choke hold and/or sleeper hold could have caused a partial reduction in the complainant's blood flow, resulting in partial

and/or compete unconsciousness and additional stresses on the heart, superimposed on the adrenergic effects of alleged sexual excitement, allegedly led to a fatal cardiac arrhythmia in the complainant who was supposedly predisposed to arrhythmia based on coronary atherosclerosis found during the complainant's autopsy. Applicant's writ exhibit D; see Finding No. 31, supra.

*Rebuttal:* The "speculative assertions" are, in fact, medical determinations from a trained medical pathologist. There was no showing that Dr. Radelat was not a qualified expert and to find his assertions "speculative" is unreasonable and untenable.

Further, the assertion that the cross-examination brought forth the information supplied in Dr. Radelat's affidavit is inherently unreasonable. Dr. Schrode testified there was no possible explanation for this crime other than deliberate murder. He testified that without a reasonable probability, this could not have happened according to the defense at trial. The affidavit of Dr. Radelat entirely rebuts the medical examiner's testimony. This finding is unreasonable.

34.     The Court finds that trial counsel obtained an independent medical opinion from Walmsley to attempt to refute Schrode's findings that external neck compression caused the complainant's death and that trial counsel presented such medical opinion through the testimony elicited during cross-examination of Schrode.

*Rebuttal*: The defense affirmed they hired a consulting cardiologist. This is *not* a forensic pathologist trained to determine manner and means of death. This finding is true that Dr. Walmsley was hired, but does nothing to undermine the core issue which is an expert pathologist

was the only way to rebut the testimony of Dr. Schrode.

*Argument and Authorities*

The two-step analysis set out by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), is the standard for appellate review of counsel's effectiveness during trial.

First, Mr. Masterson must show that counsel's performance was so deficient as not to function as the "counsel" guaranteed by the Sixth Amendment to the United States Constitution. *U.S. Const. amend. VI*; *see Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The constitutional right to counsel does not guarantee errorless counsel, therefore, the effectiveness of counsel must be determined by the entire representation. The second *Strickland* prong requires Mr. Masterson to establish "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694. Rather, the issue is whether he received a fair sentencing hearing resulting in a verdict worthy of confidence. *cf. Kyles v. Whitley*, 514 U.S. 419 (1995).

The one defense Mr. Masterson had to support his testimony at trial and establish, at least possibly establish, was that his version of the events could have been correct. That was not done here. The Fifth Circuit considered a case where an expert pathologist was not called and determined there was not ineffective assistance of counsel because it did not go to the heart of the defense case:

> Contrary to Pondexter's argument, counsel did not build his "entire case around" the alternative defensive theory that the victim was deceased when he fired the shot. As set forth in the text of the opinion, the instant claim of ineffective assistance of counsel does not involve his primary defense theory that he fired no shots.

*Pondexter v. Dretke,* 346 F.3d 142, 147 (5th 2003). In *Pondexter*, the defendant's primary defense was his assertion that a co-defendant had shot the victim. The pathologist would have supported an alternative claim that the defendant shot the victim a second time but the victim was already dead at that point. In the case *sub judice*, Mr. Masterson testified and his defense was that he had accidentally killed the complainant during a sexual encounter. The State's medical examiner completely undermined that case. An expert for the defense could have supported the defense and explained that there was, indeed, a reasonable medical probability that it happened the way Mr. Masterson said it happened.

After *Pondexter* was remanded, it was again appealed and the Fifth Circuit further supplemented the discussion regarding the need for a pathologist:

> Pondexter relies heavily on *Rompilla*, maintaining it requires us to review the prejudice prong of this IAC claim *de novo*, rather than, under AEDPA deference, deciding whether the state-court decision was unreasonable. It is unnecessary, however, to decide this question because, even under a *de novo* standard of review, Pondexter fails to establish prejudice.
>
> Under such plenary review, Pondexter fails to establish that, had trial counsel consulted with, and/or presented, a pathologist, the jury's verdict would have been different. The jury was presented with the testimony of an eyewitness that Pondexter shot the victim after Henderson fired the first shot. The State also presented the medical testimony of Dr. Guileyardo. He testified that the second bullet entered the left side of the victim's face and exited below her right ear, perforating her oral cavity, boring a hole through her tongue, and shattering her right jawbone. It was Dr. Guileyardo's opinion that both gunshot wounds were inflicted while the victim was still alive, and that either shot could have killed her.
>
> Pursuant to our *de novo* review, we conclude that the jury, cognizant of overwhelming evidence of guilt, would have found Pondexter guilty even if trial counsel had consulted with, and/or called, a pathologist. As a result,

there is not a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different". *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052 (emphasis added).

*Pondexter v. Quarterman,* 537 F.3d 511, 523 -524 (5th Cir. 2008). Under a *de novo* review, Mr. Masterson meets the standard that the result would have been different. The defense expert supported the defense and provided equally as compelling evidence as the State. The jury could surely have taken that into consideration and returned a not guilty verdict or a verdict for a lesser offense.

In *Parker v. Allen*, the Fifth Circuit rejected a similar claim because the evidence would have been cumulative:

> The state court noted that Veasey's testimony would not have changed the outcome of the trial but would have supported the prosecution's theory of the crime, and went to the weight of the evidence the jury placed on Ward's testimony. The state appellate court held that Parker was not prejudiced because the additional expert witness's additional testimony was cumulative. Parker's attorneys presented witnesses during the trial who testified that Parker's knife was not the murder weapon. Because Veasey's testimony would have been cumulative, the district court correctly held that the state court reasonably applied Strickland.

*Parker v. Allen*, 565 F.3d 1258, 1282 -1283 (5th Cir. 2009). That is not the case herein. The pathologist's testimony that the defense failed to present would most definitively not have been cumulative, as the defense didn't present any expert testimony. This was the type of evidence the jury needed to hear.

***Conclusions of the Trial Court Rebutted***

**Second Ground for Relief: alleged ineffective assistance of trial counsel**

EXPERT OPINION/CAUSE OF DEATH

4. The applicant fails to show ineffective assistance of trial counsel for not presenting an expert witness on the cause of the complainant's death, based on counsel making the

reasonable, strategic decision not to present the testimony of expert Robert Walmsley, M.D., after Schrode acknowledged the same evidence during counsel's cross-examination that trial counsel would have presented through Walmsley. *See Ex parte Kunkle*, 852 S.W.2d 499, 505 (Tex.Crim.App.1993)(noting that counsel's strategic choices made after thorough investigation of relevant law and facts are "virtually unchallengeable"); *see also Ex parte Ewing*, 570 S.W.2d 941 (Tex.Crim.App. 1978) (holding that trial strategy will be reviewed only if record shows that action was without plausible basis).

*Rebuttal*: This finding is unreasonable in light of its making no sense whatsoever.

First, the defense never offered the expert testimony of anyone nor sought anyone's opinion regarding the forensic pathology. Dr. Walmsley was a cardiologist and not a forensic pathologist. Strategic choices are only unchallengeable if they are made *after* investigation. *See Knowles v. Mirzayance* 129 S.Ct. 1411, 1420 (2009), explaining that"[S]trategic choices made **after thorough investigation of law and facts relevant to plausible options** are virtually unchallengeable." *Id.*, at 690, 104 S.Ct. 2052.(Emphasis supplied).

The state habeas court's findings were unreasonable applications of established federal standards, specifically the standards regarding ineffective assistance of counsel. The defense presented no expert testimony, so the defensive theory was overwhelmingly rejected by the State's expert witness, and therefore the jury. Evidence was available that would have rebutted the State's expert and supported Mr. Masterson's defense. The defense was harmed as a result. Mr. Masterson received ineffective assistance of counsel.

## GROUND FOR RELIEF TWO

**MR. MASTERSON WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AT THE PUNISHMENT PHASE OF THE TRIAL WHEN TRIAL COUNSEL FAILED TO DEVELOP AND PRESENT AVAILABLE MITIGATING EVIDENCE.**

At the punishment phase the mitigating evidence regarding Mr. Masterson's background was presented by his sister, Ramona Weiss. (RR 22 - 53-71). She was the sole witness who knew anything about his life. Her entire testimony was less than 20 pages with 4 pages of cross-examination. She testified that Mr. Masterson and the other children were often abused by their alcoholic father and that Mr. Masterson had spent several months in a foster home at one point. (RR 22 - 58-59). There was little detail involving the abuse of Mr. Masterson himself and Mr. Masterson's background. Her testimony, however tragic it was, could not be placed in context without the proper psychological background and explanation to the jurors.

Mr. Masterson was interviewed by psychologist Dr. Jerome Brown, in preparation of the state writ application (Appendix E). In the interview Mr. Masterson provided much more information concerning his childhood including the beatings at the hands of Mr. Masterson's father were. He was often slapped or struck with such items as belts, switches, water hoses, extension cords and coat hangers. The beatings were often administered in the middle of the night when his father was in a drunken rage, as punishment for some minor infraction. Mr. Masterson also regularly witnessed his father beating his mother. Most

tellingly, Mr. Masterson was sexually abused by his brother when he was eight years old, on at least one occasion. Information like this, placed in the proper context, would have assisted the jury in understanding what was compelling and mitigating about Mr. Masterson and why his life should be spared. There are indications from treatment records that Mr. Masterson may have had some type of attention deficit disorder.

Mr. Masterson also revealed a long history of drug abuse, primarily the use of cocaine and crack. Mr. Masterson reported fifty to seventy-five seizures when overdosing on drugs. When Mr. Masterson was in the Texas Youth Commission he underwent a psychiatric evaluation that recommended that he be considered for residential treatment. It did not appear that he ever received such treatment.

A psychological evaluation of Mr. Masterson is contained in the business records of the Texas Youth Commission in reference to Mr. Masterson's commitment to that juvenile justice facility (Appendix F - Report Dated 5-10-88, Case Number 0702778). The report, prepared by psychologist Hector Cantu, indicated that Mr. Masterson's WISC-R score fit his background of having to rely on himself with little or no parental support. It also indicates that the lack of a loving, nurturing environment, along with the fact Mr. Masterson had to rely on his own capabilities to survive, often was manifested in aggressive, acting out behavior. (Page 4 of report). Dr. Cantu recommended residence in a long, structured setting.

Mr. Masterson was also evaluated by Dr. Kenneth Day, a psychiatrist, while at the

Texas Youth Commission (Appendix F - Report Dated 5-13-88, case Number 0702778). Dr. Day reported that Mr. Masterson had very negative feelings about his father. Dr. Day reported that Mr. Masterson had a history of being abused by his father. Dr. Day arrived at a number of diagnostic impressions, among them, conduct disorder, substance abuse, attention deficit, hyperactivity disorder and probable mild organic brain dysfunction. Dr. Day also listed a number of treatment recommendations, among them residential treatment and substance abuse counseling. Dr. Day noted that as a youth, Mr. Masterson would cry when talking about his family.

These Texas Youth Commission records were obtained by state habeas counsel but they were never introduced in evidence at the punishment phase of trial.

Trial counsel also did not seek to have Mr. Masterson examined by a psychologist or psychiatrist. Consequently, no expert opinion evidence was adduced that could have been utilized by the jury in answering the special issues on punishment. Had this line of inquiry been pursued, the aforementioned mitigating evidence could have been presented.

### Trial Court Findings Rebutted

In order to best illustrate how much the trial record and the trial court's findings diverge, the Petitioner offers the following direct excerpts from the trial court's findings with a rebuttal offered immediately afterwards. The findings are numbered in the order they appear in the state trial court's findings for convenience and ease of reference.

Following are the state habeas court's findings, and why they are unreasonable:

35.    The Court finds, based on the credible affidavits of trial counsel, counsel reviewed

39

the applicant's May, 1988 to March 1989 Texas Youth Counsel [TYC] records and made the reasonable strategic decision not to present the applicant's TYC records because they contained the following information that was more harmful than helpful to the applicant; the applicant's admission of extensive drug abuse; the applicant's average IQ range; the applicant's admission that he and his friends robbed wealthy homosexuals to get money; the applicant's habit of fighting in first grade; the applicant's expulsion from school; and, the applicant's shooting someone during a drug deal. See State's Exhibits A & B, affidavits of trial counsel Robert Loper & Layton Duer, respectively.

*Rebuttal*: The defense attorneys never state they saw those records *before* trial.

The trial attorneys affirmed the records were not offered because they would have been more harmful than helpful. There is NO record that a psychologist ever examined the records and explained or put them in the proper context to understand them.

36.    The Court finds, based on the appellate record and the credible affidavits of trial counsel, that trial counsel made the reasonable trial decision to present evidence of the applicant's abuse and lack of a loving, nurturing environment through the more compelling testimony of Ramona Weiss, the applicant's sister, who testified that their father kidnaped their mother when the applicant was three years old; that their sixteen-year-old sister took care of them for one month during that time; that their father came home after drinking and beat the children; that the applicant was placed in a foster home at one point; and, that the applicant, who had eye problems was teased as a child, attended school regularly until he was twelve years old (XXII RR at 53-64). See State's exhibits A & B, affidavits of trial counsel Robert Loper & Layton Duer, respectively; see also Findings No. 20, supra.

*Rebuttal*: While the sister could testify to *what* happened to Mr. Masterson, the records and/or an expert to explain *why* those abuses mattered and *how* it affected Mr. Masterson. This finding is wholly unreasonable in light of the facts of the case.

37.    The Court finds that the portion of the applicant's TYC records containing the opinion of Hector Cantu, Psychologist, that the applicant's IQ score indicated a lack of loving, nurturing environment and that the applicant had to rely on his own capabilities to survive was essentially present through the testimony of Ramona Weiss.

*Rebuttal*: That was not the entirety of Hector Cantu's report - nor is that the

39

entirety of the record of what was by all accounts an abused and troubled boy. This finding is unreasonable in light of the entire record.

38. The Court finds that the portion of the applicant's TYC records containing the report of Kenneth Day, M.D., concerning the applicant's abuse was presented through the testimony of Ramona Weiss.

> *Rebuttal*: Ms. Weiss never testified that Mr. Masterson had a "probable mild organic brain dysfunction." Dr. Day's report noted that. Ms. Weiss never testified that Mr. Masterson suffered from attention deficit, hyperactivity disorder, mild to moderate and chronic anxiety. Dr. Day noted that. Ms. Weiss never testified that Mr. Masterson was highly motivated to change although he had some rough edges. Dr. Day noted that. The finding by the trial court fails to consider the entirety of the records and is unreasonable.

