

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

NO. WR-59,481-02

EX PARTE RICHARD ALLEN MASTERSON

ON APPLICATION FOR WRIT OF HABEAS CORPUS IN CAUSE
NO. 867834-A IN THE 176TH JUDICIAL DISTRICT COURT
HARRIS COUNTY

*Per Curiam*.

## O R D E R

This is a subsequent application for a writ of habeas corpus filed pursuant Texas Code of Criminal Procedure, Article 11.071, Section 5.

On April 2, 2002, a jury convicted applicant of the offense of capital murder. The jury answered the special issues submitted pursuant to Texas Code of Criminal Procedure article 37.071, and the trial court, accordingly, set punishment at death. This Court affirmed applicant's conviction and sentence on direct appeal. *Masterson v. State*, No. AP-74,344 (Tex. Crim. App. Feb. 2, 2005) (not designated for publication). Applicant filed his initial

Masterson - 2

application for a writ of habeas corpus pursuant to Article 11.071.  We denied relief.  *Ex parte Masterson*, WR-59,481-01 (Tex. Crim. App. Aug. 20, 2008).

Applicant presents four allegations.  We have reviewed the application and find that applicant's allegations fail to satisfy the requirements of Article 11.071 § 5.  Accordingly, we dismiss the application as an abuse of the writ without considering the merits of the claims.

IT IS SO ORDERED THIS THE 19TH DAY OF DECEMBER, 2012.


Do Not Publish

# NEUROPSYCHOLOGICAL ASSOCIATES

## 13656 BRETON RIDGE, SUITE F

## HOUSTON, TX 77070

(281)890-7776 VOICE    ✦    (281)890-7785 FAX

## FACSIMILE TRANSMITTAL SHEET

| TO: | FROM: |
|---|---|
| Mr. Patrick McCann | Shawanda W. Anderson, Ph. D. |
| COMPANY: | DATE: |
| attorney | 02/11/2013 |
| FAX NUMBER: (713) 226-8097 | TOTAL NO. OF PAGES, INCLUDING COVER: 6 |
| PHONE NUMBER: 713-223-3805 | SENDER'S REFERENCE NUMBER: |
| RE: R. Masterson | NPA REFERENCE NUMBER: |

☒ URGENT    ☒ FOR REVIEW    ☐ PLEASE COMMENT    ☐ PLEASE REPLY    ☐ PLEASE RECYCLE

NOTES/COMMENTS:

Greetings Mr. McCann,

Please see attached psych eval report for the patient named on the reference line. Thank you for the referral and we welcome feedback, suggestions, and any future referrals.

Best regards,

Shawanda W. Anderson, Ph. D., HSPP

This fax may include confidential and/or privileged information, and is intended to be viewed, accessed and used by the person or entity to which it is addressed. If the reader of this fax is not the intended recipient or an authorized agent, the reader is hereby notified that any dissemination, distribution and/or copying of this fax is prohibited. If you have received this fax in error, please notify the sender by replying to this message and destroy this fax immediately.

WWW.NEUROPSYCH-ASSOCIATES.COM

# Neuropsychological Associates

13656 Breton Ridge Street, Suite F

Houston, TX 77070

(281)890-7776 voice   (281)890-7785 fax

www.neuropsych-associates.com

Shawanda Williams-Anderson, Ph. D., HSPP

---

## FORENSIC NEUROPSYCHOLOGICAL EVALUATION

**Name:** Richard Masterson   **Civil Action #:** H-09-2731

**Ethnicity:** Caucasian   **Gender:** Male

**Date of Evaluation:** 01/11/2013   **DOB:** 03/05/1972

**Reason for Referral:**

The examinee was referred, by his defense attorney, for a neuropsychological evaluation to help determine if symptoms he experienced can be attributed to an organic cause, and if the symptoms warrants further investigation.