39. The Court finds that the portion of the applicant's TYC records containing the report of Kenneth Day, M.D. concerning Day's diagnostic impressions of conduct disorder, substance abuse, attention deficit hyperactivity disorder, and probable mild organic brain dysfunction were either presented through the testimony of other witnesses [conduct disorder], no more than speculation [probable mild organic brain dysfunction] or not especially sympathetic [substance abuse] or mitigating [ADHD]. See applicant's writ exhibit F; see also Findings Nos. 6-7, 9, 11-18, 22-23, supra.

*Rebuttal*: That Dr. Day's finding of "probable mild organic brain dysfunction" is "speculation" is unreasonable in light of NO contravening evidence to support it. The entire finding that this evidence was presented elsewhere fails to acknowledge that it was not, nor presented in any

39

way, shape, or form in a professional opinion to explain the history

and psyche of Mr. Masterson.  This entire finding is unreasonable in

light of the facts.

MENTAL HEALTH EXPERT

40.     The Court finds, based on the appellate record and the credible affidavits of the trial counsel, that trial counsel requested and received funds to retain expert Dennis Longmire, Ph.D., to testify concerning future dangerousness; that Longmire concluded that the applicant had a high probability of future danger, compared to the general population of murderers; and, that trial counsel made the reasonable trial decision not to present

Longmire's testimony (I C.R. at 263). See State's Exhibits A & B, affidavits of trial counsel Robert Loper & Layton Duer, respectively.

*Rebuttal*: This finding is immaterial to a determination that a proper inquiry into

the background of Mr. Masterson was done or even considered by

counsel. Dr. Longmire's sole function was "future dangerousness."

That is not the ONLY issue the jurors considered when deciding

whether Mr. Masterson should live or die. In fact, the *other* question

presented was:

> Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Richard Allen Masterson, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed? (C.R. 315).

41.     The Court finds, based on the credible affidavits of the trial counsel, that the applicant did not want trial counsel to present Longmire's testimony, which would have included testimony about the applicant's family, stating that he did not want his family blamed for his actions or put on trial. See State's Exhibits A & B, affidavits of trial counsel Robert Loper & and Layton Duer, respectively.

*Rebuttal*: In fact, this finding is unreasonable because it fails to acknowledge

that an expert who could have explained the unique circumstances of

Mr. Masterson was never provided nor sought.

42.     The Court finds that, based on the credible affidavits of trial counsel, trial counsel

determined that it was in the applicant's best interest to prevent the State's expert from

testifying about future dangerousness, so trial counsel reached an agreement with the State whereby the State agreed not to call the State's expert to testify about future dangerousness. See State's Exhibits A & B, affidavits of trial counsel Robert Loper & Layton Duer, respectively.

*Rebuttal*: In fact, this finding is unreasonable because it fails to acknowledge

that an expert who could have explained the unique circumstances of

Mr. Masterson was never provided nor sought

43.     The Court finds that the February 4, 2004 habeas assertions of Jerome Brown, Ph.D., that the applicant was abused and raised in an abusive home, that the applicant exhibited behavioral problems; that the applicant was teased about being cross-eyed and was nearly blind in one eye; and, that the applicant had no difficulties on death row were essentially presented during the applicant's trial. See applicant's writ exhibit E, see also Finds Nos. 14-18, 20, 22-23, supra.

*Rebuttal*: Again, this finding is unreasonable because a lay witness could not

possibly have presented the scope and parameters of what Mr.

Masterson suffered from. The defense entirely failed to adequately

prepare for the *mitigation* section of the trial. It was not all about

future dangerousness. This finding is unreasonable in light of the

facts.

44.     The Court finds speculative the February 4, 2004 habeas assertion of Jerome Brown, Ph.D., concerning the "possible" presence of "some type of brain anomaly or dysfunction." See applicant's writ exhibit E.

*Rebuttal*: Apparently, the trial court found any indication that Mr. Masterson

suffered from a brain anomaly to be speculative. Without any

rebuttal from the State on this issue, this finding is unreasonable.

45.     The Court finds that trial counsel investigated possible mitigating evidence, consulted an expert on the issue of future dangerousness, reasonably chose not to present evidence that

46

would be more harmful than helpful, competently and vigorously presented guilt-innocence and punishment evidence, cross-examined witnesses, presented a defense theory, and argued against conviction and the death penalty.

*Rebuttal*: The only "evidence" that mitigation was investigated from the trial attorney's affidavits is that they "talked to the defendant's family about potential mitigating evidence ... [and] talked to the Defendant about his background and life in an attempt to find mitigating evidence." (See State's Exhibits A & B, affidavits of trial counsel Robert Loper & Layton Duer, respectively.). Both attorneys offer *exactly* the same nomenclature on their mitigation investigation. They presented no evidence that a mitigation expert was consulted or hired. No experts on mitigation were ever sought. They spoke to the family of the Defendant and Mr. Masterson, which is not the same as speaking to experts who could interpret the facts. This finding is unreasonable in light of the facts.

46.    The Court finds that the applicant's case is factually distinguishable from the decision in *Wiggins v. Smith*, 539 U.S. 510 (2003), where counsel were found ineffective for failing to investigate and present evidence of defendant's social history, an action that was a prevailing norm in that jurisdiction, and failing to pursue defendant's social service records showing horrific and extensive abuse.

*Rebuttal*: This finding is unreasonable in light of the *facts* and the *law* because this case is exceedingly similar to *Wiggins*, as will be explained in the argument and authorities section.

47.    The Court finds that the applicant's case is factually distinguishable from the decision in *Rompilla v. Beard*, 545 U.S. 374 (2005), where counsel were found ineffective for failing

to pursue the "sure bet" investigation of the defendant's prior rape and assault conviction and file that was readily available to counsel who knew it would be presented at trial.

> *Rebuttal*:  This finding is unreasonable in light of the *facts* and the *law*
>
> because this case is akin to *Rompilla*, as will be explained
>
> in the argument and authorities section.

48.    The Court finds that the applicant's case is factually distinguishable from the decision in *Williams v. Taylor*, 529 U.S. 362 (2000), where counsel were found ineffective for failing to investigate and present evidence of the defendant's childhood abuse, borderline mental retardation and good behavior in prison, based on counsel's erroneous belief that state law did not permit the introduction of such records.

> *Rebuttal*: This finding is unreasonable in light of the *facts* and the *law* because
>
> nowhere did trial counsel state they believed the evidence was
>
> inadmissible. The had no evidence even to consider.

49.    The Court finds that the applicant's case is factually distinguishable from the decision in *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), where counsel were found ineffective for failing to inquire whether the defendant had been abused and evidence was later presented that the defendant suffered extensive, prolonged sexual and physical abuse from his father.

> *Rebuttal*: This finding is unreasonable in light of the *facts* and the *law* because
>
> there is no showing that trial counsel had any idea about the severity
>
> of the abuse Mr. Masterson suffered from, nor the incredible effect it
>
> had upon him.

### *Argument and Authorities*

Factors that mitigate an individual defendant's moral culpability "ste[m] from the

diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct.

2978, 2991, 49 L.Ed.2d 944 (1976)(plurality opinion of Stewart, Powell, and Stevens, JJ.).

The Supreme Court further noted that:

This Court has previously recognized that "(f)or the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender." *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55, 58 S.Ct. 59, 61, 82 L.Ed. 43 (1937). Consideration of both the offender and the offense in order to arrive at a just and appropriate sentence has been viewed as a progressive and humanizing development. *See Williams v. New York*, 337 U.S., at 247-249, 69 S.Ct., at 1083-1084; *Furman v. Georgia*, 408 U.S., at 402-403, 92 S.Ct., at 2810-2811 (Burger, C. J., dissenting).

*Woodson*, 428 U.S. at 304, 96 S.Ct. at 2991. Case law is replete with instances where the failure to investigate and present mitigation evidence is absolute reversible error. As the Court of Appeals recounted, in *Kubat v. Thieret*, 867 F.2d 351, 367 (7th Cir. 1989), the failure to call witnesses resulted in effective assistance of counsel. In *Kubat*, the Court held:

At the post-conviction hearing, fifteen character witnesses testified on Kubat's behalf. None of the witnesses were members of Kubat's family; most were neighbors and coworkers; all were well-respected citizens in their community; one was a deputy sheriff; and all stated that they would have testified on Kubat's behalf at the sentencing hearing if they had been asked. Despite the availability of this impressive array of character witnesses, Kubat's counsel contacted only two of the fifteen before trial and called none of the fifteen to testify at the sentencing hearing.

*Kubat*, 867 F.2d at 366-67 "The **sentencing stage of any case**, regardless of the potential punishment, is '**the time at which for many defendants the most important services of the entire proceeding can be performed**.'" *Vela v. Estelle*, 708 F.2d 954, 964 (5th Cir.1983), *cert. denied*, 464 U.S. 1053, 104 S.Ct. 736, 79 L.Ed.2d 195 (1984)(emphasis supplied). Where the potential punishment is life imprisonment, as in the instant matter, the sentencing proceeding takes on added importance. *See id.*

The United States Supreme Court has confirmed that when considering whether defense counsel provided effective assistance of counsel in not presenting available, relevant

evidence in mitigation of punishment, "not all of the additional evidence need be favorable to the petitioner." *Williams v. Taylor*, 529 U.S. 362, 396, 120 S.Ct. 1495, 1513, 146 L. Ed. 2d 389 (2000). In *Austin v. Bell*, 126 F.3d 843, 848-849 (6th Cir. 1997), the Court held

> that the failure of trial counsel "to investigate and present any mitigating evidence during the sentencing phase so undermined the adversarial process that [defendant's] death sentence was not reliable.... [G]iven that several of [defendant's] relatives, friends, death penalty experts, and a minister were available and willing to testify on his behalf, failure to present any mitigating evidence does not reflect a strategic decision, but rather an abdication of advocacy

> Here, the defense offered just one person to speak about Mr. Masterson's childhood. She was a relative - not an expert. She could not tell the jury *why* those experiences made Mr. Masterson the man before the court that day.

In *Wiggins v. Smith*, 123 S.Ct. 2526, 156 L.Ed.2d 471 (2003), the United States Supreme Court reversed a Maryland death sentence on ineffective assistance grounds for failure to adequately investigate and present migrating evidence of the petitioner's background. In *Wiggins*, habeas counsel presented expert testimony by a forensic social worker about severe physical and sexual abuse the petitioner had suffered at the hands of his mother and while under the care of a series of foster parents. Trial counsel testified at the habeas hearing that he did not remember retaining a forensic social worker to prepare a social history before sentencing, even though state funds were available for that purpose.

The Supreme Court concluded that trial counsel did not conduct a reasonable investigation. The court noted that counsel "put on a halfhearted mitigation case…" 123 S.Ct, at 2530. The court held that counsel's failures prejudiced Wiggins' defense. The court

explained that assessing prejudice by reweighing the aggravating evidence against the totality of the mitigating evidence that counsel failed to discover and present was powerful, stating

> Wiggins experienced severe privation and abuse while in the custody of his alcoholic, absentee mother and physical torment, sexual molestation, and repeated rape while in foster care. His time spent homeless and his diminished mental capacities further augment his mitigation case. He thus has the kind of troubled history relevant to assessing a defendant's moral culpability [citation omitted]. Given the nature and extent of the abuse, there is a reasonable probability that a competent attorney, aware of the history, would have introduced it at sentencing, and that a jury confronted with such migrating evidence would have returned with a different sentence. The only significant mitigating factor the jury heard was that Wiggins had no prior convictions. Had it been able to place his excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance.

*Id*. at 2531.

In *Soffar v. Dretke*, 368 F.3d 441, 476-77 (2004), the Fifth Circuit explained the reach of *Wiggins*:

> In *Wiggins,* the Supreme Court set out to determine whether the attorneys in the underlying capital murder trial exercised "reasonable professional judgmen[t]" in their investigation and presentation of mitigating evidence during the penalty phase of the trial. 123 S.Ct. at 2535-42 (*quoting Strickland*, 466 U.S. at 691, 104 S.Ct. 2052 (alteration in original)). **In doing so, the Court focused not on whether defense counsel should have presented a mitigation case during sentencing, but rather on whether "the investigation supporting counsel's decision not to introduce mitigating evidence was itself reasonable**." *Id*. The Court thereafter engaged in an **objective review** of defense counsel's performance, measuring it for "reasonableness under prevailing professional norms." *Id*. (citation and quotation omitted). The Court's review documented counsel's efforts in investigating mitigating evidence, which included: (1) arranging for a psychological review of the defendant; (2) reviewing the pre-sentence

investigation report; and (3) reviewing the state records reflecting the defendant's various placements within the state's foster care system. *Id*. at 2536-37. The Court concluded that defense counsel's "decision not to expand their investigation beyond the [pre-sentence and social services] records fell short of the professional standards" that prevailed at the time.... "[C]ounsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id*. (emphasis supplied)

It is of no moment that counsel may have spoken to family members and Mr. Masterson himself. The fact that counsel was made aware of the psychological issues of Mr. Masterson warranted further investigation. That is assuming that counsel even *knew* about the TYC records. Trial counsel were not doctors and could not have understood exactly how those records explained who Mr. Masterson was and why he did what he did.

In order to be constitutionally effective, defense counsel has a general "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2052. In *Seidel v. Merkle*, 146 F.3d 750 (9th Cir. 1998), the Court considered whether the petitioner was denied effective assistance of counsel by his attorney's failure to conduct any investigation into the petitioner's psychiatric background and subsequent failure to present any evidence to the jury regarding his mental health. *Seidel*, 146 F.3d at 752. In finding deficient performance, the Court held:

In general, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052. In the instant case, there were abundant signs in the record that Seidel suffered from mental illness. **Nevertheless, trial counsel failed to conduct any investigation at all into**

**his client's psychiatric history and therefore neglected to pursue a potentially successful defense**. *See Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.1994) ("[C]ounsel must, at a minimum, conduct a reasonable investigation enabling him to make informed decisions about how best to represent his client."); *Evans v. Lewis*, 855 F.2d 631, 637 (9th Cir.1988) ("[C]ounsel's failure to pursue the possibility of establishing [his client's] mental instability constituted deficient performance.").

It was clear from the evidence available to counsel at the time of trial that Seidel has an extensive history of mental problems. The pre-trial record included the following factual items: (1) Seidel had been treated with medication by a prison psychiatrist while awaiting trial; (2) Seidel's jail medical record indicated that he had been treated at a V.A. hospital for a mental disorder; and (3) Seidel's Own Recognizance Report, prepared for his bail hearing, documented prior hospitalization at a V.A. hospital for symptoms related to his mental condition.

In addition to the evidence in the pre-trial record that should have alerted trial counsel to the possibility of using Seidel's mental illness as a defense, there is also evidence in the record that counsel actually was aware of the mental problems that his client suffered

*Seidel*, 146 F.3d at 755-56. (Emphasis added).