**Assessment Tools:**

Unstructured clinical interview with the examinee,

Mini-mental Status Exam (MMSE),

Rey Auditory Verbal Learning Test (RAVLT),

Trails A & B,

Symbol Digit Modalities Test (SDMT),

Rey Complex Figure Test (RCFT),

Hooper Visual Organization Test (HVOT)

Wisconsin Card Sort Test-64 (WCST-64).

**Behavioral Observations:**

The examinee was escorted to the interview room by 3 armed officers. The interview room contained a round wooden table and 2 chairs. The room was visible to officers through a barred window. Mr. Masterson's hands and feet were shackled, but his hands were released on request by the examiner so that he could sufficiently interact in the assessment process. He wore a standard issued, white jumpsuit. He also wore glasses for corrected vision. Eye contact was appropriate. He appeared his stated age, and was tall in stature. There were visible scars on the left side of his head. A slight dysconjugate gaze was also noted.

Mr. Masterson was not very talkative initially and seemed quite guarded. He stated that he believed that the assessment was to occur earlier in the month and seemed disappointed that it did not. After explanation of what to expect, the examiner's role, and the limits of confidentiality, he seemed eager to begin the process. Rapport was fairly easily established and maintained. His thought processes were coherent, and he did not appear to be attending to unseen external stimuli. He denied the presence of delusions, suicidal and homicidal ideation. Mr. Masterson's attention and effort were good and he was able to follow all instructions to completion. He seemed to approach each task frankly and with the intent to perform his best.

**Background/Social History:**

Mr. Masterson, a 41-year-old, right-handed Caucasian male, was able to give a verbal account of his personal history and medical background. Mr. Masterson relayed that he was born in Houston, Texas. He reported being the youngest of 9 children born to his parents. There is reportedly a 13 year age range between he and his oldest sibling. He reported that his gestational period and birth were unremarkable. He also reported that he reached his developmental milestones at the appropriate ages. He did report that he was born with a congenital condition that caused blindness in his left eye. He reported having corrective surgery on his eye at age 10 and that the beneficial results were short-lived. He attributed the congenital condition to the noted dysconjugate gaze.

He stated that his parents were married for 27 years, but were separated for several years during this time. Mr. Masterson stated that he was 11 years old at the time of the separation. He regarded his parents as neglectful and reported being placed in "foster care" when he was approximately 4 years old. He stated that his father drank heavily and was often abusive. He reported that he was raised in North Houston by both parents and it was "Hell growing up." His father reportedly passed away from cancer in 2000. His mother has also passed away from cancer. Mr. Masterson also reported being the victim of other perpetrators in the home. He reported that his older brother molested him at approximately age 7 or 8. He suspected that his brother learned this behavior from their father, as his brother and at least 1 sister were victims of incest. Mr. Masterson stated that he never divulged his abuse until age 27 when he told his girlfriend and subsequently confronted his brother.

Mr. Masterson reported receiving 7 years of formal education and concluded his education in 6th grade. He stated that he was retained at least once and was 13 when he signed from school. He did not readily acknowledge academic problems in school, but did indicate that he had behavioral difficulties in school. He stated he "fought a lot" because he was often teased about his eye. He estimated a frequency of engaging in physical altercations as "everyday." However, he was somewhat elusive and did not divulge a formal diagnosis or psychiatric problems that would better account for his behavior.

At age 13, Mr. Masterson reportedly was homeless and refused to return home because of the abuse/neglect. He stated that he was "on the street" and living from "friend-to-friend" for approximately 2 years. He stated, by age 15 he lived in a motel room with 14 other children, and 2 adults. He reported that prostitution and drug sales were his means of support. He also reported that it was approximately the same time that he began using illicit substances. He reported daily use of cocaine until his initial incarceration in 1988 (charges were truancy and criminal mischief). He stated that after his 11 month sentence, he remained sober for approximately 4-5 years. Subsequently, he engaged in daily drug binges and used cocaine intravenously from ages 21 to 24.