The Court determined that Seidel's trial counsel had

...conducted no investigation to ascertain the extent or possible ramifications of his client's psychiatric impairment. Counsel did not obtain Seidel's military, prison, or medical records, which obviously would have provided a full account of his mental health history. He *failed to interview any witnesses regarding Seidel's mental state. Counsel never requested that any mental or psychiatric evaluations be performed on his client to assess his condition*. In sum, counsel failed to conduct any research at all into the possibility of presenting a defense related to his client's obviously impaired mental state. Counsel's disregard for conspicuous pieces of evidence that pointed to a potentially fruitful trial strategy cannot be described as anything short of defective representation.

*Seidel*, 146 F.3d at 756. (Emphasis added).

*Lambright v. Stewart*, 241 F.3d 1201 (9th Cir. 2001), is yet another case where the

Court of Appeals considered whether defense counsel's failure to investigate or present any evidence of the defendant's mental disability or social history resulted in deficient representation. *Lambright*, 241 F.3d at 1204. The Court held:

> Lambright argues that an extensive series of "red flags" should have motivated counsel to investigate his psychiatric condition and to present mitigating psychiatric testimony at sentencing. Lambright's presentence Psychological Evaluation told of his service in Vietnam, during which he witnessed the violent death of friends, and the mental breakdown that he suffered after returning to this country. It described some of the hallucinations he had experienced and his subsequent need for hospitalization in a mental facility. The report also mentioned two of Lambright's attempts to commit suicide. In an affidavit before the district court, moreover, Lambright wrote that he had "discussed his past mental problems and drug use with his trial counsel." There can be no doubt that Lambright has raised a colorable claim of deficient performance. *Counsel's alleged failure to obtain a psychiatric evaluation of Lambright, despite knowing of his wartime experience and extensive drug abuse, is the type of performance courts have labeled deficient under Strickland. See Williams*, 120 S.Ct. at 1514 (holding that the failure to "conduct an investigation that would have uncovered extensive records graphically describing [the petitioner's] nightmarish childhood" constituted deficient performance); *Turner v. Duncan*, 158 F.3d 449, 456 (9th Cir.1998) ("[Counsel's] failure to arrange a psychiatric examination or utilize available psychiatric information also falls below acceptable performance standards.")...

*Lambright*, 241 F.3d at 1206-07. (Emphasis added).

While the Courts will not use hindsight in gauging counsel's effectiveness, the decisions made by counsel will be evaluated based upon the investigation utilized to determine the best possible strategy. "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness." *Crane v. Johnson*,

178 F.3d 309, 314 (5th Cir. 1999)(*citing Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983)(on rehearing)).

In *Silva v. Woodford*, 279 F.3d 825 (9th Cir. 2002), the Court partially granted habeas relief when a defense attorney failed to investigate his client's mental health background. In *Silva*, the defense attorney had even contacted a psychiatrist about possible defenses. *Silva*, 279 F.3d at 837. The defense attorney affirmed that he was following the client's direction when he failed to investigate. *Silva*, 279 F.3d at 838. The Court of Appeals determined this performance deficient even given "an additional measure of deference" due to the client's wishes. *Id*. The Court reiterated the ABA standard that:

> Duty to investigate
> It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty. ABA Standards for Criminal Justice 4-4.1 (2d ed.1980)

*Silva*, 279 F.3d 825 at 840, n. 11.

In the present case, if counsel was aware of the TYC records and chose to ignore them without fully understanding them, they were ineffective. If counsel was unaware of the records, which apparently were easily and readily available, they failed to conduct a proper investigation and were ineffective.

***Conclusions of the Trial Court Rebutted <u>Together at End</u>***

TYC RECORDS

In order to best illustrate how much the trial record and the trial court's findings diverge, the Petitioner offers the following direct excerpts from the trial court's findings with a rebuttal offered immediately afterwards. The findings are numbered in the order they appear in the state trial court's findings for convenience and ease of reference.

5.     The applicant fails to show ineffective assistance of trial counsel for not presenting the applicant's TYC records, a reasonable, strategic decision made by trial counsel based on the applicant's TYC records containing information that would be more harmful than beneficial to the applicant. *See Buckley v. Collins*, 904 F.2d 263, 265 (5th Cir. 1990)(holding choice of witnesses matter of trial strategy and counsel not ineffective for choosing not to call witness whose testimony would have harmed defendant regardless of beneficial effect of testimony).

6.     Trial counsel cannot be considered ineffective for not presenting the applicant's thirteen-year old TYC records whose slight mitigating value, if any, would have been lost amidst the harmful information contained in the records about the applicant's extensive drug use, habit of fighting, expulsion from school, his shooting another individual during a drug deal, and his admission that he robbed wealthy homosexuals; the applicant fails to show that the results of the proceeding would have been different if such records had been presented. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

7.     The applicant fails to show ineffective assistance of trial counsel based on counsel making the reasonable, strategic decision to present essentially the same mitigating evidence included among the harmful information in the applicant's TYC records through the testimony of the applicant's sister, Ramona Weiss. *Id.; Kunkle*, 852 S.W.2d at 505)(noting that counsel's strategic choices made after thorough investigation of relevant law and facts are "virtually unchallengeable").

8.     The applicant fails to show that trial counsel are ineffective for their reasonable decision not to present punishment testimony of a mental health expert after counsel employed Dennis Longmire, Ph.D., who informed trial counsel that the applicant had a high probability of future dangerousness, compared to the general population of murderers. *See Buckley*, 904 F.2d at 265 (holding choice of witnesses matter of trial strategy and counsel not ineffective choosing not to call witness whose testimony would have harmed defendant regardless of beneficial effect of testimony); *Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex. Crim. App. 1986)(holding that claim of ineffective assistance of counsel cannot be sustained absent a showing that witnesses were available and that their testimony would have benefitted defendant).

9.      The applicant fails to show ineffective assistance of counsel for not presenting Dr. Longmire's testimony, which would have included testimony about the applicant's family, based on the applicant informing counsel that he did not want his family blamed for his actions or put on trial. *See Sonnier v. State*, 913 S.W.2d 511, 522 (Tex. Crim. App. 1995)(holding counsel not ineffective for following defendant's expressed wishes not to present punishment evidence in capital case); *see also McFarland v. State*, 845 S.W.2d 824,848 (Tex. Crim. App. 1992)(*quoting United States v. Masat*, 896 F.2d 88, 92 (5th Cir. 1990))(holding counsel not ineffective for following defendant's choice not to present mitigating evidence and stating that "we are asked to permit a defendant to avoid conviction on the ground that his lawyer did exactly what he asked him to do. That argument answers itself.").

10.     Trial counsel are not ineffective for making the trial decision to reach an agreement with the State so that the State would not call the State's expert to testify about future dangerousness, after trial counsel reasonably determined such an agreement was in the best interests of the applicant. *Kunkle*, 852 S.W.2d at 505)(noting that counsel's strategic choices made after thorough investigation of relevant law and facts are "virtually unchallengeable").

11.     Trial counsel are not ineffective for not presenting evidence of alleged brain damage, based on the speculative, unsupported nature of such habeas allegation and in light of the applicant's demonstrated ability to plan the killing, elude capture, flee to another state, commit another offense similar in nature to the instant offense, and again elude capture before his eventual arrest. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

12.     The applicant fails to show that counsel are ineffective for allegedly failing to investigate and present mitigating evidence; the applicant fails to show that trial counsels' investigation and presentation of mitigating evidence in his case is factually similar to the situations in *Wiggins v. Smith*, 539 U.S. 510 (2003), *Rompilla v. Beard*, 545 U.S. 374 (2005), *Williams v. Taylor*, 529 U.S. 362 (2000), or *Ex parte Gonzales*, 204 S.W.3d 391 (Tex. Crim. App. 2006), where counsel were found ineffective. *See and cf. Tucker v. Johnson*, 242 F3d 617, 622-24 (5th Cir. 2001), *cert. denied*, 533 U.S. 972, 122 S. Ct. 18 (rejecting claim of ineffective assistance of counsel where defendant argued that counsel should have presented additional evidence of abuse; recognizing that defendant essentially arguing that counsel should have presented stronger mitigating case).

*Rebuttal:*  These are rebutted together. First, Mr. Masterson's argument and

authority section clearly details why there is reversible error in the

instant case. The case law is replete with holdings that counsel has a

duty to investigate. There is no showing that was done here. The

Supreme Court has established the standard, which clearly was not

met here:

> The notion that defense counsel must obtain information that the State has and will use against the defendant is not simply a matter of common sense. As the District Court points out, the American Bar Association Standards for Criminal Justice in circulation at the time of Rompilla's trial describes the obligation in terms no one could misunderstand in the circumstances of a case like this one:
>
>> "**It is the duty of the lawyer to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction**. The investigation should always include efforts to secure information in the possession of the prosecution and law enforcement authorities. The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt or the accused's stated desire to plead guilty." 1 ABA Standards for Criminal Justice 4-4.1 (2d ed. 1982 Supp.).
>
>> "[W]e long have referred [to these ABA Standards] as 'guides to determining what is reasonable.'" *Wiggins v. Smith*, 539 U.S., at 524, 123 S.Ct. 2527 (*quoting Strickland v. Washington*, 466 U.S., at 688, 104 S.Ct. 2052), and the Commonwealth has come up with no reason to think the quoted standard impertinent here. (Footnotes omitted)(Emphasis Supplied).

*Rompilla v. Beard*, 545 U.S. 374, 387, 125 S.Ct. 2456, 2465 - 2466 (2005). There was no evidence of mitigation investigation. No mitigation expert was hired. No expert was hired to explain the TYC records even to defense counsel. In sum, Mr. Masterson was failed at the most important portion of his trial.

The trial court's findings are unreasonable because Mr. Masterson's attorneys did not perform the investigation that would have allowed them to make a reasonable decision as to which mitigation evidence to use.

## GROUND FOR RELIEF THREE

**MR. MASTERSON WAS DENIED HIS RIGHT TO TRIAL BY JURY AND TO DUE PROCESS OF LAW GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION WHEN A JUROR SLEPT THROUGH CRITICAL TESTIMONY GIVEN BY THE MEDICAL EXAMINER.**

In order to best illustrate how much the trial record and the trial court's findings diverge, the Petitioner offers the following direct excerpts from the trial court's findings with a rebuttal offered immediately afterwards. The findings are numbered in the order they appear in the state trial court's findings for convenience and ease of reference.

After Dr. Paul Schrode, the Assistant Medical Examiner, Christy Kim, the HPD serologist, and Jennifer Lacoss, the HPD DNA analyst, had finished testifying, trial counsel brought to the attention of the court the next morning that Cynthia Franco, one of the jurors, appeared to have been asleep during most of the testimony. Counsel also submitted affidavits (Appendix "A", "B" herein and included in the state writ) in which both trial attorneys stated the same concerning their observations of Juror Franco.

The following was placed on the record:

Mr. Loper:   Yes, Sir, Judge, at this time before we have begun for the day the Defense would move for a mistrial. Yesterday during the first day of testimony in the case, April 22, 2002, both defense lawyers – I think it would have been apparent to anybody else in the courtroom – that one of the jurors, Ms. Cynthia Franco appeared to have been asleep throughout most of the testimony.

The Court:   In the morning or afternoon or both.

Mr. Loper:   This would have been, my recollection what I observed was in the afternoon, after lunch. And was not paying full

attention to the testimony, and for those reasons we think that she's going to be unable to fairly deliberate upon the facts at the point in time that the jury begins its deliberations in this case. And to support that, I would like to call co-counsel to testify into the record what his observations were.(RR 19 - 5)

Mr. Layton Duer, co-counsel testified on the record that:

After we came back from lunch, I believe she was sitting in the middle seat on the front row, it appeared to me that she was asleep during part of the testimony in the afternoon. Her eyes were closed, her chin was down on her chest, and it appeared to me that she was asleep, and I believe when I was looking at her I believe it was during the testimony of the medical examiner.

(R.R, 19 - 6-7). The trial court denied the motion for a mistrial and denied the motion to

have an alternate take the sleepy juror's place. (RR 19 - 7). Immediately after this colloquy,

the trial court brought the jury back in and asked them whether they watched "The X-Files."

(Vol. 19 - 8). He stated he wanted to be sure the jurors were watching a show he cared

about because it was going off the air. (RR 19 - 9)

*Trial Court Findings Rebutted*

First Ground for Relief: alleged juror misconduct

24.     The Court finds that Paul Schrode, Harris County Assistant Medical Examiner, testified during the applicant's trial on April 22, 2002, followed by State's witness Christ Kim and Jennifer Lacoss, and the trial counsel made a motion for mistrial on April 23, 2003, based on juror Cynthia Franco allegedly sleeping the previous day (XVII RR at 5-8).

*Rebuttal:*     Mr. Masterson agrees that this was the order of the proceedings.

25.     The Court finds that, during  a hearing outside the presence of the jury, the trial court denied the motion for mistrial after counsel Duer stated that it "appeared" to him that Franco slept during part of the afternoon testimony and that Duer "believe[d]" it was during the

testimony of the medical examiner (XIX RR at 6-7).

*Rebuttal:* Mr. Masterson has discussed above that Mr. Duer actually stated much more than this truncated finding by the trial court. Mr. Duer stated that not only were her eyes closed, but she also had her chin on her chest. That is much more indicative of a sleeping person than merely random eye closings. Additionally, Mr. Masterson presented affidavits in his state writ which again asserted this as not some eye closing, but she did appear to be sleeping. Mr. Loper stated the sleeping was brought to his attention by Mr. Duer. (Appendix B).

26.     The Court finds that a juror "appearing" to sleep, i.e., having closed eyes, does not establish that the juror was actually sleeping, and the Court further finds there is no evidence that juror Franco slept during Schrode's testimony on April 22, 2002.

*Rebuttal*: This finding is unreasonable in light of the facts because the indicators of sleeping were clearly present. They were brought to the attention of the trial court. The court, instead of even making a cursory inquiry or having a reasonable discussion over the severity of the problem, chose to bring the jurors in and harangue them over why they had not watched "The X-Files."

27.     The Court finds that Schrode's testimony concerned the complainant's physical injuries and cause of death, not the applicant's intent to commit the offense (XVII RR at 192-241).

*Rebuttal:* The medical examiner testified as to the mechanism of death

and Mr. Masterson concedes that the doctor would not have testified as to intent or the circumstances of the offense or as to any other area *except* the most important testimony regarding the death of the complainant. Additionally, two scientists testified after the medical examiner and there is a distinct possibility that the juror was sleeping through that testimony, as well.