Currently, Mr. Masterson is incarcerated on Death Row of the Polunsky Unit. He has been convicted on capital murder charges involving strangulation and car theft. He began his sentence in May of 2002. He stated that he was unfamiliar with the victim and that it was an accidental death. He has never married and has no children. He has limited contact from family members. He stated that he rarely receives correspondences from his siblings.

### Medical/Psychological History:

Mr. Masterson has a significant medical history. In addition to his congenital eye defect, he has been diagnosed with Hepatitis C. He attributed the latter to his drug use. He also has a history of grand mal seizures. He reported that when he was using illicit substances, he could experience as many as 3 seizures per day.

Recent symptoms that are of concern are daily migraines that Mr. Masterson experiences. He described the pain as a "heaviness inside" his cranium. He stated that the pain is deep inside the cranium and extends down towards the spinal column. He also reported a shooting pain from the front of his head to the back that originates behind his eye. He stated that he experiences a stiff neck in addition to the pain. He reported a family history of migraines.

Mr. Masterson also reported that a Dr. Day, in 1988, conducted an evaluation while he was incarcerated (TYC). Reportedly, Dr. Day recommended that Mr. Masterson be evaluated and treated for organic brain damage. It is unclear what Dr. Day attributed to the etiology of the damage, but Mr. Masterson postulated that his many fights and altercations may have resulted in some damage to his cerebrum and was detected by Dr. Day. His history of substantial drug use may also be a contributing factor.

### Test findings:

Memory--Mr. Masterson was oriented x 4. He scored 30 out of 30 points on the MMSE. He demonstrated intact and adequate cognitive skills to participate in the evaluation. The evaluation began with measures of memory.

On a verbal learning task requiring him to recall a list of 15 words that were repeated 5 times, Mr. Masterson was able to recall as many as 15 of 15 words after the fifth trial. He recalled between 8-15 words across trials. He did demonstrate benefit from exposure and repetition. Following a period of distraction, he was able to recall 13 of 15 words, which indicated little deterioration of information. This performance fell in the average range. Following some delay (30 minutes), he was able to freely recall 14 of 15 words. This performance fell in the high average range.

Processing Speed-- Measures of cognitive processing speed indicated low average ability. The timed task required Mr. Masterson to write a number associated with a novel symbol, with visual stimulus cues being continuously given. Mr. Masterson completed 43 of a possible 110 items when his responses were written. He was able to correctly identify 47 of 110 items when he gave the responses verbally. He made 6 errors when completing this task. Although he has left visual field blindness, this could not fully account for the perceptual transposing that was observed on this task.

Visual Perceptual-- The RCFT was administered to assess perceptual organization. The examinee is given a complex figure and asked to copy the figure presented. Mr. Masterson's performance was classified as average. He was able to recreate all of the 36 point aspects of the

R. Masterson

page 3

figure. He did not omit features of the figure and was able to recreate the figure in an average amount of time. Mr. Masterson's performance suggests that he does not have difficulties with visually processing complex information, thus his performance on the processing speed task was not due to perceptual deficits.

A second and unrelated task of visual perception, the HVOT, was also administered. The HOVT is an instrument designed to measure an individual's ability to organize visual stimuli. The test consists of 30 line drawings depicting simple objects, which have been cut into pieces and rearranged in a puzzle-like manner. The subject is asked to identify what each object would be if it were put back together correctly. Mr. Masterson correctly identified 24 out of 30 objects. This performance falls in the average range despite the errors.

**Executive Functioning**-- Trails A & B were administered to Mr. Masterson to assess speeded scanning and mental flexibility. On Trails A, Mr. Masterson was required to connect circles containing letters in alphabetical order while being timed. Thus, the task requires intact visual scanning abilities, mental ordering, and fine motor abilities. Mr. Masterson's ability to perform the task was in the average range (T=44). He was able to order the alphabets, but did make 1 error. He was able to complete the task in 41 seconds. Visual scanning and fine motor ability were adequate for the task. His performance on Trails B was similar and fell in the average range (T=53). Trails B is a more complex task in that it has circles to be connected that contain letters and numbers. The examinee is required to switch between letters and numbers when ordering. Mr. Masterson performed the task in 80 seconds. He did not make any errors on the task.