28.   The Court finds that the applicant's intent was shown through his admission that he "put down" the complainant and had the complainant in a headlock until he went limp, his statement to the police that he intended to kill the complainant to steal his car, his threat to Deputy Willie Drew that he would choke Drew like he did his other victims, and his similar choking assault on Steven Drew (XVIII RR at 174)(XIX RR at 77, 201-11).

*Rebuttal:* The "intent" of the Petitioner had nothing to do with whether a juror missed substantial and key evidence. If the medical examiner and two crime lab witnesses were not necessary for the State to prove its case, then there was no reason for the other eleven jurors to hear the same. This finding is unreasonable in light of the fact that a juror missed possibly three of the witnesses the State relied upon to convict Mr. Masterson.

29.   The Court finds that the applicant's jury was well aware of evidence concerning intent and evidence of the applicant's self-serving "explanation" of the choking, regardless of the lapse of attention, if any, during Schrode's testimony.

*Rebuttal*: Here, it appears the State does concede that there is a distinct possibility that a juror did not hear (or was sleeping) through portions of the trial. The finding, however, that this sleeping was immaterial defies credulity and is unreasonable in light of the law. Interestingly, the trial court does not make a finding that he did NOT observe the juror sleeping.

**Argument and Authorities**

The United States Supreme Court has recognized that a defendant has a right to a "tribunal both impartial and mentally competent to afford a hearing". *Tanner v. United States*, 483 U.S. 107, 107 S.Ct. 2751 97 L.Ed.2d 90 (1987); *Jordan v. Massachusetts*, 225 U.S. 167, 32 S.Ct. 651,652, 56 L.Ed1038 (1912). The testimony and cross-examination of Dr. Schrode was a critical part of the case. It dealt with the cause of death of Honeycutt. The testimony was important because it dealt with Mr. Masterson's intent in regard to Honeycutt's death.

The Supreme Court explained in *Tanner* that the court noted that no juror had been observed sleeping:

> The District Court Judge appropriately considered the fact that he had "an unobstructed view" of the jury, and did not see any juror sleeping. App. 147-149, 167-168; See Government of Virgin Islands v. Nicholas, 759 F.2d, at 1077 (**"[I]t was appropriate for the trial judge to draw upon his personal knowledge and recollection in considering the factual allegations** ... that related to events that occurred in his presence"). The juror affidavit submitted in support of the second new trial motion was obtained in clear violation of the District Court's order and the court's local rule against juror interviews, MD Fla.Rule 2.04(c); on this basis alone the District Court

would have been acting within its discretion in disregarding the affidavit.

> In any case, although the affidavit of juror Hardy describes more dramatic instances of misconduct, Hardy's allegations of incompetence are meager. Hardy stated that the alcohol consumption he engaged in with three other jurors did not leave any of them intoxicated. App. to Pet. for Cert. 47 ("I told [the prosecutor] that we would just go out and get us a pitcher of beer and drink it, but as far as us being drunk, no we wasn't"). The only allegations concerning the jurors' ability to properly consider the evidence were Hardy's observations that some jurors were "falling asleep all the time during the trial," and that his own reasoning ability was affected on one day of the trial. App. to Pet. for Cert. 46, 55 (Emphasis supplied).

*Tanner*, 483 U.S. at 125-126, 107 S.Ct. 2739 at 2750. The prosecution never offered its own testimony under oath that no juror had been observed sleeping. What is not said on this issue, speaks volumes.

### Trial Court's Conclusions Rebutted

In order to best illustrate how much the trial record and the trial court's findings diverge, the Petitioner offers the following direct excerpts from the trial court's findings with a rebuttal offered immediately afterwards. The findings are numbered in the order they appear in the state trial court's findings for convenience and ease of reference.

First Ground for Relief: alleged juror misconduct

1.     The applicant is procedurally barred from advancing his habeas claim of alleged juror misconduct based on his untimely motion for mistrial, made a day after it "appeared" to trial counsel that juror Franco allegedly slept during what counsel "believed" was Schrode's testimony (VIII RR at 192-242-65)(XIX RR at 5-8). *Tex.R.App.P. 33.1(a); Hodge v. State*, 631 S.W. 2d 754, 757 (Tex. Crim. App. 1978); *see also Hughes v. Johnson*, 191 F.3d 607, 614 (5th Cir. 1999)(holding that defendant's failure to comply with Texas contemporaneous objection rule constituted adequate and independent state-law procedural ground sufficient to bar federal habeas).

*Rebuttal:* This conclusion is in conflict with the contemporaneous objection rule to

the point that this was not a ruling by the trial court requiring an

immediate decision. This was an influence on the jury that was made known to the court *in time* for the court to at least have conducted an inquiry or appointed the alternate juror. Instead, the Court chose to speak to the jurors about The X- Files. The objection was timely because the error could have been corrected at the time of the objection to provide Mr. Masterson with a fair trial.

2.      In alternative, the applicant fails to show that the trial court abused its discretion in denying the applicant's motion for mistrial after the applicant failed to present convincing evidence that juror Franco slept during Schrode's testimony on April 22, 2002. *See Salazar v. State*, 38 S.W.3d 141,148(Tex.Crim.App.2001)(noting that the trial court is the finder of fact for resolution of conflicting evidence of jury misconduct); *Archie v. State*, 221 S.W.3d 695 (Tex. Crim. App. 2007)(noting that abuse of discretion proper standard for determining if trial court erred in denying motion for mistrial); *see also In re commitment of Morales*, 98 S.W.3d 288 (Tex. App.-Beaumont 2003, pet denied)(holding that it was possible that juror, who was alleged to have been sleeping during testimony, was just resting her eyes and witness could not know if juror was actually sleeping).

*Rebuttal*: This conclusion is unreasonable in light of Supreme Court precedent.

       *See Tanner*, *supra*.

3.      The applicant fails to show juror misconduct and fails to show that juror Franco did not hear evidence concerning the issue of intent, evidence that came from witnesses other than Schrode. The applicant fails to show that his rights, under *U.S. CONST. amends. VI* and

*XIV*, were violated.

*Rebuttal*: This conclusion is unreasonable in light of Supreme Court precedent.

　　*SeTanner*, *supra*.

The trial court could have removed any chance of this error's infecting Mr. Masterson's trial by conducting a hearing and placing the alternate juror on the jury. Instead the court chose to violate Mr. Masterson's rights to due process of law and to a fair trial.

**GROUND FOR RELIEF FOUR**

**MR. MASTERSON WAS DENIED DUE PROCESS WHEN THE TRIAL COURT REFUSED TO CHARGE THE JURY ON THE LESSER INCLUDED OFFENSE OF NEGLIGENT HOMICIDE, WHICH WAS RAISED BY THE EVIDENCE, INCLUDING MR. MASTERSON'S TESTIMONY.**

This claim was presented in Mr. Masterson's direct appeal and was rejected by the Court of Criminal Appeals. *Masterson v. State*, 155 S.W.3d 167, 171-72 (Tex.Crim.App. 2005). That rejection was an unreasonable application of established federal law.

## SUMMARY OF THE ARGUMENT

Mr. Masterson's confession admitted to an intentional murder. However, he repudiated much of that confession in his direct testimony, explaining that he hadn't wanted to tell the police officer questioning him that he had intentionally gone home with a man to have sex with him. In fact, he testified, that had been the case. He had applied a sleeper hold to the victim because the victim asked him to do so. Mr. Masterson didn't like to perform such a hold; he knew it was dangerous. Nevertheless, he did it on this occasion. Something went wrong, and Shane Honeycutt died, but that hadn't been Mr. Masterson's intention.

Other evidence showed that the complainant's death had indeed been during the course of a sex act. There was evidence to show that Mr. Masterson was guilty only of criminally negligent homicide. He hadn't intended to cause death but had negligently done so through his conduct, which he should have known carried a risk of causing death.

The trial court's denial of this requested charge also denied Mr. Masterson due process of law. The Court of Criminal Appeals compounded that denial by not even addressing the merits of his claim.

## ARGUMENT

The issue is whether the evidence raised the possibility that if guilty Mr. Masterson was guilty only of the lesser-included offense of criminally negligent homicide. There are two parts to this issue: is criminally negligent homicide a lesser-included offense of capital murder, and was there evidence, no matter how credible or otherwise, that raised the possibility that Richard Masterson was guilty only of that lesser offense?

The first part is easily answered in Mr. Masterson's favor. Criminally negligent homicide has long been acknowledged to be a lesser-included offense of any form of homicide, including capital murder. They are found in the same section of the Penal Code. An offense is a lesser-included offense of another if they differ only in the culpable mental state alleged or if the greater contains an additional element. Article 37.09, Texas Code of Criminal Procedure. In this case criminally negligent homicide has a lesser culpable mental state (negligently versus intentionally), and lacks the element of causing the death during the course of another felony (in this case, robbery). *See, e.g., Lugo v. State*, 667 S.W.2d 144 (Tex.Crim.App. 1984). Neither the State nor the trial court nor the Court of Criminal Appeals has disputed this aspect of Mr. Masterson's claim.

So the issue is primarily an evidentiary one: did the evidence raise the possibility that

Richard Masterson committed criminally negligent homicide?  If it did, then Mr. Masterson was entitled to the requested charge, even if the evidence was weak or contradicted. Whether the evidence is credible is not a factor. *Dowthitt v. Johnson*, 230 F.3d 733, 757 (5th Cir. 2000), *cert. denied* 230 F.3d 733.  That is for the jury to decide, not the trial judge.

The state trial court may not refuse a lesser-included offense instruction if the jury could rationally acquit on the capital crime and convict for a non-capital crime. *Dowthitt, supra*, at n. 37. The defendant is entitled, upon request, to an instruction on the lesser-included offense if it is included within the greater offense and there is some evidence that, if guilty, the defendant is guilty only of the lesser offense. *Nobles v. Johnson*, 127 F.3d 409, 418-19 (5th Cir. 1997), *cert. denied* 118 S.Ct. 1845.

*Preservation of the Error*

Mr. Masterson's attorneys made a timely request for the lesser-included offense instruction. (RR20 4). The trial court refused the request, while submitting several other lesser-included offenses. (CR2 293-96). The error was therefore properly preserved for review. Art. 36.15, V.A.C.C.P. The Court of Criminal Appeals acknowledged that Mr. Masterson was denied the requested instruction. 155 S.W.3d at 172.

The error was properly preserved for review.

*Evidence That Raised the Possibility of Criminally Negligent Homicide*

Larry Brown testified that Shane, the victim, would undress as soon as he came home, especially if he was going to engage in a sexual liaison. (RR18 61). The victim's

body, when found, was nude. (RR18 61, 62).

Morgan Porter saw Mr. Masterson the next day, when Mr. Masterson said he had "really put somebody to sleep." (RR18 113). But Mr. Masterson had never told Porter he knew how to kill someone. (RR18 124). Significantly to this point, Mr. Masterson said, "I fucked up." (RR18 125-26).

Sergeant Robert Parish, HPD, testified that he was familiar with the sleeper hold, and demonstrated it on a prosecutor. (RR18 148). It was used to put a victim to sleep from loss of blood. But Sgt. Parish said he had not learned the hold as part of his police training, because, "It's extremely dangerous." (RR18 148-49).

Dr. Paul Shrode had heard of the use of the sleeper hold in sexual activity, "to heighten the enjoyment of the climax." (RR18 231). Dr. Shrode also testified that because the complainant had a ninety percent blockage of one artery to the heart, this "would have caused him to die earlier during a strangulation, potentially." (RR18 207).

The two DNA analysts showed that the complainant had traces of his own semen on his body, including his thigh. (RR18 246, 261).

The primary testimony raising the possibility of criminally negligent homicide was Richard Masterson's own testimony. When the complainant invited Mr. Masterson home with him, Mr. Masterson assumed it was to have sex. (RR19 120). The complainant asked, "What is this going to cost me?" because the place where they had met was "a hustler bar." (RR19 122). At that time, Mr. Masterson had no intention of taking the victim's car. (RR19

68

120).

After the complainant emerged from his bathroom naked, Mr. Masterson undressed as well, and they began having sex. (RR19 123-24).[3] Then the complainant asked him "if I ever choked anybody out before." (RR19 127). Mr. Masterson knew Shane meant asphyxiation for sex. (RR19 126-27). Mr. Masterson told him no. When asked why, he said, "Because, that just scares me. That's why I'm here." (RR19 127). Mr. Masterson had used a choke hold before, but "not in that way."

While he put his arm around Shane's neck, in a sleeper hold, the sexual activity continued. (RR19 128). Then Shane began grunting or gurgling, and a few minutes later was dead. (RR19 129-30). Again, Mr. Masterson denied intending to kill the deceased. (RR19 139). He confessed differently to the police officer because he hated to admit that "I was having sex with a man and he died." (RR19 139-40).

*Law and Application*

Texas law holds that a jury must be instructed on a lesser included offense if there is any evidence that the defendant committed only the lesser offense. *Rousseau v. State*, 855 S.W.2d 666, 672 (Tex.Crim.App. 1993). As set out above, the credibility of the evidence is not an issue.

A person commits criminally negligent homicide if he causes the death of an individual by criminal negligence. Texas Penal Code Sec. 19.05(a). That mental state is

---

[3]This claim was corroborated by the victim's semen on his penile swab and his own thigh, though evidence does not need to be corroborated simply to raise an evidentiary issue.

defined as follows:

> A person acts with criminal negligence, or is criminally negligent, with respect to circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's viewpoint.

Texas Penal Code §6.03(d).

The evidence raised the possibility that Mr. Masterson committed this offense and only this offense. In his testimony he denied intending to steal the complainant's car when he went home with him. Other evidence also showed the purpose of the encounter was sex, not robbery. If the jury believed this evidence, they would have believed he was not guilty of capital murder. The evidence showed that the sleeper hold that killed the victim was very dangerous. A police officer testified as such. Testimony from both Mr. Masterson and Morgan Potter showed that Mr. Masterson was familiar with this hold. It also showed that Mr. Masterson himself should have been "aware of a substantial and unjustifiable risk that... the result would occur." The defendant testified that the sleeper hold scared him. In other words, he should have been aware that his conduct could kill someone, but obviously was not – or at least was insufficiently aware of the risk to refuse to take the unjustifiable risk. Mr. Masterson did not testify he knew the sleeper hold was capable of causing death, but if he was as familiar with it as he had said he was, he should have known. That is the *gravaman* of criminally negligent homicide.

70

Mr. Masterson acknowledged that he had caused the complainant's death, but denied doing so intentionally.

The evidence raised the possibility that the crime of which Mr. Masterson was guilty was not capital murder but criminally negligent homicide.