The WCST-64 is an abbreviated task that requires the examinee to match 64 cards to 4 stimulus cards. The examinee is given only minimal feedback (i.e., correct/incorrect) on his/her performance and is to use that feedback to guide future responses. Thus, abstract reasoning, flexibility, and deduction are necessary tasks to successfully complete the WCST-64. On the WCST-64 Mr. Masterson was able to complete 1 of 3 categories. He was not particularly perseverative on this task, but did have difficulty reasoning and deciphering the rules of the task. He responded well to the feedback, but did not take it into consideration when deducing his next move. Results indicate that this area of executive functioning is impaired and that he may have difficulty using his environment to make decisions, having forethought about his actions, and reasoning.

**Summary/Conceptualization:** Mr. Richard Masterson is a 41-year-old, Caucasian male with a history of abuse/neglect, significant substance use, and behavioral difficulties. Currently, he is incarcerated and being housed on Death Row of the Polunsky Unit on charges of capital murder. His defense team precipitated and requested a neuropsychological evaluation to determine if symptoms he is currently experiencing could be attributed to an organic etiology. The current symptoms include daily headaches, vertebral stiffness, and neck pain. He also has a medical history significant for Hepatitis C, blindness in his left eye, and grand mal seizures.

Test results indicated that Mr. Masterson has many intact abilities, including memory and visual perception. However, he did demonstrate relative deficits in the areas of cognitive processing speed and abstract reasoning. Although his processing speed was in the low average range, he made several errors. Likewise, his reasoning was impaired and fraught with errors.

Mr. Masterson's testing profile is typical of a person with a history of substance abuse and subtle brain dysfunction. That is, many areas are intact, but there are deficits seen in higher order cognitive domains such as speeded processing and reasoning that may not be overt to an untrained observer. His deficits can surely be from injuries he sustained in his developmental years where abuse frequently occurred, or his many physical altercations. Also, substance abuse can be a causative and/or contributing factor. In general, chronic substance use can cause brain damage and dysfunction, and the effects can be even more detrimental if the brain was previously comprised via injury or otherwise. The symptoms Mr. Masterson is experiencing may indicate the presence of some sort of brain anomaly. He described a "heavy" sensation that may indicate such. Additionally, he described symptoms such as stiff neck and "pain deep in the brain" that may specific to irregular brain ventricles or a foreign substance in the cerebrospinal fluid. Lastly, but of great importance, is the fact that a previous practitioner mentioned and queried the possible presence of brain injury. In summary, Mr. Masterson's profile indicates that he may be experiencing symptoms related to brain dysfuntion. Given the pattern of his symptoms and history, neuroimaging and further evaluation is warranted.

_[signature]_ Ph.D.    2/8/13

Shawanda W. Anderson, Ph. D., HSPP        Date

Licensed Psychologist/Neuropsychologist



**JUDGMENT – DEATH PENALTY**

CAUSE NO. __867834__

THE STATE OF TEXAS  
VS.  
__RICHARD ALLEN MASTERSON__  
(Name of Defendant)  
AKA _____

IN THE __176TH__ DISTRICT COURT  
OF HARRIS COUNTY, TEXAS

| | |
|---|---|
| Date of Judgment: | APR 25 2002 |
| Date of Offense: | FEB 9 2001 |
| Attorney for State: | SUNNY MITCHELL |
| Attorney for Defendant: | BOB LOPER |
| | ☐ Defendant Waived Counsel |
| Offense Convicted of: | CAPITAL MURDER |