*The Court of Criminal Appeals' Avoidance of the Issue*

Though, as pointed out above, Mr. Masterson raised this issue in his direct appeal, the Court of Criminal Appeals did not address the claim completely. Instead the court, in an opinion by Presiding Judge Sharon Keller, said, "Assuming, without deciding, that appellant was entitled to the requested instruction, we find any error to be harmless." 155 S.W.3d at 171. Relying on its own opinion in *Saunders v. State*, 913 S.W.2d 564, 572 (Tex.Crim.App. 1995), the court ruled that the fact that the trial court gave an instruction on a different lesser-included offense "may, in appropriate circumstances, render a failure to submit the requested lesser offense harmless." *Id.* The court reasoned that the harm from a trial court's refusal to instruct the jury on a lesser included offense may put the jury in the dilemma of believing the defendant was guilty of something, and so convicting him of the greater offense even if they didn't believe the evidence proved it. But the jury is not in that dilemma if they have the option of convicting the defendant of something other than the highest degree of offense. Since, in Mr. Masterson's case, the trial court instructed the jury on the lesser-included offense of manslaughter, among others, yet the jury still chose to convict him of capital murder, the jury must have believed him guilty of capital murder and nothing else. *Id.*

So the Court of Criminal Appeals' logic is that if the trial judge gives a jury any other option than convicting the defendant of capital murder or acquitting him, the defendant hasn't been harmed by the denial of the specific lesser-included offense instruction he requested.

*How This Holding Violates Established Federal Law*

The Supreme Court has also addressed the possibility of a jury's being unwilling to let someone they believe guilty of something go entirely free if they have no option between the highest offense and a not guilty verdict:

> Moreover, it is no answer to petitioner's demand for a jury instruction on a lesser offense to argue that a defendant may be better off without such an instruction. True, if the prosecution has not established beyond a reasonable doubt every element of the offense charged, and if no lesser offense instruction is offered, the jury must, as a theoretical matter, return a verdict of acquittal. But a defendant is entitled to a lesser offense instruction – in this context or any other – precisely because he should not be exposed to the substantial risk that the jury's practice will diverge from theory. When one of the elements of the offense charged remains in doubt, but the defendant is plainly guilty of *some* offense, the jury is likely to resolve its doubts in favor of conviction.

*Beck v. Alabama*, 447 U.S. 625, 635, 100 S.Ct. 2382, 2388 (1980)(citation omitted).

But the Court of Criminal Appeals' ruling that as long as <u>any</u> lesser included offense instruction was given to the jury, the jury must have thought Mr. Masterson guilty of the highest offense, does not address the long line of cases, both Texas and federal, saying that if the possibility of an offense – a particular lesser offense – is raised by the evidence, it must be submitted to the jury. The Court of Criminal Appeals' ruling assumes that a jury will not quite follow its instructions. Even if this jury believed that Mr. Masterson hadn't committed

72

the murder intentionally but should have been aware of the risk of his conduct – that he had committed criminally negligent homicide, in other words – they would have settled for some other lesser included offense if they couldn't find the one they believed described in the jury instruction. This logic supposes that a jury will not follow its instructions, when many cases have instructed us that we should presume they do.

The risk in this case was that the jury, not finding the offense they believed had happened described in their instructions, would convict Mr. Masterson of the highest level of offense, because clearly he was guilty of causing the victim's death.

The law remains that if a lesser-included offense is raised by the evidence, the trial judge has a duty to instruct the jury on that offense. This one was, and the trial court refused to do that duty. This judgment and sentenced should be reversed as a result.

## GROUND FOR RELIEF FIVE

**MR. MASTERSON'S FIFTH AMENDMENT RIGHT WAS VIOLATED BY THE ADMISSION OF HIS CONFESSION WHICH WAS GIVEN IN EXCHANGE FOR A PROMISE BY POLICE.**

## GROUND FOR RELIEF SIX

**MR. MASTERSON'S FIFTH AND SIXTH AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF HIS CONFESSION, WHICH WAS GIVEN AFTER POLICE CONTINUED QUESTIONING HIM AFTER HE HAD INVOKED HIS RIGHT TO COUNSEL.**

These two grounds will be argued together because they rely on much of the same evidence, developed in a pretrial hearing on Mr. Masterson's motion to suppress his confession.

### SUMMARY OF THE ARGUMENT

After the killing in this case, Mr. Masterson took the Complainant's car and drove to Georgia. He left the car in Georgia and went to Florida, where he was arrested and held until a Houston police officer came to interview him.

In the meantime, Mr. Masterson's nephew in Georgia was arrested while driving the complainant's stolen car. Police also found illegal drugs in the car.

Before the arrival of the Houston police officer, Mr. Masterson was questioned by a Florida magistrate in the presence of police officers. He told them that he wanted an

attorney.

Before the Houston police officer began his interview, there is a dispute in the evidence as to whether Mr. Masterson invoked his right to counsel before that officer. Mr. Masterson said he did; the officer said he didn't. The trial court found in favor of the officer. However, there was no conflict as to whether Mr. Masterson had requested an attorney earlier, to the Florida police. No one denied that he did. Therefore there is no evidence to support the trial court's finding that he did not.

Once Mr. Masterson asserted his right to counsel, all interrogation should have ceased. Officer Null, of Houston, is charged with the knowledge of his fellow law enforcement officers in Florida that Mr. Masterson had requested an attorney. Because of this interrogation following Mr. Masterson's invocation of his rights, Mr. Masterson's statement that followed should have been suppressed.

Furthermore, while Mr. Masterson and Officer Null talked, before the formal statement began and even before Mr. Masterson admitted to any participation in murder, Mr. Masterson asked for the officer's help in seeing that charges against his nephew were dropped. Mr. Masterson was particularly concerned that his young nephew not be prosecuted for the drugs found in the stolen car, because the drugs belonged to Mr. Masterson. The officer said he would do what he could to help.

The officer testified that he did not make this promise in exchange for Mr. Masterson's giving a statement. However, he also testified that he did not know why Mr. Masterson had confessed. Mr. Masterson testified that he believed that the officer would

only help see charges against his nephew dropped if Mr. Masterson did cooperate by giving a statement.

So, the officer's testimony did not contradict Mr. Masterson's. In Mr. Masterson's mind, he had to give a confession after the officer's promise of help. This was bolstered by the fact that during the taped statement the officer reminded Mr. Masterson about the drugs in the car. The trial court's finding that the statement was not given in exchange for the officer's promise is not supported by the evidence. Mr. Masterson gave his statement in exchange for the officer's promise, whether the officer thought they had struck a bargain or not. Therefore, the statement was involuntary, and should have been suppressed.

The statement was very damaging, as the only direct evidence that Mr. Masterson had committed the capital murder in this case, so its admission was harmful.

*Facts*

The trial court held a pre-trial hearing on Mr. Masterson's motion to suppress his taped confession. During that hearing both the officer who took Mr. Masterson's statement and Mr. Masterson himself testified.

After killing Darin Shane Honeycutt in Houston, Mr. Masterson took his car and drove to Georgia. He left the car with relatives and went to Florida, where he was arrested after stealing another car. In the meantime, Mr. Masterson's nephew was arrested in Georgia while driving the first stolen car. Police in Georgia also found drugs, probably cocaine, in the car. (RR2 149).

While in custody in Florida, Mr. Masterson made some sort of appearance before a judge, with the judge appearing on a television camera. (RR2 145). This hearing probably involved extradition. (RR2 145-46). At this point Mr. Masterson asked if he could have a lawyer. (RR2 145). However, he was told he didn't need a lawyer, that he just needed to sign papers. RR2 146).

Houston Police Officer David Null arrived in Florida to interview Mr. Masterson about the capital murder that was the subject of this case. He advised Mr. Masterson of his rights, including the right to counsel, and Mr. Masterson said he understood. (RR2 60, 61).

When Mr. Masterson testified, he said he had asked Null whether he needed a lawyer, but Null ignored this request, as if Mr. Masterson hadn't spoken. (RR2 146).

Questioning proceeded. At first Mr. Masterson denied that he had ever met the victim, or even been in Houston at the time of the murder. (RR2 62). Eventually, though, Mr. Masterson confessed, first to the officer, then on audiotape. (RR2 65, 68).

At some time before Mr. Masterson gave his statement, he and Null discussed the fact that Mr. Masterson's nephew had been arrested, and had probably been charged with possession of a trace of cocaine that Mr. Masterson had left in the victim's stolen car. Null testified that he hadn't known about the nephew. (RR2 63). He also testified that he did not make any promises to Mr. Masterson in exchange for Mr. Masterson's talking about the capital murder case. (RR2 62-63, 92).

However, he did agree he would try to help by telling investigating officers that Mr.

Masterson said the bag in which drugs had been found belonged to him, not his nephew. (RR2 109). The officer apparently made good on this promise. In the tape itself he reminded Mr. Masterson to claim the "dope" found in the car the nephew had been driving. (RR2 86, 87).

Though the officer denied having made Mr. Masterson a promise in exchange for his testimony, he admitted that he didn't know Mr. Masterson's motive for confessing. (RR2 110). He also said that when he agreed to help with the nephew's case, "I didn't know how he [Mr. Masterson] would interpret it. He asked me to do it and I told him that I would." (RR2 110).

Mr. Masterson testified explicitly as to how he took this offer from the police officer. When Mr. Masterson asked for Null's help in that case, the officer replied that he would see what he could do. Mr. Masterson took this to mean that if he cooperated by giving a statement, the officer "would help me out." (RR2 149). This was his reason for confessing to capital murder, to get his nephew out of trouble. (RR2 150). He testified explicitly, "I give the statement because Mr. Null told me that he would drop them charges on my nephew." (RR2 160).

At the conclusion of the hearing, the trial court overruled the motion to suppress the confession, finding that "There is no credible evidence to indicate that the defendant was ever promised anything to make this statement. The credible evidence shows that the defendant never asked for a lawyer, that he waived his rights and freely and voluntarily gave

the statement to Officer Null and as such would be admissible before the jury." (RR2 198).

*Law and Application*

This issue is to a certain extent one of first impression, which is this: Is the question of whether a promise was given to induce a confession to be analyzed from the defendant's point of view, or the police officer's? Even if an officer didn't intend his promise to induce the confession, if the defendant nevertheless subjectively gave his confession in exchange for the promise, was the confession involuntary? The answer, based on previous case law, is yes. The whole concept of voluntariness is obviously from the suspect's point of view. Why did he give his confession? Was it freely given, or in exchange for something? In this case, Mr. Masterson believed that he had to confess in order to save his nephew from being punished for a crime he hadn't committed. The officer may have testified that that was not his intention, but he also testified that he didn't know why Mr. Masterson confessed. The only evidence on the issue came from Mr. Masterson himself, and the trial court's finding didn't directly address that issue. Nor did the opinion from the Court of Criminal Appeals.

The statement Mr. Masterson gave in this case was crucial to the prosecution's case.

The trial court is the sole fact finder at a hearing on a motion to suppress evidence. In ruling on the issues on which the trial court made findings, the appellate court "should afford almost total deference to a trial court's determination of the historical facts <u>that the</u>

record supports, especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex.Crim.App. 1997) (emphasis added). In other words, the trial court's findings will be upheld if they are supported by the evidence. *Green v. State*, 934 S.W.2d 92 (Tex.Crim.App. 1996), *cert. denied,* 117 S.Ct. 1561.

This was the basis of the Court of Criminal Appeals' rulings on these two issues. The opinion by Presiding Judge Keller simply said that "the trial court has discretion to disbelieve testimony even if it is not controverted. The trial court did in fact discount Mr. Masterson's testimony and was within its discretion to do so." 155 S.W.3d at 171. That was on the question of whether Mr. Masterson requested counsel. As to the issue of the promise, the court held, "No positive promise was ever made. Moreover, the evidence suggests that Mr. Masterson initiated the discussion regarding helping his nephew. 'Having cast himself in the role of entrepreneur, [Mr. Masterson] cannot expect an appellate court to find implied "promises" in official responses (to his overtures) that are ambiguous at best.'" *Id.* at 171-72 (citations in footnotes omitted).

However, these two rulings, along with the trial court's crucial findings that they uphold, are not supported by the record.

*Involuntary Confession Induced By Promise*

To take the second first, the Court of Criminal Appeals' ruling is not even a response to Mr. Masterson's claim. Just because Mr. Masterson himself may have been the first to

bring up the question of his nephew's fate does not mean that the officer could not have said something in response that Mr. Masterson might take as a promise to help in exchange for a confession. In response to such a question the officer could have said something along the lines of, "That is a separate issue from what you and I have to discuss." But he did not. He said he'd see what he could do. Mr. Masterson took that as a promise to help, and that was why he gave his confession. So the Court of Criminal Appeals' ruling does not even address his claim. There is nothing about being an "entrepreneur" that strips a defendant of his constitutional rights.

Furthermore, the Court of Criminal Appeals' primary holding that "[n]o positive promise was ever made" is contradicted by all the evidence. The officer himself testified that he promised to do what he could to help the nephew.

If a confession is given in exchange for a promised benefit, the confession is not voluntary. "A confession must not be extorted by threat or violence, nor obtained by any direct or implied promise..." *Cerda v. State*, 10 S.W.3d 748 (Tex.App.–Corpus Christi 2000, no pet.).

> To render a confession inadmissible upon the ground that it was induced by the promise of some benefit to defendant, such promise must be positive, and must be made or sanctioned by a person in authority and it must also be of such character as would likely influence the defendant to speak untruthfully. *Hill v. State*, 902 S.W.2d 57, 59 (Tex.App.–Houston [1st Dist.] 1995), *pet. ref'd*, quoting *Fisher v. State*, 379 S.W.2d 900, 902 (Tex.Cr.App. 1964).

Officer Null testified that he did not know anything about the nephew's case when he began questioning Mr. Masterson. However, he agreed that he had promised to help with that case. He did not intend this as a promise in exchange for Mr. Masterson's giving a statement, but he admitted that he did not know how Mr. Masterson himself took that offer. Mr. Masterson testified that he understood an exchange was required; the officer would only help his nephew if Mr. Masterson confessed to the crime about which he was being questioned. Because Mr. Masterson testified explicitly to what he thought, and the officer testified that he did not know the effect of his promise, and did not know why Mr. Masterson did confess, the evidence does not support the trial court's finding that the statement was not given in exchange for a promise. In this case, the promise was positive. The officer agreed to do what he could to help Mr. Masterson's nephew. He carried through on this promise by reminding Mr. Masterson to state on the tape that the dope found in the car belonged to Mr. Masterson, not to his nephew. (RR2 86, 87).