A FELONY, DEGREE: CAPITAL

(Circle appropriate selection – N/A = not available or not applicable)

| | 1st Paragraph | | 2nd Paragraph | | |
|---|---|---|---|---|---|
| Plea to Enhancement Paragraph(s): | True \| Not True | **(N/A)** | True \| Not True | **(N/A)** | Charging Instrument: Indictment |
| Findings on Enhancement(s): | True \| Not True | **(N/A)** | True \| Not True | **(N/A)** | Plea: Not Guilty |

This cause being called for trial, in Harris County, Texas, unless otherwise referenced, the State appeared by her District Attorney as named above and the Defendant named above appeared in person with Counsel as named above; or the Defendant knowingly, intelligently, and voluntarily waived the right to representation by counsel as indicated above in writing in open court, and both parties announced ready for trial.

A Jury composed of __DANNY LEE EPPERS__ and eleven others was selected, impaneled, and sworn. The indictment was read to the Jury, and the Defendant entered a plea of not guilty thereto, after having heard the evidence submitted; and having been charged by the Court as to their duty to determine the guilt or innocence of the Defendant and having heard argument of counsels, the Jury retired in charge of the proper officer and returned into open Court on __APR 24 2002__, the following verdict, which was received by the Court and is here entered on record upon the minutes:

"We, the Jury, find the defendant, Richard Allen Masterson, guilty of capital murder, as charged in the indictment."

Thereupon, the Jury, in accordance with law, heard further evidence in consideration of punishment, and having been again charged by the Court, the jury retired in charge of the proper officer in consideration of punishment and returned in open Court on __APR 25 2002__, the following verdict, which was received by the Court and is here entered of record upon the minutes:  
(Special Issues/Verdict/Certification):

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Richard Allen Masterson, would commit criminal acts of violence that would constitute a continuing threat to society?  
ANSWER:  
We, the jury, unanimously find and determine beyond a reasonable doubt that the answer to this Special Issue is "YES."

CRM95

1



(Special Issues – Continued):

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, Richard Allen Masterson, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

ANSWER:
We, te jury, unaminously find that the answer to this Special Issue is "NO."

VERDICT

We, the Jury, return in open court the above answers to the "Special Issues" submitted to us, and the same is our verdict in this case.

It is therefore considered, ordered, and adjudged by the Court that the Defendant is guilty of the offense indicated above, a felony, as found by the verdict of the Jury, and that the said Defendant committed the said offense on the date indicated above, and that he be punished as has been determined by the Jury, by death, and that Defendant be remanded to jail to await further orders of this Court.

And thereupon, the said Defendant was asked by the Court whether he had anything to say why sentence should not be pronounced against him, and he answered nothing in bar thereof.

Whereupon the Court proceeded, in presence of said Defendant to pronounce sentence against him as follows, to wit, "It is the order of the Court that the Defendant named above, who has been adjudged to be guilty of the offense indicated above and whose punishment has been assessed by the verdict of the Jury and the judgment of the Court at Death, shall be delivered by the Sheriff of Harris County, Texas immediately to the Director of the Institutional Division, Texas Department of Criminal Justice or any other person legally authorized to receive such convicts, and said Defendant shall be confined in said Institutional Division in accordance with the provisions of the law governing the Texas Department of Criminal Justice, Institutional Division until a date of execution of the said Defendant is imposed by this Court after receipt in this Court of mandate of affirmance from the Court of Criminal Appeals of the State of Texas. The said Defendant is remanded to jail until said Sheriff can obey the directions of this sentence. From which sentence an appeal is taken as a matter of law to the Court of Criminal Appeals of the State of Texas.

Signed and entered on ____APR 25 2002____

X _Brian Rains_
BRIAN RAINS
JUDGE PRESIDING

RECORDER'S MEMORANDUM
This instrument is of poor quality and not satisfactory for photographic recordation; and/or alterations were present at the time of filming.

Automatic Appeal 4-25-02
MANDATE OF AFFIRM. 3-7-05

2/998/EE
4/999/EE

CRM95

2