The promise was also likely to induce Mr. Masterson to speak untruthfully. Officer Null questioned Mr. Masterson for about 45 minutes before he began confessing. (RR2 99). He certainly would have ascertained Mr. Masterson's state of mind. Mr. Masterson was facing a long prison sentence for the robbery in Florida. He did not want to stay in Florida and he did not want to serve a long sentence in prison. He would rather be executed sooner. Mr. Masterson must have said something of this nature to Officer Null, because prosecutors knew it during the hearing. (RR2 160). The prosecutor asked explicitly whether Mr.

Masterson had confessed to capital murder because he wanted to get the death penalty.

For a person in this frame of mind, the officer's promise to help out Mr. Masterson's nephew would have provided the added incentive to confess to a capital murder untruthfully, both so that he could help his nephew and so that he could avoid a long prison sentence.

The promise met all the criteria of an offer given in exchange for a confession. Therefore the confession was improperly induced and involuntarily made. For these reasons, the trial court should have suppressed the confession.

The defense raised this issue again before the jury. During trial, just before Officer Null's testimony, the defense decided explicitly to let in evidence of the extraneous offense of possession of cocaine (the drug found in the stolen car) in order to raise the voluntariness of the confession. (RR19 54-56). The defense requested and was given a jury instruction that the jury should not consider the evidence in the confession if they found it was not made voluntarily. (CR 299). And the jury heard evidence that even more clearly established that the officer made a promise and acted on it.

James Masterson, Mr. Masterson's brother, testified that Sergeant Parish, the primary investigator for the Houston Police Department, told him that his nephew had been arrested, but that if Richard would say something, the police would let the nephew go. (RR18 181).

Specifically, he told the defense lawyer on cross-examination:

A.  Right.  Sergeant Parish said something if Richard would say that – something, that they would let Adam [the nephew] go.

Q.  What was it that – that something you're talking about, what is that something, if Richard would say what?

A.  I guess they were going to get Adam for what happened to the guy, and Parish wanted Richard to say he did it and Parish said that he'd make sure Adam got cut loose and no charges filed against him.

(RR19 181-82).  Sergeant Parish did not deny this claim during his own testimony.

A Georgia police officer confirmed that charges against Charles Adam Tanturri were dismissed after a conversation between the district attorney's office in Georgia and the Houston Police Department. (RR19 29-30).

So there was evidence of cooperation between law enforcement agencies going on to fulfill Officer Null's promise to Richard Masterson. And a higher-ranking Houston police officer confirmed – apparent even before Officer Null's interrogation of Mr. Masterson – that they would get the charges dropped against Mr. Masterson's nephew if Mr. Masterson gave a statement.

The Court of Criminal Appeals' ruling was that the trial court was free to disregard all this evidence, even if it was undisputed by the State, even if it came from State's witnesses. This ruling is contrary to established federal law.  The AEDPA standard is that a state court holding will be upheld unless it resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. In this case, the Court of Criminal Appeals held that the trial court's findings were supported by a complete lack of evidence. The State had the burden of proving the voluntariness of the confession, as the proponent of this evidence.  But the State did not put on any evidence that Mr. Masterson did not believe he had to make a statement in order to save his nephew.  To the contrary, some of the prosecution's evidence supported this claim.

The interrogating officer acknowledged telling Mr. Masterson he would do what he could to help his nephew. On the tape of the confession itself he reminds Mr. Masterson to fulfill his part of the bargain by claiming the drugs seized in the car.

The jury's implicit finding that the confession was voluntary is even less supported by credible evidence. The jury heard that there was cooperation between law enforcement agencies of different states to see that Mr. Masterson's nephew had the charges dropped against him. More importantly, the jury heard from James Masterson, a State's witness, that the officer leading the investigation told him that the nephew's charges would be dismissed if Mr. Masterson gave a statement. This was evidence the State didn't present during the pretrial hearing. Nor did they ask the officer in question, who also testified at trial, to refute this claim.

All the evidence showed that Mr. Masterson did make his confession in exchange for a promise by police to help his nephew. The State offered no other reason why he would have made such damaging admissions. The contrary state findings are unreasonable, and are not supported by credible evidence.

*Mr. Masterson's Request for an Attorney*

As to the other issue, Mr. Masterson said that he asked for an attorney before Officer Null ever began questioning him. Mr. Masterson made this request to Florida authorities. He was told he would not need an attorney. At this point, all questioning of Mr. Masterson should have ceased. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *McCarthy v. State*, 65 S.W.3d 47, 51 (Tex.Cr.App. 2001). No police officer should have been allowed to initiate further questioning of Mr. Masterson until he had been

provided with an attorney or re-initiated contact himself. Neither of these things happened.

Whether Officer Null knew of Mr. Masterson's request before interviewing him is irrelevant, "because courts impute knowledge of the invocation of any *Miranda* rights to all representatives of the State." *McCarthy, supra*, 65 S.W.3d at 51. The record is not clear that Mr. Masterson made his request to law enforcement officers, but there was certainly a judge present, and anyone holding Mr. Masterson in custody would have been a representative of the State. The State in this case must be imputed with knowledge that Mr. Masterson had invoked his right to counsel.

Officer Null did testify that Mr. Masterson did not ask him for a lawyer at any time during Null's questioning. However, no one disputed the fact that Mr. Masterson made the request earlier. One deputy from Florida did testify at the hearing, but he was the arresting officer and did not have any further contact with Mr. Masterson after putting him in jail. (RR2 126). This deputy also testified that he did not take Mr. Masterson before a magistrate (RR2 140)., so he would not have been present at the time Mr. Masterson made the request. Therefore, the evidence that Mr. Masterson requested an attorney before he was questioned is undisputed. The record does not support the trial court's ruling that Mr. Masterson did notrequest an attorney.

The Sixth Amendment right to counsel is offense-specific. *Guidry v. State*, 9 S.W.3d 133, 142 (Tex.Cr.App. 1999), *cert. denied,* 121 S.Ct. 98. If Mr. Masterson had invoked his right to counsel while Florida authorities were questioning him about the Florida robbery case, that request would not have applied to this capital murder case from Texas. However, the hearing at which Mr. Masterson made his request concerned extradition to Texas. The

hearing conducted by Florida authorities was about the instant case, the Harris County capital murder, not any Florida offense.

Again, the State was the proponent of the evidence and had the burden to prove its voluntariness. But the prosecution put on no evidence to contradict Mr. Masterson's claim that he requested an attorney when he appeared before the magistrate. The trial court's and the Court of Criminal Appeals' findings to the contrary were not supported by credible evidence. They were supported by no evidence. The standard the Court of Criminal Appeals clearly applied was that in the absence of evidence the proponent of evidence has carried the burden to prove its admissibility. This is contrary to well-established federal law, including the AEDPA standards of review.

This error violated Mr. Masterson's constitutional right to an attorney. The error was certainly not harmless. Mr. Masterson's statement was introduced at trial and played for the jury. (RR19 70). The prosecution ended with this piece of evidence, because it was the most powerful evidence they had. (RR19 100). It provided the only direct evidence that Mr. Masterson intended to kill the victim, and did so in order to steal his car. (RR19 81). No other evidence even placed Mr. Masterson at the scene of the offense. A witness could not identify him (RR18 40), no fingerprints or DNA evidence linked Mr. Masterson to the crime (RR18 95, 256), and no other evidence would have been remotely sufficient to prove Mr. Masterson's guilt of capital murder. Only his statement did that. The confession was the State's only real evidence that Mr. Masterson had committed capital murder. Its admission was not harmless.

The trial court's findings that Mr. Masterson did not ask for an attorney and did not

confess in exchange for a promise are not supported by the record and should not have been upheld by the Court of Criminal Appeals. The trial court erred by admitting the statement. This Court should order Mr. Masterson's conviction and death sentence set aside and Mr. Masterson released if he is not afforded a new trial within a certain period of time.

## GROUND FOR RELIEF SEVEN

**THE STATE FAILED TO CARRY ITS BURDEN OF PROVING THAT MR. MASTERSON WOULD BE A CONTINUING THREAT TO SOCIETY WHEN BASED ON HIS OWN TESTIMONY IT WAS APPARENT THAT HE WOULDSPEND HIS TIME IN CONFINEMENT UNDER SUCH RESTRAINT THAT HE COULD NOT BE A DANGER TO SOCIETY.**

### SUMMARY OF THE ARGUMENT

Mr. Masterson's own testimony probably insured his receiving a death sentence, because he testified that he would do what it took to protect himself and his property in prison if he received a life sentence, so that he would undoubtedly get into violent conflicts. This coupled with other evidence that he had had violent confrontations when confined previously allowed the State to argue convincingly that he would be a continuing threat to society even if that society was within prison.

However, this testimony also demonstrated that Mr. Masterson will never be released into free society, and would spend his time in prison under such constraints that he would not be allowed to pose any threats to society. Given the record he would undoubtedly compile in prison, the evidence also showed that he would never again be released into free society.

So in fact the State failed to carry its burden of proving that Mr. Masterson would be a continuing threat to society.

*Facts*

Mr. Masterson relies on the facts set out in the statement of facts above, primarily the facts from the punishment phase of trial, in which the State presented various law enforcement personnel to inform the jury of other confrontations in which Mr. Masterson had taken part in other confinements.

The punishment testimony which undoubtedly most delighted the prosecution was Mr. Masterson's own, in which he assured the jury that he would be a future danger to others:

> ...they have to answer two questions, am I going to be a future danger? Am I going to protect myself by any means necessary? Yes, I am. That makes me a future danger, yes, I am.
> Second issue, is there any mitigating circumstances? I don't think so. Everybody lives and dies by the choices that they make. None of my family out there could control what I did. I did what I did because I wanted to do it, not because they made me do it, or because I got my ass whooped.... Just like now, there's a time when people just got to say, I did it, I accept responsibility for it. So whatever your decision is, I accept that. You found me guilty, you must believe I'm guilty. And if you send me to prison, for life, the chances are, in the Texas Department of Corrections the chances are I'm going to have to defend myself, and like I said, I will defend myself, whether it's against a guard or inmate or anybody else by any means necessary.

(RR22 84-85).

On cross-examination by the State, the prosecutor characterized his testimony as having said that "you think the jury should answer the special issues in such a way that you get the death penalty, right?" Mr. Masterson answered, "If they're following the law, yes." (RR22 99). What he meant was that if there was a case of "me protecting myself or my property, yes, I'm a future danger." (RR22 100). When asked if it was likely he could go a

year in prison without getting into a violent dispute, Mr. Masterson answered, "Probably not a month."

*Law and Application*

The evidence presented by the State did not meet the federal standard of reviewing sufficiency of the evidence, specifically *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). This sounds paradoxical, given the evidence including Mr. Masterson's own testimony. But in fact that testimony established that he would never be paroled into free society, and that he would be placed under such restraints in prison that he would not be able to be a continuing threat to society.

This claim was made in Mr. Masterson's direct appeal as his point of error number five. The Court of Criminal Appeals addressed it: "Mr. Masterson's argument appears to be that he is so dangerous that he is not dangerous. His contention is ingenious but unpersuasive." 155 S.W.3d at 174.

The entire rest of the Court of Criminal Appeals analysis of the claim is as follows: "If accepted, it would stand the capital punishment scheme on its head, giving relief to the most dangerous offenders. We will not speculate, for legal sufficiency purposes, about the effectiveness of the prison and parole authorities' methods of protecting society from those who are intent on committing future criminal acts of violence. Point of error five is overruled."

The Court of Criminal Appeals' ruling fails to follow accepted federal law because it doesn't do a sufficiency analysis at all. It simply makes a policy statement. The opinion says in effect, We don't like the result that would be achieved if we ruled in favor of this point. So the Court performed no analysis at all of Mr. Masterson's actual claim of insufficient evidence.

The Court of Criminal Appeals considers it unacceptable that dangerous offenders would be granted relief under this claim. That shouldn't matter to an appellate court performing a legal review. The fact remains that the sufficiency claim is valid. The State failed to carry its burden to prove that Mr. Masterson would be a continuing threat to society, because they failed to prove how he could possibly be such a threat. He would spend his entire prison career in administrative segregation.

The Court of Criminal Appeals' refusal to "speculate" meant it performed no analysis, its sole function on this point of error. Its holding demonstrates that the jurors themselves would have to speculate what would happen in prison. This does not amount to proof beyond a reasonable doubt.

The reason the Supreme Court reversed the death sentence in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). was that the prosecutor asked the jury to sentence the defendant to death based upon a danger that did not exist, under South Carolina law. He suggested to them that the defendant would be a danger to free society when in fact the life without parole law meant the defendant would

never be in free society.  In Texas the parole law means the same thing for a defendant like Richard Allen Masterson:  he will never be paroled into free society, no matter how "eligible" he may be.  The prosecutors may not be forbidden to <u>m ake a</u> future dangerousness argument, because the possibility of parole into free society does exist, if only as a tiny light flickering at the end of a 40-year tunnel.  However, for a certain kind killer – and Mr. Masterson is perhaps one of a very few -- that light is extinguished by his own behavior in the past and by his own testimony of intent to use violence whenever necessary in the future.  The darkness, for him, is endless, and he will never emerge, so the jury need not, indeed they may not, sentence such a defendant to die. Mr. Masterson's own crimes and his own testimony assured that he will never be among us again; he will never be a continuing threat to free society.

It is a matter of reason and common sense for jurors in Mr. Masterson's case to conclude that he will never be paroled.  As long as the Texas death penalty scheme retains as its single statutory aggravating factor: the question whether it is necessary to <u>execute</u> the defendant to protect society from his future violence, the answer for a defendant like Mr. Masterson must be "no".

The Court of Criminal Appeals resolution of this issue, which failed to address it at all in the legal sense, "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"; in other words, it is the basis for a claim for relief under AEDPA standards.

The Court's only holding was that it would not speculate on whether prison authorities could control someone like Richard Masterson. The Court did not address the evidence. A violent offender such as Mr. Masterson would be subject to complete restraint in prison. The evidence at trial showed he had had two violent encounters with other inmates during past incarcerations. One of those was very minor, and in the other the corrections officer didn't know who had started the fight. One had resulted in his being confined more completely. It did not take speculation to realize that prison authorities would be even more watchful over an inmate who arrived in their system with Mr. Masterson's conviction and background.

In spite of the Court of Criminal Appeals' dislike of the result that would be reached if they actually addressed Mr. Masterson's claim in this case, an actual legal analysis of the evidence showed that the State did not carry its burden to prove that Mr. Masterson would be capable of being a continuing danger to any society in the future.

Because the State failed to prove the continuing threat issue this Court should order Mr. Masterson released or that his punishment be reformed to life imprisonment.

## **GROUND FOR RELIEF EIGHT**

**MR. MASTERSON WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE TRIAL COURT REFUSED THE DEFENSE REQUEST TO ARGUE LAST AT PUNISHMENT ON THE ISSUE OF MITIGATION.**

## SUMMARY OF THE ARGUMENT

The defense made a motion in the trial court to argue last at the punishment phase of trial. The motion was based on the fact that neither side has the burden of proof on the mitigation special issue. Traditionally the side with the burden of proof – nearly always the State in criminal cases – has the right to argue last, because it has the burden of persuasion.

In this case the defense in effect had the burden of proof on the mitigation special issue, by the time the jury had found Mr. Masterson guilty of capital murder and that he would be a future danger to society. In order to receive effective assistance of counsel, Mr. Masterson needed to argue last, to have the opportunity to counter the prosecution's arguments concerning mitigation. But the trial court denied the motion, preferring the traditional State-last final argument. The Court of Criminal Appeals upheld this ruling.

These rulings denied Mr. Masterson his right to the effective assistance of counsel.

## ARGUMENT

Mr. Masterson filed a pretrial motion asking to be allowed to argue last on the special issue of mitigation. (CRI 156). This motion was based on the defendant's right to effective

assistance of counsel, specifically citing the United States Constitution. During pretrial hearings the trial court overruled the motion. (RR2 203-04).

Traditionally the State has the right to present the closing argument, because traditionally the State has the burden of proof and persuasion in criminal cases. But the Texas death penalty statute provides no burden of punishment on the mitigation special issue, and the Court of Criminal Appeals has held repeatedly that there is none.

The right to closing argument traditionally follows the burden of proof, such as in civil cases. Under the former insanity statute, where the defendant had the burden of proving this affirmative defense in a trial that involved no other issue but sanity, the defendant had the right to open and close the arguments. *See, Knoeppel v. State*, 382 S.W.2d 493, 494 (Tex.Crim.App. 1964).

The Court of Criminal Appeals rejected this claim based primarily on a Texas statute, Article 36.07 of the Code of Criminal Procedure, which allows the State to argue last in all criminal cases. The Court of Criminal Appeals held that this statute governed this case, even though the death penalty statute assigns no order to closing arguments. Art. 37.071, Code of Criminal Procedure. *Masterson, supra*, 155 S.W.3d at 175.

But Mr. Masterson in his brief on direct appeal specifically relied on his constitutional right to the effective assistance of counsel, which of course would prevail over a state statute. The Court of Criminal Appeals did not address the constitutional claim, so its decision is unreasonable under well-established federal law.

The right to counsel is the right to effective counsel. In an adversarial proceeding, the right to close the arguments is crucial, because it allows the closer to address and counter the opponent's claims. The State always has this right. That can be justified when the State has the burden of proof, but in this context it does not. It has been recognized that if either side has the burden of proof on the issue of mitigation, it is the defense. *See, Coella v. State*, 915 S.W.2d 834, 847-48 (Tex.Crim.App. 1995) (Clinton, J., dissenting, joined by Overstreet, J.).

The defense does effectively have the burden of proof and persuasion on the mitigation issue, because by the time the parties address that issue and by the time the jury answers, the death penalty juggernaut is rolling. The jury has already found the defendant guilty of capital murder and has further found that he will be a future danger to society. The defendant is on a losing streak that leads to death, and the mitigation special issue almost never puts a stop to that streak.

One reason for this, perhaps the primary reason, is that the State always gets to argue last at punishment. The State gets to counter any argument the defense might make. The State gets to leave the last impression, have the last word. The jury goes to make the decision that leads to whether the defendant will live or die with the words of the defendant's adversary in their ears.

But it is the defendant who has the right to the effective assistance of counsel, not the State. That right is denied or diluted in every capital murder trial in Texas, where the defendant is always denied his right to the most effective possible representation.

In this particular case the defense presented compelling mitigating evidence that Mr.

Masterson had been abused, abandoned, and neglected as a child. There was also evidence from corrections officers, normally prosecution witnesses, that if Mr. Masterson was treated with respect in custody he would respond in kind. But the defense's presentation of that evidence was extinguished because the State had the opportunity to belittle it in their own final argument – which was, indeed, the final argument.

"The purpose of closing argument is to facilitate the jury's proper analysis of the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone and not on any fact not admitted into evidence." *Faulkner v. State*, 940 S.W.2d 308, 311 (Tex.App.–Fort Worth 1997, pet. ref'd). This purpose is not served by always having the State present the closing argument at punishment in a death penalty case.

In a case where what is at stake for the State is simply another win in the busiest death penalty state in the free world, while Mr. Masterson was on trial for his life, his constitutional right to counsel was violated by the court's ruling, and ignored by the Court of Criminal Appeals' holding.

## GROUND FOR RELIEF NINE

**THE "12-10" RULE IS UNCONSTITUTIONAL AS APPLIED IN THIS CASE BECAUSE THE JURY FINDINGS IT REQUIRES AND THE SCHEME IN WHICH IT IS APPLIED VIOLATE THE EIGHT AMENDMENT TO THE UNITED STATES CONSTITUTION.**

The Court of Criminal Appeals rejected this and the following claim for relief in a single paragraph, holding only that they had previously rejected these claims. *Masterson, supra*, 155 S.W.3d at 175-76.

Counsel concedes that this claim has been continually rejected by the Texas Court of Criminal Appeals and federal courts. Whether or not the Court of Criminal Appeals has "discussed" or decided any one of Mr. Masterson's legal issues adversely at any one time is of no moment. As any member of the Texas bar can tell you, *stare decisis* is practically nonexistent at the Court of Criminal Appeals.[4]

---

[4]        *See, e.g. Proctor v. State*, 967 S.W.2d 840, 846 n. 1 ((Tex.Crim. App. 1997)(Meyers, J. dissenting)

The Court overrules nearly a century of precedent. The majority says requiring the State to prove the offense occurred within the applicable limitations period has proven "unworkable." Precedent has regularly come to be viewed as "unworkable" in recent months. *See Hatch v. State*, 958 S.W.2d 813 (Tex.Crim.App.1997)(overruling Hernandez ); *Ex parte Wilson*, 956 S.W.2d 25 (Tex.Crim.App.1997)(overruling portion of Jarrett ); *Guzman v. State*, 955 S.W.2d 85 (Tex.Crim.App.1997)(overruling *Dubose, Carter* and *Arcila* ); *Ex parte McJunkins*, 954 S.W.2d 39 (Tex.Crim.App.1997)(op. on reh'g) (recalling mandate in order to issue opinion overruling *Ex parte Sims*); *Malik v. State*, 953 S.W.2d 234 (Tex.Crim.App.1997)(overruling *Benson /Boozer* line of cases); *Cain v. State*, 947 S.W.2d 262 (Tex.Crim.App.1997)(overruling *Morales, Marin, Whitten* to extent of conflict); see also *Creager v. State*, 952 S.W.2d 852 (Tex.Crim.App. 1997)(disavowing implication in *Dunn* ); *Carmona v. State*, 941 S.W.2d 949 (Tex.Crim.App.1997)(disavowing Fuller to some extent).

While Mr. Masterson acknowledges that the current posture of this circuit with regard to his legal issues is not in his favor, Mr. Masterson requests that this Court examine his issues on their merit. "Lest it be forgotten, [d]eath, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305. The Constitution itself requires careful review of Mr. Masterson's death sentence. The reality is the law is ever evolving. Indeed, "[t]he genius of the Constitution resides not in any static meaning that it had in a world that was dead and gone, but in its adaptability to interpretations of its greatest principles that cope with current problems and current needs." William J. Brennan, Constitutional Adjudication, 40 Notre Dame Law, 559, 568 (1965).

In *Atkins v. Virginia*, 122 S.Ct. 2242 (2002), the Supreme Court considered the issue of whether executing the mentally retarded violated the Eighth Amendment. Prior to their decision, the issue was foreclosed. In reversing precedent, the Court noted:

---

The Court has overruled cases after case. *Nunfio v. State*, 808 S.W.2d 482 (Tex.Crim. App. 1991), *overruled by Barajas v. State*, 2002 WL 1380916 (Tex.Crim.App. Jun 26, 2002); *Ex parte Duffy*, 607 S.W.2d 507, 516 (Tex.Cr.App.1980), *overruled by Hernandez v. State*, 988 S.W.2d 770 (Tex.Crim. App. 1999). And just recently, the Court overturned *Ex parte Bauder*, 974 S.W.2d 729 (Tex. Crim. App. 1998), *overruled by Ex parte Lewis*, 2007 WL 57823 (Tex. Crim. App. Jan. 10, 2007); *see also, Watson v. State*, 204 S.W.3d 404, 414 (Tex.Crim.App.2006) (overruling in part *Zuniga v. State,* 144 S.W.3d 477 (Tex.Crim.App.2004)).

A claim that punishment is excessive is judged not by the standards that prevailed in 1685 when Lord Jeffreys presided over the "Bloody Assizes" or when the Bill of Rights was adopted, but rather by those that currently prevail. As Chief Justice Warren explained in his opinion in *Trop v. Dulles*, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958): "The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. ... The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." Id., at 100-101, 78 S.Ct. 590.

*Atkins*, 122 S.Ct. at 2247. If Mr. Atkins had chosen to not present the argument, clearly foreclosed to him at the time he asserted it, he would most likely have been executed by now. The evolving standards that Mr. Chief Justice Warren wrote of in *Trop* in 1958 continue today:

The exact scope of the constitutional phrase 'cruel and unusual' has not been detailed by this Court. But the basic policy reflected in these words is firmly established in the Anglo-American tradition of criminal justice. The phrase in our Constitution was taken directly from the English Declaration of Rights of 1688, and the principle it represents can be traced back to the Magna Carta. The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. While the State has the power to punish, the Amendment stands to assure that this power be exercised within the limits of civilized standards. (footnote omitted).

*Trop v. Dulles*, 356 U.S. 86, 99-101, 78 S.Ct. 590, 597-98 (1958). The evolving standards of decency mandate Mr. Masterson present this issue – and that this Honorable Court consider the same, although seemingly foreclosed.

1.    *Article* 37.071 § 2(a)

Texas law requires that neither the court, the state, nor counsel for the defense may inform a juror or prospective juror of the effect of the jury's failure to agree on special

issues at punishment. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(a)(Vernon Supp. 1997). All parties in Mr. Masterson's case acted in compliance with this statute.

2.  *Article 37.071 §§ 2(d)(2) & 2(f)(2)*

Texas law requires that the capital sentencing jury be instructed that it may not answer the first special issue "yes" or the second special issue "no" unless 10 or more jurors agree. *See* Tex. Code Crim. Proc. Ann. art. 37.071 §§ 2(d)(2) & 2(f)(2). Mr. Masterson's jury was instructed pursuant to the statute. (CR 309-316).

3.  *The Law*

The Court of Criminal Appeals, in rejecting variants of this argument during the last few years, has erred. Essentially, the "10-12 rule" contained in Tex.Crim.Proc. Art. 37.071 violates the constitutional principles discussed in *Mills v. Maryland*, 486 U.S. 367 (1988), and *McCoy v. North Carolina*, 494 U.S. 294 (1990).

The "10-12 provision" in Art. 37.071, § 2(d)(2) & § 2(f)(2), violates the constitutional principles discussed in *Mills* and *McCoy* for the following reasons. The "10- 12 provision" requires that, in order for the jury to return answers to the special issues that would result in a life sentence, (I) at least ten jurors must vote "no" in answering the first special issue, (ii) at least ten jurors must vote "no" in answering the second special issue, *or* (iii) at least ten jurors must vote "yes" in answering the third special issue. This "10-12 provision" violates the Eighth and Fourteenth Amendments because there is a reasonable possibility that, under the present Texas capital

sentencing scheme, all twelve jurors in a capital case could believe that a life sentence would be appropriate under state law, but, because at least ten jurors could not collectively agree on their answer to any one of the special issues, the jury could not return a life sentence. Such a "majority rules" mentality could lead jurors to change their potential holdout votes for life to a vote for the death penalty. Of course, a "no" answer to the "future dangerousness" special issue -- a finding that a capital defendant does not pose a future threat to society -- is a constitutionally recognized mitigating factor. *See Franklin v. Lynaugh*, 487 U.S. 164 (1988); *Skipper v. South Carolina*, 476 U.S. 1 (1986).

As an illustration, consider the following hypothetical circumstance: at trial, four of the twelve jurors conclude that, as a consequence of a capital defendant's positive character traits, he would not pose a future threat to society; thus, those jurors individually vote to answer the first special issue negatively.

Finally, suppose that the four remaining members of the jury conclude, as a result of the capital defendant's mitigating evidence of a troubled childhood, that the mitigation special issue should be answered affirmatively. However, for whatever reason, assume that those four jurors also believe that the capital defendant would pose a future threat to society and also that the defendant possessed the requisite *mens rea* under the "parties" special issue. Thus, those four remaining jurors only vote in the defendant's favor on the third special issue.

Hypothetically speaking, all twelve members of the jury in such a case individually agree that *one of the three statutory mitigating factors* has been established

and that, under state law, a life sentence is appropriate. That is, all twelve jurors could have believed that a mitigating factor exists which, under state law, should have caused the capital defendant to be sentenced to life. However, jurors are given the impression that Texas law forbids the imposition of a death sentence *only if* ten members of a capital sentencing jury agree collectively as to *which* statutory mitigating factor has been established; because such jurors could disagree about which of the three factors has been established, however, they are left without guidance as to how to proceed. In the absence of such guidance, there is a constitutionally unacceptable risk that Texas capital sentencing juries may feel coerced by a "majority rules" mentality into returning answers to the special issues that would result in a death sentence. A death sentence imposed by a jury so instructed is too likely a product of arbitrary decision-making for the Constitution to tolerate. *See McKoy v. North Carolina, supra; Mills v. Maryland, supra.*

# GROUND FOR RELIEF TEN

**MR. MASTERSON'S CONSTITUTIONAL RIGHT TO BE FREE OF CRUEL AND UNUSUAL PUNISHMENT WAS VIOLATED IN THIS CASE BY THE TRIAL COURT'S REFUSAL TO INFORM THE JURY THAT A HUNG JURY WOULD RESULT IN A LIFE SENTENCE.**

As set out in the previous ground for relief, the Court of Criminal Appeals acknowledged this claim without actually addressing it. 155 S.W.3d at 175-76.

The Texas capital punishment statute provides that if a jury fails to reach agreement at punishment, even if there is only one juror voting in contradiction to the others, the trial court will automatically sentence the defendant to life imprisonment. Article 37.071, §2(g), Texas Code of Criminal Procedure. However, the statute also provides that the jury cannot be informed of this provision of the law. Article 37.071, §2(a), *supra*. So Richard Masterson's jury was not informed that if they failed to agree on punishment, Mr. Masterson would be sentenced to life imprisonment, rather than a mistrial resulting in a new trial.

This statutorily-required ignorance on the part of the jury violates the Eighth and Fourteenth Amendments to the Constitution, because it creates pressure on uninformed jurors who might vote for life instead to vote with the majority for death. A jury that is not fully informed of relevant law is not reaching a proper verdict, resulting in cruel and unusual punishment and denial of due process of law. *See, Caldwell v. Mississippi*, 105 S.Ct. 2633, 2639-46 (1985) (the Eighth Amendment is violated if a capital sentencing jury is not informed of relevant state sentencing law).

Given Mr. Masterson's evidence that he had not been a danger to anyone while incarcerated, as well as his abused and neglected childhood, and perhaps lingering doubt as to whether he had committed capital murder or some lesser offense, it is likely that at least one juror would have voted (at least initially) in favor of a life sentence rather than death. But not having been informed of the consequences of a hung jury, that juror would believe that such a result would result in a mistrial and new trial. This misperception would exert pressure on the juror to vote with the majority and reach a unanimous result. This "life" juror, it must be remembered, would already have found Mr. Masterson guilty of capital murder, and would not want that verdict to disappear. He or she would also be likely to believe that, given an eleven to one majority, the next jury would both find Mr. Masterson guilty and answer the special issues in a way resulting in a death sentence. So the juror would give up his or her position and vote in favor of death, not realizing that his or her non-death vote could be given effect if he or she would refuse to give in. Under Texas law, this situation would result in a failure to reach unanimity and an automatic life sentence. But the jurors would not know that. The statute specifically requires that they be kept in ignorance.

This instruction violates the Eighth Amendment's ban on cruel and unusual punishment. *See, Caldwell v. Mississippi*, *supra.* (Eighth Amendment violated if capital sentencing jury is not informed of relevant state sentencing law). To establish a *Caldwell* violation, the defendant must show that the instructions to the jury improperly described the applicable law. *Dugger v. Adams*, 109 S.Ct. 1211, 1215 (1989). In this case

the instructions failed to inform the jury of that applicable law.

Because of this constitutional violation, Mr. Masterson's conviction and sentence of death must be vacated and the cause remanded for a new trial. Alternatively, Mr. Masterson's sentence of death should be vacated and a life sentence entered.

**GROUND FOR RELIEF ELEVEN THROUGH FOURTEEN**

**ARGUMENTS AND AUTHORITIES**

Threshold arguments for all claims *Martinez v. Ryan*, 566 U.S.__, 1332 S.Ct. 1309 (2012) recently decided by the Supreme Court of the United States provides that in limited circumstances procedural default may be bypassed by showing cause and prejudice for the default, and that such cause and prejudice may include the ineffective assistance of post-conviction counsel. The Fifth Circuit Court of Appeals rejected the argument in *Ibarra v. Thaler,* 691 F.3d 677 (5th Cir. 2012) and petition for a writ of certiorari was granted by the Supreme Court and is pending. *Trevino v. Thaler*, No. 11-10189. This does not create a "right" to effective assistance of counsel on state habeas- it simply acknowledges that a failure by state post-conviction counsel can create a cause and prejudice by which procedural default may be excused on a federal review. The *Martinez* decision does not appear to include a failure to exhaust claims.

The claims brought forth in this subsequent application are based on the holdings in *Jackson v. State,* 160 S.W. 3d 568 and later *Ruffin v. State,* 270 S.W. 3d 586 (2008). These cases hold that the presence of a mental disease or defect may be shown to a jury at guilt/innocence to defeat the specific intent to commit a crime it does not excuse the commission of a crime but may, in application, simply result in conviction of a lesser included offense which does not require the higher or more culpable mental state. See *Ruffin v. State,* id.

Post conviction counsel, to his credit, discovered evidence of seizure disorder (claim four) and mild organic brain disorder (claim one) in his initial state writ. However,

he focused upon its representation at punishment rather than its potential use at guilt/innocence. In order to exhaust these claims they are brought now pursuant to the Court of Criminal Appeals' own decision in *Ruffin* , Supreme Court 's decision in *Martinez,* and Section 5 under Article 11.071.

In regard to claim two, the trial counsel claimed via affidavit that the State had discovered the juvenile information but had neglected to present it at punishment because it contained "double edge" information that could be used for future danger by the state. The problem with this argument is that they state did decide to introduce it and in fact brought this information forward and they were unprepared to rebut it. Under *Rompilla v. Beard* this is a simple failure to prepare for a punishment case that a reasonable attorney would know is coming.

Looking at the records it appears that based upon a health interview that he gave in the sixth grade, Mr. Masterson had been shot in the chest and the bullet was lodged under his heart when he was younger. Well known studies document the traumatic effects of injuries such as this on veterans and on crime victims. The fact that this was clearly documented in his medical history and was never presented as evidence for trial indicates a complete lack of investigation under *Wiggins v. Smith,* 539 U.S . 5 10 (2003) the Sixth and Fourteenth Amendments of the United States Constitution.

Mr. Masterson was a sexually abused, beaten, shot and traumatized young boy who grew up in a household that would have compared Jess favorably with even the worst nightmares as Charles Dickens. Whether from a combination of the beatings and injuries he received and any medications or the long term effects of youthful drug

abuse, <u>all</u> his juvenile counselors recommended residential treatment *which he never received.* He was convicted of what appeared to be rough gay sex gone wrong, though in the state's version of events it was portrayed as a killing in the course of a robbery. Mr. Masterson has never truly had a chance and his trial attorneys failed to provide him a meaningful defense either of his guilt or his life. Accordingly, these issues were presented in a subsequent petition for review by the Court of Criminal Appeals in subsequent application was dismissed by written order. (Appendix part 4, Attachment A). Thus, these issues have been properly exhausted. Procedural default, is any exists, should be excused due to the ineffective assistance of trial and habeas counsel, as well as, the injustice this would work on a brutalized youth who was essentially raised to be hung.

## GROUND FOR RELIEF ELEVEN

**TRIAL COUNSEL [AND BY EXTENSION HABEAS COUNSEL] PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS FOR FAILING TO INTRODUCE EVIDENCE OF ORGANIC BRAIN DYSFUNCTION HAD THAT COULD WOULD HAVE BEEN ADMISSIBLE UNDER JACKSON V. STATE IN TEXAS COURTS THAT THAT BEEN DISCOVERED.**

On February 4, 2004 Dr. Jerome Brown conducted an in depth examination of Petitioner Richard Masterson for his post-conviction counsel Sydney Crowley. Mr. Masterson revealed a history of beatings, severe headaches, reported seizures, significant head injuries including being struck in the head by a glass. At page three of his report he makes it clear that a neuropsychological testing and brain scan would be in order and that there is possibly some sort of brain anomaly or brain dysfunction present. [See attached report of Dr. Brown.] In May of 1988 during a psychiatric evaluation at the Texas Youth Commission Child Care System on the very first page of the report it indicates organic brain syndrome. On the third page of the report it lists three probably organic brain dysfunction diagnoses. On page four the psychiatrist, Dr. Day, M.D. recommends that Mr. Masterson be considered for residential treatment and special education. He also recommends substance abuse counseling but descries family therapy as "somewhat of a lost cause". [See attached report by Dr. Day, dated May 13, 1988)

Under *Jackson v. State*, id, the Court of Criminal Appeals determined that a judge may determine whether mental illness may be presented and if it can be presented, whether it raises the issue of a lesser included offense. Then the jury may decide if it lessens the defendant's culpability by finding him guilty of a lesser included offense if presented at the guilt phase of trial. *Jackson* v. *State,* 160 S.W. 3d at 575. *Jackson* v. *State* relied on an analysis of *Penry* v.

*State,* 903 S.W. 2d, 715 (Tex. Crim. App. 1995). In 2008 the Court of Criminal Appeals reaffirmed its *Jackson* holding in *Ruffin v. State,* id, and made it clear that specific intent may be negated before the jury on evidence of mental disease or defect. This is different than diminished capacity in that it requires a specific affirmative defense by the state as to the intent alleged and plead by the state; thus is may apply in some instances by not all and must be raised by the facts.

Here, the presence of organic brain dysfunction, which could cause inability to control impulses or to reign in behavior which could have been presented to negate the intent to kill or to commit the underlying felony. The failure to do this rendered a fatal flaw in the defense under *Strickland* v. *Washington,* 466 U.S. 668 (1984) the Sixth and Fourteenth Amendments of the Constitution and to Mr. Masterson's right to a fair trial.

## GROUND FOR RELIEF TWELVE

**THE TRIAL COUNSEL [AND BY EXTENSION HABEAS COUNSEL] WERE INEFFECTIVE UNDER *ROMPILLA V. BEARD* FOR FAILING TO ADEQUATELY INVESTIGATE AND PREPARE A REBUTTAL AGAINST THE STATE'S USE OF JUVENILE RECORDS DURING THE PUNISHMENT PHASE OF HIS TRIAL.**

Trial counsel gave an affidavit that indicated that they had in fact, reviewed the juvenile records an determined that there was too much double edged information within them to offer them in punishment. However, under *Rompilla v. Beard,* 545 U.S. 374 (2005) it is a failure of the duties of counsel to fail to [prepare to rebut the state's expected case in punishment. See *Rompilla v. Beard,* id. Here, the decision to not offer it did not prevent the information from coming it, but rather the trial counsel simply failed to prepare to rebut it or to use it to their advantage. Their failure to embrace the good and the bad in these records meant that the state got to control the picture of Mr. Masterson, not the defense. As can be seen by the trial record at punishment, the state [which always had access to the juvenile records] caught the defense flat footed and was able to paint a picture of Mr. Masterson as a dangerous feral youth as opposed to the tragically traumatized child that he in fact was. [See affidavit of trial counsel and state's response, see punishment evidence offered by the state]. Under *Rompilla v. Beard* it was not a choice by trial counsel to ignore or attempt to hide the story of Mr. Masterson's difficult youth - it was their obligation to prepare for the state's use of this information, and to take all of it before the jury so that they could make a balanced decision . They failed to do so and thus so failed to render the standard professional assistance required under *Strickland v. Washington* and *Rompilla v. Beard.*

## GROUND FOR RELIEF THIRTEEN

**THE TRIAL COUNSEL [AND BY EXTENSION HABEAS COUNSEL] PROVIDED INEFFECTIVE ASSISTANCE OF COUNSEL WHEN THEY FAILED TO PRESENT AND DEVELOP MITIGATING EVIDENCE ON THE FACT THAT MR. MASTERSON HAD BEEN SHOT AS A YOUTH.**

In 1988 while reviewing the medical history of Mr. Masterson it was noted that he was blind in his left eye and had been shot in the chest with the bullet lodged under his heart. [See social history attached] In a separate medical evaluation from the injury is noted again on page four of six on the commitment summary of the Texas Youth Commission, "child has bullet lodged in chest near spine". Mr. Masterson had just turned sixteen. [See Commitment summary, also attached] Post traumatic stress disorder is a real disorder based upon trauma and fear. It can cause crippling anxiety, flashbacks, and various other symptoms all too familiar to every group from rape survivors, combat veterans, paramedics and police to random shooting victims. These effects are well documented and not one bit of this information was presented to a jury deciding the life or death of Mr. Masterson. Nothing about how it affected him, how it prevented him from sleeping, how it raised his already high anxiety levels after he was a sexual and physical abuse victim, not a word about the nightmares or the physical limitations or pain because the bullet remained inside him. His trial attorneys did not present this. His post-conviction attorney, although he discovered it to his credit, did not raise this is a separate issue of ineffectiveness. [See initial state habeas application] Thus under *Strickland v. Washington* and *Martinez v. Ryan* this matter is brought before this Honorable Court so that it may review and consider this claim.

## GROUND FOR RELIEF FOURTEEN

**THE TRIAL COUNSEL [AND BY EXTENSION HABEAS COUNSEL] WERE INEFFECTIVE UNDER STRICKLAND V. WASHINGTON FOR FAILING TO INVESTIGATE AND DEVELOP EVIDENCE OF SEIZURE DISORDER WHICH COULD HAVE BEEN BROUGHT FORWARD AT THE GUILT STAGE OF MR. MASTERSON 'S TRIAL ON CAPITAL MURDER.**

As early as 1989 both trauma and recreational drug use was associated with increased seizure disorder. [See article and abstract attached]  Seizure disorders can include blackouts, involuntary muscle responses, and lack of control of large skeletal muscle systems.

Both previously mentioned psychological reports one from his days as a youth and one from 2004 mentioned drug abuse [doubtless in response to his own sexual and physical abuse at the hands of his family] and multiple sources of trauma including head injuries and beatings, again, mostly courteous , of his loving family.  Given the autoerotic and asphyxiation aspects of the crime which Mr. Masterson was charged with, a seizure during consensual asphyxiation in order to heighten orgasm would be a logical defense to the intent to kill.  The failure to develop this evidence or to investigate it was a failure under *Strickland v. Washington* and the failure to raise it by post-conviction counsel was a failure under *Martinez.*

# PRAYER

WHEREFORE. PREMISES CONSIDERED, it is respectfully requested that this Honorable Court

1.  Vacate the petitioner's conviction.

2.  Vacate the petitioner's sentence.

3.  Issue a writ of habeas corpus so that the petitioner may be relieved of his illegal restraint of liberty, such restraint being founded upon an unlawful and unconstitutional conviction and sentence based upon ineffective assistance of counsel.

4.  Permit discovery, pursuant to Rule 6, Rules - Section 2254 cases.

5.  Allow the petitioner a period of time within which to file such amendments to this application as might be necessary to bring all proper matters before this Court.

6.  Permit the filing of a traverse or reply to the state's answer.

7.  Finally, to grant such other and further relief as this court may deem appropriate.

Respectfully Submitted,


*/s/ Patrick F. McCann*
_____
Patrick F. McCann
Law Offices of Patrick F. McCann
909 Texas Ave. Suite 205
Houston, TX 77002


Attorney for Petitioner,
Richard Masterson

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing pleading was served

upon opposing counsel by ECF filing and by depositing the same in United States Mail, first

class, postage prepaid, addressed to:


Assistant Attorney General
Erich Dryden
Office of the Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548

*/s/ Patrick F. McCann*
_____

Patrick F. McCann

## VERIFICATION AS TO PETITIONER'S KNOWLEDGE

Petitioner Masterson has been fully informed of, and has consented to, claims

raised in this petition.  *See 28 U.S.C. § 2242*, and Advisory Committee Note on Rule 2(c);

*Lucky v. Calderon*, 86 F.3d 923 (9th Cir.  1996).

I swear that the alleged facts in this petition are true and correct to the best of my

knowledge.

/s/ Patrick F. McCann
_____

Patrick F. McCann