UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RICHARD ALLEN MASTERSON,        §
                                §
                                §
        Petitioner,             §
VS.                             §        CIVIL ACTION NO. 4:09-CV-2731
                                §
RICK THALER,                    §
                                §
        Respondent.             §

## MEMORANDUM AND ORDER

Richard Allen Masterson, an inmate in custody of Texas Department of Criminal Justice – Correctional Institutions Division, has filed a federal petition for a writ of habeas corpus. Masterson challenges his capital conviction and death sentence for killing Darin Shane Honeycutt during a robbery. After considering the record, the pleadings, and the applicable law, the Court finds that Masterson is not entitled to habeas relief. The Court will deny Masterson's petition and will not certify any issue for appellate review.

## FACTUAL BACKGROUND

A brief review of the facts frames the issues Masterson raises on federal habeas review. The victim, who frequented clubs dressed as a woman while using the name "Brandy Houston," was found dead in his apartment bedroom on January 27, 2001. The victim was naked, his body hanging off the edge of his bed with his face resting on the floor. Someone had rummaged through his belongings. His car was missing from the parking lot. A subsequent autopsy determined that the victim had died from asphyxiation. The victim's injuries suggested that

someone had strangled him using a sleeper hold (where the assailant applies pressure on the victim's neck with the crook of his arm from behind).

Masterson, who had been seen frequenting clubs around the time of the murder, quickly became a suspect. Tr. Vol. 18 at 48.[1]  After the murder, witnesses saw Masterson driving the victim's car.  Masterson also made statements suggesting that he had killed someone.  For example, Masterson told his brother's employer: "I think I put somebody to sleep" and then made a motion across his neck. Tr. Vol. 18 at 112-13.  Masterson also told his brother that he had put someone "in a headlock 'til he went limp" and that he "put him down[.]" Tr. Vol. 18 at 170, 174.  By the time police officers had identified Masterson as a suspect, however, he had fled from Houston in the victim's car.

Within days, police officers in Georgia pulled over Masterson's nephew driving the stolen car. Tr. Vol. 18 at 157.  The police found cocaine inside the vehicle.  Masterson, however, had already taken a bus to Florida.

A week later, police officers in Florida arrested Masterson who had stolen another car.  A Harris county police officer traveled to Florida and interviewed Masterson.  After initially denying any involvement in the murder, Masterson confessed.  Masterson described how he met the victim and accompanied him to his apartment.  The victim anticipated that they would engage in sexual relations; Masterson intended to steal his car. Tr. Vol. 19 at 76-77.  Masterson recounted how, when they entered the apartment, the victim undressed.  Masterson then

---

[1]     The state court proceedings in this case resulted in a voluminous record.  The Court will cite the Clerk's Record containing trial court motions and docket entries as Clerk's Record at ___.  The reporter's record containing the trial court proceedings will be cited as Tr. Vol. ___ at ___.  The Court will cite the records from Masterson's initial state habeas action as State Habeas Record at ____.

"grabbed him around the neck" from behind by "put[ting] his throat in the pit of [his] arm, in the joint of [his] elbow[.]  Tr. Vol. 19 at 76.  The victim "never struggled, never did nothing, just went to sleep."  Tr. Vol. 19 at 76.  Masterson then pushed him onto the bed, "just said the hell with it, I might as well go all the way with it now," and "grabbed him around the neck[.]"  Tr. Vol. 19 at 78.  Masterson said he killed the victim because he "needed a car" because he "got tired of being in Houston."  Tr. Vol. 19 at 77.  Masterson then went through the victim's jewelry box, took the victim's VCR and car keys, and left.

In his police statement, Masterson also confessed that he had committed a similar offense in Florida.  Not long after the Texas murder, Masterson met a man in a club and went to his apartment to engage in sexual intercourse.  Masterson grabbed the man and strangled him until he passed out.  Masterson then stole his car.  Masterson later described his second crime: "Pretty much the same thing I did in Houston, except the person didn't die . . .  I didn't let the person get undressed this time."  Tr. Vol. 19 at 230.

The State of Texas charged Masterson with capital murder during the course of a robbery.  Clerk's Record at 9.  Trial counsel[2] recognized that Masterson's confession was the most damaging evidence against him and made strategic decisions to minimize its impact.  Importantly, trial counsel filed a pretrial motion to suppress the police statement.  Trial counsel argued that Masterson had invoked his right to counsel and then only confessed after the police officer made certain promises.  After a hearing, the trial court held that Masterson's statement could come before the jury.

---

[2]      The court appointed Robert Loper and Layton Duer to represent Masterson.  The Court will refer to Masterson's attorneys collectively as "trial counsel."

The trial of Masterson's guilt was not lengthy.  In a three-day guilt/innocence phase, the parties did not dispute that Masterson had been in the victim's apartment when he died.  The sole issue for the jury's consideration was Masterson's intent in strangling the victim.  The prosecution played Masterson's confession to the jury to prove that he killed to steal the victim's car. Tr. Vol. 19 at 70-89.  The prosecution argued that forensic evidence corroborated the prosecution's version of events.

The defense admitted that Masterson had strangled the victim, but claimed that he intended no harm.  This defense hinged on Masterson taking the stand and discounting his police statement.  Masterson said that he only confessed to capital murder because he was embarrassed to admit that he wanted to engage in homosexual relations with the victim.  Tr. Vol. 19 at 139-40.  Masterson told the jury that, as they had sex, the victim asked Masterson to "choke [him] out."  Tr. Vol. 19 at 127.  Trial counsel adduced testimony explaining that "autoerotic asphyxia" is a practice where an individual "decrease[s] the blood flow . . . to heighten the enjoyment of the climax" during sexual activity.  Tr. Vol. 18 at 231.  Masterson claimed that he complied with the victim's alleged request and "applied pressure to [the victim's] neck" for "[a] couple of minutes."  Tr. Vol. 19 at 128-29.  When Masterson was unable to support his weight anymore, they both fell to the floor.  The victim began "making noises, grunting, gurgling, or whatever[.]"  Masterson left the room and, when he returned, the victim was dead.  Tr. Vol. 19 at 122-30.  Based on Masterson's trial testimony, the defense argued that jurors should still hold him responsible in the victim's death, but for a crime less severe than capital murder.

The jury found Masterson guilty of capital murder.

Jurors decided Masterson's sentence by answering two special-issue questions: (1) would he constitute a future threat to society? and (2) did mitigating circumstances warrant that he receive a life sentence?[3]  Clerk's Record at 314-15.  In a two-day punishment hearing, the parties presented testimony and witnesses relevant to Masterson's sentence.  The prosecution sought to prove that Masterson's violence and lawlessness was an enduring and pervasive feature in his character.  To that end, the prosecution put into evidence records from when Masterson was in Texas Youth Commission ("TYC") custody as a juvenile, though the prosecution did not discuss the records at length.  Witnesses described some of Masterson's prior bad acts as an adult. Deedra Foster, a former girlfriend, described an incident in which Masterson accused her of having an affair, ripped a telephone off the wall, struck her in the head, and threatened to kill her if she called the police.  Tr. Vol. 21 at 120.  Later that same night, Masterson kicked in two doors to get at Ms. Foster.  When she tried to call the police, Masterson grabbed the phone, raised her off the floor, struck her several times, and threatened to beat her to death before the police arrived.  Another witness testified that Masterson had once thrown a beer bottle at her, knocking out two of her teeth.

---

[3]     In full, the special issue questions asked:

Special Issue No. 1

Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant Richard Allen Masterson would commit criminal acts of violence that would constitute a continuing threat to society?

Special Issue No. 2

Do you find from the evidence, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, do you find that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?

Clerk's Record at 314-15.

Witnesses described Masterson's violence while incarcerated.  Masterson repeatedly attacked other inmates, including one who had disrespected the Aryan Brotherhood prison gang. Masterson also threatened to choke a jail guard like he had his victims.  In addition, the jury had the brutality of the victim's murder, along with his commission of a similar offense soon thereafter, to consider in determining his fate.  In sum, the prosecution portrayed Masterson as a man of longstanding and unremitting violence.

Trial counsel called punishment-phase witnesses who gave what Masterson now describes as "extensive defense testimony."  (Docket Entry No. 53 at 18).  Two Harris County Sheriff's Office deputies testified that Masterson had not caused any problems while incarcerated before trial.  Tr. Vol. 22 at 29-33, 42-45.  Masterson's sister, Ramona Weiss, provided insight into his turbulent upbringing.  She explained that Masterson's father showed no affection, often beating his children after he came home drunk.  Their father once kidnapped their mother, leaving a sixteen-year-old sister to take care of three-year-old Masterson. Masterson was once placed in a foster home. The only sense of normalcy in their young lives came when they briefly lived with a police officer after being picked up as abandoned.  Masterson stopped attending school regularly after age twelve.  Children often teased him about his eye problems.  Ms. Weiss testified that she had never seen her brother act violently.  Tr. Vol. 22 at 53-71.

Masterson himself testified as the defense's last witness.  In an on-the-record colloquy, the trial court questioned Masterson about his choice to take the stand.  Masterson said that his attorneys had counseled him not to testify, but he still wanted to nonetheless.  Tr. Vol. 22 at 76-77.  In his testimony, Masterson disputed testimony about his prior bad acts.  He additionally justified his jail altercations and claimed that the jailor had lied about his violent threats.  Cross-

6

examination, however, proved devastating.  The prosecution questioned Masterson about other violent acts he had committed. Masterson acknowledged that he first entered state custody at age sixteen for car theft, criminal mischief, and truancy.  Masterson admitted he and his friends used to rob wealthy homosexuals.  He explained that as a youth he had been shot during a drug deal where he had also shot someone.  He had also previously committed burglary.  He served prison time in Tennessee for stealing an automobile.

In his testimony, Masterson volunteered that he would be a future danger and that no mitigating circumstances warranted a life sentence.  Tr. Vol. 22 at 84-85.  Masterson even said that the jury should return a death sentence if it followed the law.  Tr. Vol. 22 at 99.  The jury agreed and answered Texas' special issues in a manner requiring the imposition of a death sentence.

## PROCEDURAL HISTORY

Masterson sought appellate review of his conviction and sentence.[4]  Masterson's appellate brief raised eight points of error, all of which he renews on federal habeas review.  The Texas Court of Criminal Appeals affirmed Masterson's conviction and sentence in a published opinion. *Masterson v. State*, 155 S.W.3d 167 (Tex. Crim. App. 2005).  The Supreme Court refused to grant certiorari review.  *Masterson v. Texas*, 546 U.S. 1169 (2006).

During the pendency of state appellate review, Masterson filed a state application for writ of habeas corpus.[5]  The trial court signed findings of fact and conclusions of law recommending

---

[4]     Jay Brandon and Janet Morrow represented Masterson on direct appeal.

[5]     J. Sidney Crowley represented Masterson in his initial habeas proceedings.

that habeas relief be denied.  State Habeas Record at 159-73.  The Court of Criminal Appeals adopted the trial court's findings and conclusions and denied relief on August 20, 2008.  *Ex parte Masterson*, No. 59,4812008 WL 3855113 (Tex. Crim. App. 2008).

Masterson filed a federal habeas petition raising ten grounds for relief on August 17, 2009.  (Docket Entry No. 1).[6]  Respondent filed an answer and moved for summary judgment. (Docket Entry No. 5).  After Masterson filed a reply (Docket Entry No. 10), this Court stayed this action because of the pendency of relevant cases before the United States Supreme Court. (Docket Entry No. 26).

During the stay, Masterson filed another state habeas application raising four new grounds for relief.[7]  Texas, however, honors a stringent abuse-of-the-writ doctrine, codified in article 11.071§ 5 of the Texas Code of Criminal Procedure.  Unless a prisoner meets narrow exceptions, the Texas courts reject any successive habeas application without addressing its merits.  Here, the Court of Criminal Appeals dismissed Masterson's application as an abuse of the writ on December 19, 2012. *Ex parte Masterson*, No. 59,481-02, 2012 WL 6630160 (Tex. Crim. App. 2012).

The Court reopened this action on June 27, 2012.  (Docket Entry No. 34).  Masterson sought leave to amend his federal petition.  (Docket Entry No. 37).  To allow amendment, the

---

[6]     This Court appointed Patrick F. McCann to represent Masterson throughout the course of his federal habeas proceedings.

[7]     Specifically, Masterson raised four ineffective-assistance claims arguing that his trial attorneys should have presented evidence of organic brain dysfunction, rebutted the State's use of his juvenile records, developed mitigating evidence that he had been shot as a youth, and investigated whether that he suffered from a seizure disorder.  Masterson renews those issues as claims eleven through fourteen of his federal habeas petition.

Court denied the pending summary judgment motion without prejudice and entered a new scheduling order.  (Docket Entry No. 38).  Masterson filed an amended federal petition on April 8, 2013.  (Docket Entry No. 53).  In his amended federal petition, Masterson raises the following issues, including the four claims that he advanced for the first time on successive state habeas review:

1. Trial counsel provided ineffective assistance by failing to consult with a pathologist and present medical testimony about the victim's cause of death.

2. Trial counsel provided ineffective assistance by not adequately developing and presenting mitigating evidence.

3. Masterson's due process rights were denied when a juror slept during trial testimony.

4. The trial court violated Masterson's due process rights by refusing to instruct jurors on a lesser-included offense.

5. The trial court violated Masterson's constitutional right admitting into evidence his statement that the police elicited through improper promises.

6. The trial court violated Masterson's constitutional rights by admitting his statement into evidence when the police had ignored his invocation of the right to counsel.

7. Insufficient evidence showed that Masterson would be a continuing threat to society.

8. The trial court violated Masterson's constitutional rights by not allowing the defense to argue last during punishment-phase closing arguments.

9. The Texas statute setting out the jury's punishment-phase voting procedure violates the Eighth and Fourteenth Amendments.

10. The trial court violated the Eighth Amendment by not informing jurors on the effect of a hung jury.

11. Trial counsel provided ineffective assistance by not negating the *mens rea* necessary for capital murder through evidence of Masterson's organic brain dysfunction.

9

12. Trial counsel provided ineffective representation by not rebutting the State's use of Masterson's juvenile record.

13. Trial counsel provided ineffective representation by not developing mitigating evidence that Masterson had been shot as a youth.

14. Trial counsel provided ineffective representation by not presenting evidence in the guilt/innocence phase that Masterson suffered from a seizure disorder.

Respondent has filed a supplemental answer and motion for summary judgment. (Docket Entry No. 71). Respondent's new summary judgment motion only addresses the claims raised for the first time in Masterson's amended petition. Respondent relies on the arguments made in the original answer with regard to the remainder of Masterson's claims. (Docket Entry No. 71 at 3). Masterson has filed a supplemental reply. (Docket Entry No. 78). This matter is now ripe for adjudication.

## GOVERNING LEGAL STANDARDS

The writ of habeas corpus provides an important, but limited, examination of an inmate's conviction and sentence. *See Harrington v. Richter*, ___ U.S. ___, 131 S. Ct. 770, 787 (2011) ("[S]tate courts are the principal forum for asserting constitutional challenges to state convictions."). While "the Framers considered the writ a vital instrument for the protection of individual liberty," *Boumediene v. Bush*, 553 U.S. 723, 743 (2008), principles of finality, comity, and federalism narrow the scope of federal habeas review. *See Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) ("The role of federal habeas proceedings . . . secondary and limited."); *Engle v. Isaac*, 456 U.S. 107, 128 (1982) ("The States possess primary authority for defining and enforcing the criminal law."). With particular applicability to the instant case, the Anti-

Terrorism and Effective Death Penalty Act ("AEDPA") confines both the nature and scope of federal habeas review.

When an inmate has presented his claims in a manner allowing the state courts to resolve their merits, the AEDPA provides for a forgiving federal review.  The AEDPA "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in [28 U.S.C.] §§ 2254(d)(1) and (d)(2)."  *Richter*, ___ U.S. at ___ 131 S. Ct. at 784.  Under those provisions, "a federal court cannot grant a petition for a writ of habeas corpus unless the state court's adjudication of the merits was 'contrary to, or involved an unreasonable application of, clearly established Federal law.'"  *Berghuis v. Thompkins*, 560 U.S370, 378 (2010) (quoting 28 U.S.C. § 2254(d)(1)).  The Supreme Court has clarified that relief lies under section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts"; or (2) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000); *see also Thaler v. Haynes*, 559 U.S. 43, 47 (2010); *Bell v. Cone*, 535 U.S. 685, 698 (2002); *Early v. Packer*, 537 U.S. 3, 7-8 (2002).  This "substantially higher threshold" focuses not on whether the state court was "incorrect, but on whether its determination was 'unreasonable.'"  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007); *see also Morrow v. Dretke*, 367 F.3d 309, 313 (5th Cir. 2004); *Foster v. Johnson*, 293 F.3d 766, 776 (5th Cir. 2002).  Federal courts likewise afford significant deference to a state court's factual determinations, presuming all factual findings to be correct. *See* 28 U.S.C. § 2254(e)(1),(2).

11

A petitioner's compliance with the AEDPA does not alone entitle him to habeas relief. *See Horn v. Banks*, 536 U.S. 266, 272 (2002); *Robertson v. Cain*, 324 F.3d 297, 306 (5th Cir. 2003). Other judicial doctrines, such as the harmless-error doctrine and the non-retroactivity principle, restrict federal habeas relief. *See Thacker v. Dretke*, 396 F.3d 607, 612 n.2 (5th Cir. 2005). This Court cannot issue a habeas writ unless error "ha[d] a 'substantial and injurious effect or influence in determining the jury's verdict.'" *Robertson*, 324 F.3d at 304 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993)); *see also Aleman v. Sternes*, 320 F.3d 687, 690-91 (7th Cir. 2003) ("Nothing in the AEDPA suggests that it is appropriate to issue writs of habeas corpus even though any error of federal law that may have occurred did not affect the outcome."). Also, under the jurisprudence flowing from *Teague v. Lane*, 489 U.S. 288 (1989), a habeas court cannot grant relief if it would require the creation and retroactive application of new constitutional law. *See Horn*, 536 U.S. at 272.

Respondent has moved for summary judgment on some claims. Summary judgment is proper where the record shows "no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). In ordinary civil cases, a district court considering a motion for summary judgment must view all the evidence in a light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor"). However, a court must view a summary judgment motion through "the prism of the substantive evidentiary burden." *Id.* at 254.

Where the state courts have already resolved a prisoner's factual allegations by express or implicit findings, and the prisoner fails to prove by clear and convincing evidence that the presumption of correctness of 28 U.S.C. § 2254(e)(1) should not apply, construing facts in his favor is inappropriate and unauthorized.  This Court, therefore, applies general summary judgment standards only insofar as they do not conflict with the language and intent of the AEDPA or other habeas law.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); Rule 12 of the RULES GOVERNING SECTION 2254 CASES IN THE UNITED STATES DISTRICT COURTS.  Because Masterson presented many of his claims in state court, and the state courts issued detailed findings of fact and explicit conclusions of law with respect to each exhausted claim, the AEDPA largely guides this Court's summary judgment review.  With respect to any issue falling outside the AEDPA standards, federal law plainly allows for summary dismissal if unexhausted claims lack merit.

With those standards in mind, the Court turns to Masterson's grounds for relief.

## ANALYSIS OF MASTERSON'S GROUNDS FOR RELIEF

### I.    Ineffective Assistance of Counsel (claims one, two, and eleven through fourteen)

Masterson argues that his trial attorneys made insufficient efforts to avoid a capital conviction and to avert a death sentence.  In reviewing a trial attorney's efforts, courts use the framework established in *Strickland v. Washington*, 466 U.S. 668 (1984), that asks whether "a

defense attorney's *performance* f[ell] below an objective standard of reasonableness and thereby *prejudice[d]* the defense."  *Yarborough v. Gentry*, 540 U.S. 1, 4 (2003) (emphasis added); *see also Wiggins v. Smith*, 539 U.S. 510, 520 (2003).  "Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).  In evaluating counsel's performance, "[j]udicial scrutiny . . . must be highly deferential" because "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  *Strickland*, 466 U.S. at 689.  Thus, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  A court measures whether an attorney's performance prejudiced the defense by whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Lafler v. Cooper*, ___ U.S. ___, 132 S. Ct. 1376, 1384 (2012) (quoting *Strickland*, 466 U.S. at 694).

### A.    Evidence of *Mens Rea* through a Pathologist (claim one)

Masterson confessed that he intended to kill the victim.  The defense, however, sought to retract that statement through Masterson's trial testimony.  When he took the stand, Masterson claimed that he willingly engaged in sexual intercourse with the victim.  Masterson testified that the victim asked to be strangled during sex.  Allegedly, the victim died after he complied, even though Masterson had no intent to kill him.  With that version of events, trial counsel investigated the possibility that a medical condition, rather than Masterson's intent to kill, caused the victim to pass away.  Masterson faults trial counsel for not presenting testimony from a defense expert witness to bolster the defense's theory and Masterson's trial testimony.

14

1.      The trial testimony

Dr. Paul Shrode, an assistant Harris County medical examiner, performed an autopsy on the victim and established the cause of death.  Dr. Shrode determined that the victim died from "external neck compression."  Tr. Vol. 18 at 207.  Trial counsel, however, investigated the possibility that heart disease contributed or caused the victim's death.  To that end, the defense obtained the assistance of Dr. Robert Walmsey, a cardiologist.

Trial testimony adduced by the prosecution, however, discounted the effect of heart disease in the victim's death.  Dr. Shrode testified that some external injuries he found on the victim's body suggested that he died during a tussle: an apparent rug burn on his face; hemorrhages around his eyes, caused both by neck compression and by gravity as the body lay face down; and contusions on his hands.  Dr. Shrode opined that the victim had probably struggled before his death because of the condition of the bedroom and the fact that one of his acrylic nails had been pulled off.  Tr. Vol. 18 at 205-06.  Dr. Shrode explained that "external neck compression" caused the victim to asphyxiate.  Tr. Vol. 18 at 205, 208.  Dr. Shrode testified that the assailant did not break any bones in the neck, suggesting the he did not strangle the victim with his hands.  Tr. Vol. 18 at 202-03.  The intact bones suggested that the assailant likely used a sleeper hold "where the elbow, the crook of the arm is up against the windpipe so that the actual pressure is on the sides of the neck."  Tr. Vol. 18 at 201.

The prosecution's questioning then turned to Dr. Shrode's internal observations.  Dr. Shrode testified: "He also had hardening of an artery, we call it arteriosclerosis.  One of his main coronary arteries was very narrowed.  It wasn't closed, it wasn't occluded, but it was very

narrowed." Tr. Vol. 18 at 206. While the narrowed artery "[p]otentially" could have caused the victim to die earlier during a strangulation, "there's no evidence of any acute or really sudden change in his heart muscle. Also there was no hemorrhaging in the heart muscle which could suggest an acute heart attack[.]" Tr. Vol. 18 at 206, 207. Using Dr. Shrode's testimony, in conjunction with the description of the murder in Masterson's confession, the prosecution argued that Masterson intentionally killed by strangling the victim after he passed out.

The defense's cross-examination of Dr. Shrode tried to establish that a sexual act known as autoerotic asphyxiation caused the victim's heart to stop, without Masterson intending any harm. Dr. Shrode had discounted autoerotic asphyxiation as the cause of death because "the purpose of decreasing the blood flow . . . is to heighten the enjoyment of the climax" and "[i]f somebody else does this to the deceased during a sexual act and the person passes out, what's the point of continuing to strangle 'em?" Tr. Vol. 18 at 232. Dr. Shrode explained: "If a person passes out, the blood flow will resume to the brain and consciousness will return. So my conclusion is that blood flow was impeded after the neck was compressed for some time and the person passed out" but that the "blood flow was still continued to be impeded for some time after that." Tr. Vol. 18 at 231. Dr. Shrode said: "Why a person would want to continue to strangle them [once they lost consciousness]? Because they wanted to kill them." Tr. Vol. 18 at 237.

Still, trial counsel's cross-examination still left open the possibility that the victim's heart condition contributed to his death:

Trial counsel:     Is it possible that a consensual sex act involving something like that occurred that consciousness was lost and that because of Mr. Honeycutt's special circumstances in his

|                  | cardiovascular system that he went into that arrhythmic state and ultimately expired? |
| ---------------- | ---------------- |
| Dr. Shrode:      | I don't think so.  I don't think so because of the significant collateral support that his heart muscle had from the other arteries.  That because there's no evidence that he's suffered any kind of heart disease to the muscle that is because of the narrowing of the artery. |
| Trial counsel:   | But didn't you also tell us that if a person went into an arrhythmic state that might not necessarily show damage to the heart upon examination? |
| Dr. Shrode:      | Yes. |

Tr. Vol 18 at 234.

        With that cross-examination, trial counsel then did not consider it necessary to call Dr.

Walmsey to the stand.  Trial counsel explained in their affidavits:

> [T]he defense employed the services of a Cardiologist . . . to testify about the Complainant's death. Through our consultation with Dr. Walmsey, we were able to develop the areas for cross-examination of the assistant medical examiner, Paul Shrode, M.D. During cross-examination, Dr. Shrode conceded each point about which Dr. Walmsey would have testified. Co-counsel and I agreed it was no longer necessary for Dr. Walmsey to testify.

State Habeas Record at 146.

        The prosecution's closing arguments discounted the possibility that Masterson was not

responsible for the victim's death:

> [T]here was some testimony that the complainant in this case had hardening of the arteries and we all know from listening to [Dr. Shrode] that what that means is that his conduct that but for the conduct of the defendant in other words strangling the victim, the victim would not have died.  May have died early, it may have taken less time . . . but in terms of causation I don't know if that's going to be a factor[.]

Tr. Vol. 20 at 6.  The defense, however, countered that Dr. Shrode's testimony did not exclude their theory that Masterson did not intend to kill:

> Everything that he talked about was consistent with the sleeper hold pressure is on the side of the neck, not on the front of the neck.  He could have gone into an arrhythmic state.  As he agreed, all that evidence is as consistent with a consensual sex act as with asphyxiation.  When I tried to ask him can you distinguish between the two, can your scientific finding -- because he didn't decide who's guilty or not, he didn't decide intent or not, he just tells you what the findings are.  He is supposed to be an independent medical expert employed by you, the citizens of Harris County, to come and testify about his findings.
>
> He jumped on the home team's train just a little bit in this trial because when I tried to press him about his findings he said well it just couldn't have been.  Why is that, Doctor?  Well it just couldn't have been.  Why is that Doctor?  Because if you choke someone until they're unconscious why would you keep going?  You'd stop.  Well, that does make sense.  Is that the only thing you can point to Doctor?  I think I asked him three times, and I think that was the only thing he ever came up with.  He said, well, normal blood flow would resume, but that was only a surmise on his part.  He doesn't know that.  He admitted that the body was in . . . this position . . . with his head down.  He admitted that gravity could have caused all these injuries that he found as well as the sleeper hold.  Nothing that he could point to said this is definitive that this was an intentional external compression.

Tr. Vol. 20 at 20-21.

### 2.    Masterson's Habeas Claim

On state habeas review, Masterson faulted his attorneys for not vigorously challenging Dr. Shrode's expert testimony.  Masterson recognized that the circumstances, particularly given his police confession, left his attorneys with few options.  Masterson did not take issue with his trial attorneys' strategy of attacking his intent in strangling the victim.  In fact, Masterson

premised his ineffective-assistance claim on the same theory evinced by trial counsel's cross-examination of Dr. Shrode: that "the additional stresses on the heart superimposed on the effects of sexual excitement led to a fatal cardiac arrhythmia arising out of [the victim's] unforeseeable predisposition to such an arrhythmia because of coronary arteriosclerosis" which "may not have been recognizable to [Masterson] who may not have reversed the hold quickly enough to avert the irreversible consequences." State Habeas Record at 16.

Masterson argued that trial counsel should have countered Dr. Shrode's testimony by calling a defense expert in rebuttal. In support, Masterson relied on an affidavit from Dr. Paul B. Radelat, a medical doctor and forensic pathologist. Dr. Radelat reviewed the autopsy report and portions of the trial testimony "in order to form opinions regarding the death of [the victim] and the circumstances associated with his death." Dr. Radelat opined:

> Based upon the material available for my review and upon my forty plus years of training and experience in pathology, it is my opinion that the choke hold/sleeper hold applied to the neck of Darin Shane Honeycutt by Defendant Richard Masterson produced a partial reduction in cerebral blood flow thus producing brain hypoxia and partial if not complete unconsciousness. Simultaneously with the brain hypoxia, there was compression on the carotid sinuses with increased heart rate and systemic hypertension. In reasonable medical probability, these additional stresses on the heart superimposed on the adrenergic effects of sexual excitement led to a fatal cardiac arrhythmia in Darin Shane Honeycutt arising out of his unforeseeable pre-disposition to such an arrhythmia because of the coronary atherosclerosis demonstrated at post-mortem examination.
>
> Expressed in other terms, the choke/sleeper hold applied to the neck of Darin Shane Honeycutt at his request for erotic effect by Defendant Richard Masterson in reasonable medical probability could have produced the desired erotic effect, i.e. decreased consciousness, while almost simultaneously producing the decidedly undesirable effect of cardiac arrhythmia. This transition to cardiac arrhythmia, producing increasing semi-consciousness and eventual unconsciousness may not have been recognizable to Defendant Richard Masterson who may not then have reduced the hold quickly enough to avert

irreversible consequences. This sequence of events would be consistent with the
facts related by Richard Masterson in his trial testimony.

State Habeas Record at 26-27.

Notwithstanding Dr. Radelat's affidavit, the state habeas court found that trial counsel
was "able to effectively prepare for cross-examination of assistant medical examiner [Dr.]
Shrode through their consultation with expert [Dr.] Walmsey."  State Habeas Record at 165.
With that preparation, trial counsel's cross-examination effectively placed before the jury the
substance of the theory propounded by Dr. Radelat:

> [Dr.] Shrode acknowledged during cross-examination that a sleeper hold could
> have been applied to the [victim] from the rear during sexual intercourse a
> scenario fitting the [Masterson's] testimony about choking the [victim]; that it
> was possible for an individual to go into an arrhythmic state and die without
> evidence of a heart attack occurring; that the [victim] could have been in an
> unconscious arrhythmic state and the position of the [victim's] body could have
> contributed to compromised blood flow due to the flexion of the neck

State Habeas Record at 165.  Trial counsel was able to adduce that "there was nothing in [Dr.]
Shrode's post-mortem findings that would differentiate an external compression intentional
strangulation from a sexual asphyxiation accidental strangulation other than [Dr.] Shrode's
opinion that someone would stop compressing another person's neck in sexual intercourse after
the other person lost consciousness[.]"  State Habeas Record at 165.  Trial counsel's questioning,
therefore, supported Masterson's testimony in which he retracted his confession and claimed that
he did not intend to kill.

With trial counsel's preparation and questioning, the state habeas court endorsed the
strategic decision that "it was unnecessary for [Dr.] Walmsey to testify after [Dr.] Shrode
conceded the points about which Walmsey would have testified[.]"  State Habeas Record at 165.

20

In short, "the speculative assertions in the habeas affidavit of [Dr. Radelat] were essentially presented to [Masterson's] jury through trial counsels' cross-examination of Dr. Shrode[.]"  State Habeas Record at 165.  For those reasons, the state habeas court denied habeas relief.

### 3.    Federal Review

Masterson must show that the state habeas court's rejection of this claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  Masterson faces a difficult task in challenging trial counsel's efforts to counter Dr. Shrode's testimony.  After consulting with a medical doctor, trial counsel made a strategic decision to rely on cross-examination to bolster Masterson's revised account of the crime.  *Strickland* jurisprudence traditionally affords great deference to an attorney's strategic choices.  *See Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009) ("'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'") (quoting *Strickland*, 466 U.S. at 690).  The AEDPA heightens that deference, creating a "'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt."  *Burt v. Titlow*, ___ U.S. ___, 134 S. Ct. 10, 13 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. ___, ___, 131 S. Ct. 1388, 1403 (2011)).  Masterson has not shown that the Court should second guess trial counsel's strategy to put his defensive theory before the jury.

In his federal habeas petition, Masterson takes issue with trial counsel's efforts for two reasons.  First, Masterson faults trial counsel for relying on the opinion of a cardiologist, rather than a forensic pathologist, when preparing for trial.  Masterson contends that a cardiologist "is not . . . trained to determine manner and means of death."  (Docket Entry No. 53 at 33).

Masterson, however, has not adequately shown that a cardiologist's medical training would ineffectively prepare him to understand what happened to the victim's heart.  As Respondent argues:

> The defense's case rested on the theory that Masterson accidentally killed Honeycutt by applying a sleeper hold during sex and that Honeycutt's death was accelerated in large part because he suffered from a heart condition Masterson could not have foreseen.  Under the circumstances, it made perfect sense for the defense to consult a doctor who has expertise in explaining how coronary artery disease may contribute to death.

 (Docket Entry No. 5 at 23).

"The selection of an expert witness is a paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough investigation of [the] law and facts,' is 'virtually unchallengeable.'"  *Hinton v. Alabama*, ___ U.S. ___, 2014 WL 684015, at *7 (Feb. 24, 2014) (quoting *Strickland*, 466 U.S. at 690).  Trial counsel's work with Dr. Walmsey provided a familiarity with the relevant medical issues. Trial counsel used that knowledge to further the defense's case. Cross-examination left open the possibility that consensual strangulation may have led to a situation where the victim's heart condition contributed to his death.  Masterson has not shown that relying on a forensic pathologist rather than a cardiologist would have meaningfully strengthened trial counsel's ability to make strategic decisions.

In Masterson's second point, however, he argues that cross-examination proved an ineffective means to advance the defense's theory.  Masterson contends that "[t]he statements in Dr. Radelat's affidavit are powerful - infinitely more compelling than what the Respondent asserts was an effective cross examination by defense counsel."  (Docket Entry No. 78 at 5). Without calling an expert witness, trial counsel's cross-examination touched on the issues raised

22

by Dr. Radelat's affidavit.  As Respondent observes, "contrary to Masterson's assertions, Dr. Shrode did concede virtually every point [during cross-examination that] Dr. Radelat makes in his affidavit, and then some."   (Docket Entry No. 5 at 24).   In fact, the only meaningful difference between the information derived during cross-examination and that in Dr. Radelat's affidavit is an expert opinion that the death was not accidental.

"*Strickland* does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and opposite expert from the defense.   In many instances cross-examination will be sufficient to expose defects in an expert's presentation." *Richter*, ___ U.S. at ___, 131 S.Ct. at 791.  Masterson has not convincingly shown that "an expert pathologist was the only way to rebut the testimony of Dr. Shrode."  (Docket Entry No. 53 at 33-34).   Masterson has not demonstrated that a reasonable attorney could not see cross-examination as an effective too to put the theory before the jury.

Even had trial counsel called an expert such as Dr. Radelat, Masterson has not proven that additional testimony would have resulted in a reasonable probability of a different result. "In making [the actual prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."  *Strickland*, 466 U.S. at 695.  Dr. Radelat premised his opinion on the version of events Masterson gave in his trial testimony.  The record does not show that Dr. Radelat took into consideration Masterson's confession, where he admitted to strangling the still-living victim once he became unconscious.   Masterson's ineffective-assistance claim presumes that the jury would disbelieve the statement he made confessing that he intended to kill the victim.  Masterson has not given any reason to believe

that, even with the benefit of Dr. Radelat's opinion, jurors would find that Masterson lied in his confession.

Significant evidence corroborated the account Masterson gave in his police statement. Masterson's actions after the victim's death were not consistent with someone who participated in an accidental death, but one who killed to steal an automobile.  Masterson repeatedly made statements indicating that he had intended to kill.  In fact, when Masterson's brother suggested that "the guy might have died from a heart attack," Masterson "said that was bull shit."  Tr. Vol. 18 at 170.  And within days Masterson strangled someone in the same manner as the victim. Even had trial counsel put forth the proposed expert testimony, the State would still lambast the "ridiculous, incredible" theory as it did at closing: "The most important thing for you to consider in deciding his intent . . . was it intentional or was it an accident.  . . .  If you had killed somebody by accident would you go do it again nine days later?"  Tr. Vol. 20 at 7, 35-36.

Masterson's attorneys attacked the validity of his confession and presented an alternative version of the crime through his testimony.  The jury obviously discounted Masterson's self-serving account.  The weight of Dr. Radelat's opinion would not be so great as to change the jury's consideration of the evidence.  Masterson has not shown that the state court was unreasonable in finding that trial counsel did not violate his constitutional rights by not presenting expert testimony to the jury.

### B.      Mitigating Evidence in the Punishment Phase (claims two, twelve, and thirteen)

Masterson complains that trial counsel made insufficient efforts to put mitigating evidence before the jury.  Trial counsel began their investigation into a punishment phase

defense before trial.  According to affidavits submitted on state habeas review, trial counsel interviewed Masterson and his family members to learn about his background.  Trial counsel requested, and received, funds for an investigator and mental-health expert.  Dr. Dennis Longmire, "an expert on future dangerousness" evaluated whether Masterson would be a future societal threat and "concluded that the defendant had a high probability of future violence compared to the general population of murderers."  State Habeas Record at 146; *see also* Tr. Vol. 22 at 74.  Dr. Longmire, however, apparently also learned much about the difficulties in Masterson's childhood.

Masterson handicapped trial counsel's efforts to put any mitigating features of Dr. Longmire's testimony before the jury.  Masterson instructed his attorneys that "he did not want his family blamed for his actions or have them put on trial."  State Habeas Record at 146.  Accordingly, Masterson instructed counsel not to call Dr. Longmire as a witness.  State Habeas Record at 146.

Nonetheless, trial counsel still presented some information about his upbringing.  Trial counsel summarized their strategy in calling punishment phase witnesses:

> During punishment the defense presented the testimony of the defendant's sister Ramona Weiss and two Harris County Sheriff's Office deputies.  The defense presented these witnesses to inform the jury of the defendant's positive traits mitigating reasons for the offense and the defendant's home life and background.  As defense counsel we made strategic decisions as to who to call as witnesses and presented the witnesses whom we thought would best benefit Richard.

State Habeas Record at 145.  In particular, Ms. Weiss gave a brief account of Masterson's childhood that was filled with abuse, difficulty, and tumult.

Masterson himself, however, undercut counsel's efforts.   Masterson's trial testimony verified that he would habitually be violent. Masterson told jurors not to blame his family in their consideration of mitigating factors:

> Everybody lives and dies by the choices that they make.  None of my family out there could control what I did. I did what I did because I wanted to do it, not because they made me do it, or because I got my ass whooped. I got my ass whooped because I deserved it a lot of times.  Sometimes I got whooped because I didn't deserve it but most of the time I -- I did something wrong, I got punished for it.  Just like now, there's a time when people just got to say, I did it, I accept responsibility for it.

Tr. Vol. 22 at 84-85.

Masterson now claims that trial counsel did not do enough to prepare and present mitigating evidence, particularly as it relates to his childhood. Masterson argues that trial counsel's reliance on testimony from his sister lacked sufficient breadth and detail about his background.  Masterson alleges that trial counsel should have bolster the punishment defense by: (1) calling a psychological expert to relate and contextualize incidents from Masterson's turbulent upbringing (claim two); (2) adducing records prepared during Masterson's custody as a juvenile (claim twelve);[8] and (3) telling the jury that Masterson had been shot as a youth (claim thirteen).

The bulk of the evidence that Masterson faults trial counsel for not presenting comes through affidavits and reports prepared by mental-health experts.  Masterson, in fact, does not

---

[8]   Respondent also argues that Masterson procedurally defaulted judicial consideration of claim twelve.  In his initial state habeas application, Masterson raised a claim somewhat similar to claim twelve.  There, Masterson argued that trial counsel should have introduced his juvenile records into evidence.  His current ineffective-assistance claim addresses a distinct issue – how trial counsel could mitigate the violent acts contained in his juvenile records.  Nevertheless, the Court finds that Masterson adequately presented similar allegations to claim twelve in his initial pleading.  The Court will apply the AEDPA's deferential standards to claim twelve.

suggest the name of any lay witness trial counsel should have called to testify.  Masterson wishes that trial counsel had relied on an expert who, while covering much of the same ground as the testimony given by Ms. Weiss, could "tell the jury why those experiences made Mr. Masterson the man before the court that day."  (Docket Entry No. 53 at 46).  To that end, claims two, eleven, twelve, and thirteen rely on information developed by an expert on state habeas review and that found in the TYC records.

1.     Dr. Brown's Report

During the state habeas process, state habeas counsel retained a clinical psychologist, Dr. Jerome B. Brown, to investigate mitigating evidence.  On February 3, 2004, Dr. Brown conducted a clinical interview with Masterson in the Polunsky Unit of the Texas Department of Corrections.  Dr. Brown also reviewed records from Masterson's time in TYC custody.  Dr. Brown produced a report wherein he summarized the material from the TYC records and reached his own independent conclusions.  Using Dr. Brown's report, Masterson argued on state habeas:

> Mr. Masterson was interviewed by psychologist Dr. Jerome Brown, in preparation of the state writ application (Appendix E). In the interview Mr. Masterson provided much more information concerning his childhood including the beatings at the hands of Mr. Masterson's father.  He was often slapped or struck with such items as belts, switches, water hoses, extension cords and coat hangers. The beatings were often administered in the middle of the night when his father was in a drunken rage, as punishment for some minor infraction. Mr. Masterson also regularly witnessed his father beating his mother. Most tellingly, Mr. Masterson was sexually abused by his brother when he was eight years old, on at least one occasion. Information like this, placed in the proper context, would have assisted the jury in understanding what was compelling and mitigating about Mr. Masterson and why his life should be spared. There are indications from treatment records that Mr. Masterson may have had some type of attention deficit disorder.
>
> Mr. Masterson also revealed a long history of drug abuse, primarily the use of cocaine and crack. Mr. Masterson reported fifty to seventy-five seizures when

27

overdosing on drugs. When Mr. Masterson was in the Texas Youth Commission he underwent a psychiatric evaluation that recommended that he be considered for residential treatment. It did not appear that he ever received such treatment.

(Docket Entry No. 53 at 34-35).[9]   Additionally, Dr. Brown made several observations that led him to believe that Masterson may suffer from organic brain damage.  On that basis, Masterson argued that trial counsel should have presented more mitigating evidence and evidence of brain damage to the jury through an expert such as Dr. Brown.

The state habeas court reviewed Dr. Brown's report and trial counsel's affidavits.  The state habeas court, however, concluded that the mitigating factors in his report "were essentially presented during [Masterson's] trial."  State Habeas Record at 165.  As the state habeas court found,

> trial counsel investigated possible mitigating evidence, consulted an expert on the issue of future dangerousness, reasonably chose not to present evidence that would be more harmful than helpful, competently and vigorously presented guilt-innocence and punishment evidence, cross-examined witnesses presented a defensive theory and argued against conviction and the death penalty.

State Habeas Record at 168.

Dr. Brown's report plays on the same general themes as Ms. Weiss' testimony and only differs in detail, not in mitigating thrust.  The only feature in Dr. Brown's report that differs fundamentally from Ms. Weiss' account is his suspicion that Masterson has organic brain dysfunction, which the Court will discuss with regard to claim eleven.  Otherwise, nothing indicates that the added veneer of psychological testimony would have measurably strengthened

---

[9]      Masterson's briefing in his second ground for relief also faults counsel for not presenting reports prepared by two mental-health experts that are contained in his TYC records.  In his twelfth claim, however, Masterson challenges the omission of the TYC records as a different ground for relief.  The Court will discuss his TYC records separately.

the impact or importance of Masterson's background.   Moreover, Dr. Brown's report runs contrary to Masterson's explicit instructions to his attorneys not to blame "his family . . . for his actions or have them put on trial."   State Habeas Record at 146.   Even if trial counsel had developed evidence similar to that in Dr. Brown's report, Masterson may not have let trial counsel present it to the jury.   Under those circumstances, the state habeas court was not unreasonable for not finding that trial counsel performed deficiently.

2.    TYC Records

Masterson also claims that trial counsel should have based the punishment defense on records from when he was in state custody as a youth.   As discussed below, confusion about what happened at trial has created an uncertain record and has required Masterson to revise the claim he raised in state court.   Nonetheless, the Court finds that Masterson has not shown a constitutional violation regarding trial counsel's treatment of his juvenile records.

At age sixteen, the State committed Masterson to the custody of the Texas Youth Commission ("TYC") after his arrest for the unauthorized use of a motor vehicle.   During his time in TYC, parole officers, mental-health professionals, nurses, and others evaluated Masterson for various reasons.   They generated reports that were included in his TYC file. These records divulge much information about Masterson's childhood, providing a rich insight into his troubled and turbulent background.   Psychological reports describe his upbringing in an abusive home where he was not shown much love.   His difficult childhood contributed to a later diagnosis of "[c]onduct disorder, solitary aggressive type, moderate[,]" "[a] typical personality disorder traits and borderline and possible atypical biopolar traits[,]" and "[p]robable mild

organic brain dysfunction and strabismus with amblyopia[.]" (Docket Entry Nos. 54-56, Petitioner's Exhibit F).

Along with the potentially mitigating evidence, the TYC records contain sharp reminders of Masterson's early and pervasive lawlessness. The records chronicle Masterson's youthful drug usage, his expulsion from school, his wanton disregard for the law, and his prior crimes against homosexual individuals. Importantly, the records recount violent acts, including smashing a police car's window, fighting from elementary school years on, prior shootings, and other aggressive acts.

The records came before the jury, though the defense never highlighted their contents. At the start of the punishment phase the prosecution offered several documents into evidence, including Masterson's TYC records (introduced as State's Exhibit 54). Tr. Vol. 21 at 5. The defense did not object. The prosecution relied on the TYC records while cross-examining Masterson, referring to criminal acts during his teenage years and arguing that "even prior to [age] 16 you had started being violent with people[.]" Tr. Vol. 22 at 87. The cross-examination mentioned the crimes that landed Masterson in TYC custody including his "involve[ment] in a drug deal where you had shot yourself and you yourself had been shot[,]" and "commit[ing] the felony of burglary of a building[.]" Tr. Vol. 22 at 88. The defense did not rely on the TYC records to mitigate against a punishment of death.

On state habeas review, Masterson claimed that trial counsel provided ineffective representation by not adducing the TYC records into evidence. The entire state habeas proceedings labored under the misapprehension that the TYC records never came before the jury

in any form.  Masterson's habeas application introduced this error into the habeas action by arguing: "These Texas Youth Commission records were obtained by counsel but it does not appear that they were ever introduced in evidence at the punishment phase."  State Habeas Record at 18.  Based on this error, the state habeas action went ahead without recognizing that the prosecution had put the TYC records into evidence.

Nevertheless, the State adduced affidavits from Masterson's trial attorneys that explained why they did not rely on the TYC records:

> The information contained within those [TYC] records was more harmful than helpful. For example, the records included information regarding the defendant's extensive drug use, habit of fighting, expulsion from school, and shooting another individual. The record also contained information concerning the defendant being shot during a drug deal. Most importantly, the record reflected that the defendant told a Texas Youth Commission counselor that the defendant and his friends used to rob wealthy homosexuals in order to get money. The defendant's sister, Ramona Weiss, testified about the family and background, so the Texas Youth Commission records were not necessary to disseminate that information to the jury.

State Habeas Record at 153-54.  In other words, trial counsel did not rely on the TYC records because (1) in their estimation the harm from information about Masterson's prior bad acts outweighed any mitigating benefit; (2) the records showed that Masterson's targeting of homosexuals as victims was long-standing; and (3) the TYC records were cumulative of testimony already before the jury.

The state habeas court issued factual findings, premised in part on the belief that the TYC records did not come before the jury.  The state habeas court found "based on the credible affidavits of trial counsel" that Masterson's attorneys

> reviewed . . . [his] TYC records and made the reasonable strategic decision not to present [the] TYC records because they contained the following information that was more harmful than helpful to [Masterson]: [his] admission of extensive drug abuse; [his] applicants average IQ range; [his] admission that he and his friends robbed wealthy homosexuals to get money; [his] habit of fighting in first grade; [his] expulsion from school; and [his] shooting someone during a drug deal.

State Habeas Record at 166.  Also, the state habeas court found that counsel

> made the reasonable trial decision to present evidence of [Masterson's] abuse and lack of a loving nurturing environment through the more compelling testimony of Ramona Weiss, [his] sister who testified that their father kidnapped their mother when [Masterson] was three years old; that their sixteen-year-old sister took care of them for one month during that time; that their father often came home after drinking and beat the children, including [Masterson]; that their father showed no affection towards the children; that [Masterson] was placed in a foster home at one point; and that [Masterson] who had eye problems and was teased as a child attended school regularly until he was twelve years old.

State Habeas Record at 166-67.  Additionally, the state habeas court found that his sister's testimony replicated portions of the TYC records, such as the parts recounting that Masterson's "IQ score indicated a lack of a loving, nurturing environment and that [Masterson] had to rely on his own capabilities to survive[.]"  State Habeas Record at 167.  The state habeas court found that psychological diagnoses in the TYC records "were presented through the testimony of other witnesses [conduct disorder], no more than speculation [probable mild organic brain dysfunction], or not especially sympathetic [substance abuse] or mitigating [ADHD]."  State Habeas Record at 167.

Accordingly, the state habeas court concluded that trial counsel made a strategic decision not to introduce the TYC records, but to present mitigating evidence through Masterson's sister. Importantly, the state habeas court held:

> Trial counsel cannot be considered ineffective for not presenting [Masterson's] thirteen-year-old TYC records whose slight mitigating value if any would have been lost amidst the harmful information contained in the records about [Masterson's] extensive drug use, habit of fighting, expulsion from school, his shooting another individual during a drug deal, and his admission that he robbed wealthy homosexuals[.]

State Habeas Record at 171.  Given that negative information, Masterson "fail[ed] to show that the results of the proceeding would have been different if such records have been presented." State Habeas Record at 171.[10]

In his initial federal petition, Masterson likewise did not recognize that the TYC records came before the jury.  Only in Respondent's answer did the state habeas court's misapprehension become apparent.  Respondent acknowledged that the confusion called into question the state court's findings regarding deficient performance, though not in a determinative manner:

> The Director concedes that the finding that trial counsel chose not to admit the TYC records as a matter of trial strategy is erroneous, but not for the reasons Masterson asserts. Instead, as discussed below, those records were actually admitted at trial at the State's request; thus, counsel could not have been ineffective for failing to present them to the jury. The additional findings are proper, and based on the totality of the record, the state court's decision was not objectively unreasonable.

(Docket Entry No. 5 at 40).[11]  Masterson, on the other hand, argues that the error in the state habeas decision "necessitates a remand to state court for a review of the findings," (Docket Entry

---

[10]     The TYC records also include information about an incident where Masterson was shot as a youth. Masterson did not ask the state habeas court specifically to find trial counsel ineffective on that basis. Masterson himself, nevertheless, told the jury that he suffered a gunshot wound.  Tr. Vol. 22 at 87.  The circumstances surrounding that injury were not wholly mitigating.  Masterson testified that he was hit with the bullet in a drug deal where he shot another man.  Masterson, however, claims that trial counsel should have presented evidence to jurors that the incident caused Masterson to experience Post-Traumatic Stress Disorder (PTSD).  Nothing in the record substantiates that Masterson suffered from PTSD, much less because of his involvement in a shootout during a drug deal. The Court would deny claim thirteen if its merits were fully available for federal consideration.

[11]     The Court observes that, even with the misapprehension about the records, trial counsel obviously did not want to emphasize them.  State habeas counsel averred:

No. 78 at 8), though he has not shown that Texas would not permit successive habeas

proceedings on that issue, *see* TEX. CODE CRIM. PRO. art. 11.071 § 5.

The state court's error is not fatal to all its findings.  The state habeas court found no

prejudice from trial counsel's failure to put the contents of the TYC records before the jury:

> Trial counsel cannot be considered ineffective for not presenting [Masterson's]
> thirteen-year-old TYC records whose slight mitigating value, if any, would have
> been lost amidst the harmful information contained in the records about [his]
> extensive drug use, habit of fighting, expulsion from school, his shooting another
> individual during a drug deal, and his admission that he robbed wealthy
> homosexuals; [Masterson] fails to show that the results of the proceeding would
> have been different if such records have been presented.  *Strickland v*
> *Washington*, 466 US 668, 104 S.Ct. 2052 (1984).

State Habeas Record at 171.  Whether considered as a claim that trial counsel should have

introduced the TYC records (his initial allegation) or that counsel failed to rebut them (his

federal allegation), the state habeas court's ruling on prejudice is still valid.  The Court will

consider the potential prejudice flowing from trial counsel not relying on the TYC records in

conjunction with the alleged harm from his other ineffective-assistance claims.

### 3.      Cumulative Prejudice

---

The information contained within those [TYC] records was more harmful than helpful.
For example, the records included information regarding the defendant's extensive drug
use, habit of fighting, expulsion from school, and shooting another individual. The record
also contained information concerning the defendant being shot during a drug deal. Most
importantly, the record reflected that the defendant told a Texas Youth Commission
counselor that the defendant and his friends used to rob wealthy homosexuals in order to
get money. The defendant's sister, Ramona Weiss, testified about the family and
background, so the Texas Youth Commission records were not necessary to disseminate
that information to the jury.

State Habeas Record at 153-54.

Dr. Brown's report, the TYC records, and other sources of mitigating evidence contain information that could have supported Masterson's punishment defense. For example, the TYC records contain a report from psychologist Hector Cantu indicating that Masterson had to rely on himself when growing up because he lacked parental support. Without a nurturing environment, Masterson survived by developing aggressive behavioral tendencies. Another psychologist, Dr. Kenneth Day, produced a report chronicling the extensive abuse Masterson suffered at the hands of his father. Also, Dr. Day diagnosed Masterson with several mental health problems, including conduct disorder, substance abuse, attention deficit hyperactivity disorder, and possible mild organic brain dysfunction. Both experts' records encouraged that a structured setting would mitigate Masterson's propensity to violence. Dr. Brown would have corroborated Ms. Weiss' testimony about Masterson's troubled background and abused childhood.

Yet the jury considered already had before it a vehicle to consider much of that information. Unlike the detached information in the TYC records, testimony from Masterson's sister painted a vivid and wrenching picture of the turbulence and cruelty enveloping Masterson's childhood. Her testimony would enable the jury to find that neglect, abuse, and fear punctuated Masterson's childhood. Masterson's sister connected the turmoil in Masterson's life with his later violence. She opined that a structured environment would squelch Masterson's violent tendencies. The jury, nonetheless, still found insufficient mitigating evidence to support a life sentence. The state habeas court could reasonably conclude that a jury would respond to additional accounts mirroring his sister's testimony in the same way.

Additionally, the TYC records were double-edged. *Strickland*'s prejudice prong asks reviewing courts to "'consider all the relevant evidence that the jury would have had before it if

[trial counsel] had pursued the different path.'" *Charles v. Stephens*, 736 F.3d 380, 393 (5th Cir. 2013) (quoting *Wong v. Belmontes*, 558 U.S. 15, 20 (2009)).  A court must take "into account that certain mitigating evidence would have exposed the petitioner to further aggravating evidence." *Pinholster*, ___ U.S. at ___, 131 S. Ct. at 1410.  As the state habeas court observed, juries may not find some psychological conditions, such as substance abuse, as a mitigating factor.  Further, the TYC records would remind the jury that Masterson's violence was pervasive in his life.  His propensity toward fighting permeated his youth.  He stole cars.  He used drugs.  He smashed windshields in police cars.  He committed offenses against homosexuals.  He shot a man in a drug deal.  Whatever mitigating effect the records had would be dampened by the recurrent reminder that Masterson was a violent and lawless man.

Finally, any unpresented mitigating evidence would not come before the jury in isolation from consideration of the crime a defendant has committed.  Although all capital-murder cases involve horrible crimes, Supreme Court precedent unquestionably anticipates that the severity of the crime is a relevant factor in *Strickland* prejudice.  *See Smith v. Spisak*, 558 U.S. 153-55 (2010); *Strickland*, 466 U.S. at 699; *see also Vasquez v. Thaler*, 389 F. App'x 419, 428 (5th Cir. 2010) ("Naturally, the power of the newly amplified case to mitigate a jury's selected punishment will be contingent on other factors in the case, such as the circumstances of the crime."); *Carty v. Thaler*, 583 F.3d 244, 263 (5th Cir. 2009) ("In this re-weighing, the brutality of the crime is relevant but does not automatically trump additional mitigating evidence."). Masterson lured his victim into a compromising and defenseless position before killing with his bare hands.  He showed no remorse for his crime.  Masterson committed a nearly identical crime soon afterward, though that victim did not die.

36

Masterson's own punishment phase testimony gave the jury little reason to return answers to the special issues that would result in a life sentence.  Masterson told the jury to disregard the turmoil in his background because "[e]veryone lives and dies by the choices they make.  None of my family out there could control what I did."  Tr. Vol. 22 at 84.[12]  Masterson told the jury that, "chances are," he would act violently in prison if "that's what it takes."  Tr. Vol. 22 at 85, 94.  Masterson's testimony would have torpedoed any effort trial counsel would have made to present additional mitigating evidence.

In sum, Masterson has not shown that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  *Richter*, ___ U.S. ___, 131 S.Ct. at 786–87.  Accordingly, Masterson has not shown that trial counsel's representation amounted to deficient performance that prejudiced his defense.  The Court will deny claims two, twelve, and thirteen.

### C.    Procedurally Inadequate Ineffective-Assistance Claims (claims eleven and fourteen)

Masterson did not include his eleventh and fourteenth claims in his initial habeas petition, but first advanced them in a successive state habeas application.  Masterson then raised them in his amended federal petition.  Respondent argues that the AEDPA's strict limitations period

---

[12]    In full, Masterson said:

> Everybody lives and dies by the choices that they make. None of my family out there could control what I did. I did what I did because I wanted to do it, not because they made me do it, or because I got my ass whooped. I got my ass whooped because I deserved it a lot of times. Sometimes I got whooped because I didn't deserve it but most of the time I -- I did something wrong, I got punished for it. Just like now, there's a time when people just got to say, I did it, I accept responsibility for it.

Tr. Vol. 22 at 84-85.

prevents federal adjudication of late-filed claims eleven and fourteen.  Respondent also contends that Masterson defaulted all his new claims in state court.  Masterson responds that the procedural concerns do not pose a barrier to federal review.

> ### 1.    Timeliness

The Court must decide whether Masterson advanced claims eleven and fourteen in a timely manner.[13]  The AEDPA established "an explicit limitation period for state prisoners filing federal habeas petitions."  *Fisher v. Johnson*, 174 F.3d 710, 711 (5th Cir. 1999) (citing *Lonchar v. Thomas*, 517 U.S. 314, 327 (1996)); *see also Cantu-Tzin v. Johnson*, 162 F.3d 295, 298 (5th Cir. 1998).  Inmates generally must file the constitutional claims one year after state review has concluded.  *See* 28 U.S.C. § 2244(d).  Masterson's conviction became final when the United States Supreme Court denied his petition for a writ of certiorari on February 21, 2006.  *Masterson v. Texas*, 546 U.S. 1169 (2006).  Because Masterson filed his state habeas application during the pendency of his direct appeal, however, the AEDPA limitations period was tolled until the Court of Criminal Appeals denied habeas relief on August 20, 2008.  *See* 28 U.S.C. § 2244(d)(1)(2).  Masterson had until August 20, 2009, to submit a federal habeas petition.

Masterson filed his original petition on August 17, 2009.  Respondent does not dispute that Masterson's initial petition was timely.  Masterson, however, did not advance claims eleven

---

[13]     Respondent does not argue that the twelfth claim is untimely because it "is arguable that this particular claim is not time barred because it contains a common core of operative facts."  (Docket Entry No. 71 at 21).   That same reasoning, however, contributes to this Court's finding that claim twelve is not procedurally barred.

and fourteen until he filed his amended petition on April 8, 2013.[14]  Respondent argues that the AEDPA bars federal consideration of those claims raised outside the limitations period.

Under Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts, a habeas petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground."   The factual and legal basis for claims eleven and fourteen were available to Masterson when he filed his timely habeas petition.[15]  Still, Masterson filed those claims after the expiration of the AEDPA's limitations period.   Federal law only allows parties to interject claims in an amended habeas petition when they "relate back to the date of the original pleading" as understood by Federal Rules of Civil Procedure Rule 15(c)(2).  *See Mayle v. Felix*, 545 U.S. 644, 650 (2005).[16]  "[C]laims raised in an amendment to a habeas petition [do] not automatically relate back merely because they arose out of the same trial and conviction."   *United States v. Gonzalez*, 592 F.3d 675, 679 (5th Cir. 2009) (citing *Felix*, 545 U.S.

---

[14]     On February 23, 2011, Masterson asked this Court to stay his action so that he could return to state court. (Docket Entry No. 13).  He did not, however, mention many of the issues he would raise for the first time in his amended petition.  Masterson renewed his motion on October 3, 2011.  (Docket Entry No. 22). While this Court ultimately stayed the case, it was to wait for Supreme Court precedent, not to allow exhaustion of state remedies.   To that point, Masterson had not informed the Court that he intended to advance new federal grounds for relief.

[15]      "[E]quity is not intended for those who sleep on their rights."  *Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir.2010) (quoting *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006)).  To establish his entitlement to equitable tolling, a petitioner must "sho[w] (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing."  *Holland*, ___ U.S. at ___, 130 S. Ct. at 2562 (internal quotation marks omitted); *see also McQuiggin v. Perkins*, ___ U.S. ___, 133 S. Ct. 1924, 1931 (2013).

[16]     Rule 15(c)(2) of the Federal Rules of Civil Procedure provides that "[a]n amendment of a pleading relates back to the date of the original pleading when . . . the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading."

at 650).   Instead, when "the original and amended petitions state claims that are tied to a common core of operative facts, relation back will be in order."  *Felix*, 545 U.S. at 664.

The Court must decide whether claims eleven and fourteen are "new ground[s] for relief supported by facts that differ in both time and type from those the original pleading set forth.'" *Gonzalez*, 592 F.3d at 679 (quoting *Felix*, 545 U.S. at 650).   Masterson argues that "the issues brought in [his] Amended Petition relate back to the original issues in regard to his biological and psychological dysfunction."  (Docket Entry No. 78 at 31).   Masterson raised other challenges to trial counsel's representation in his original petition, some of which implicated the investigation of mental-health issues.   However, the claims in Masterson's initial petition focused on counsel's efforts to secure a life sentence.   Masterson argued that deficiencies in trial counsel's representation required a new sentencing hearing.   Claims eleven and fourteen, however, focus on the guilt/innocence phase, now asking the Court to vacate his capital-murder conviction.   As Respondent argues: "[b]ecause Masterson's new allegation pertains to a completely separate phase of the trial and evidence that should have been used for a very distinct purpose, the allegation differs in both time and type."  (Docket Entry No. 71 at 7-8).   The Court finds that claims eleven and fourteen do not relate back to issues raised in Masterson's initial petition.   Claims eleven and fourteen are time barred.

Federal courts "must be cautious not to apply the statute of limitations too harshly[.]" *United States v. Patterson*, 211 F.3d 927, 931 (5th Cir. 2000); *see also Ott v. Johnson*, 192 F.3d 510, 513 (5th Cir. 1999).   As a judicial accommodation in the interest of justice, federal courts have applied "[t]he doctrine of equitable tolling [to] preserve[] a plaintiff's claims when strict application of the statute of limitations would be inequitable."  *Davis v. Johnson*, 158 F.3d 806,

40

810 (5th Cir. 1998).  Masterson asks this Court to use its equitable powers to allow federal review of his time barred claims.

Equitable tolling "turns on the facts and circumstances of [each] particular case" and "does not lend itself to bright-line rules." *Fisher*, 174 F.3d at 713.  "[T]he habeas petitioner bears the burden of establishing that equitable tolling is warranted." *Howland v. Quarterman*, 507 F.3d 840, 845 (5th Cir. 2007); *see also Phillips v. Donnelly*, 216 F.3d 508, 511 (5th Cir. 2000).  Masterson argues that the failure of his earlier attorneys to raise the new claims forgives his failure to raise the claims in a timely manner.  He summarily states: "The circumstances in this case are both rare and exceptional.  It is both a failure on trial counsel and especially on first writ counsel . . . for failing to develop this evidence and present it in a previous application." (Docket Entry No. 78 at 32-33).

In a recent decision, the Supreme Court held that complete attorney abandonment can qualify as an extraordinary circumstance for equitable tolling purposes.  *See Holland v. Florida*, 560 U.S. 631, 652 (2013).  The circumstances providing for equitable tolling, however, are distinct from "'a garden variety claim of excusable neglect'" or negligence.  *Id.* (quoting *Irwin v. Department of Veterans Affairs*, 498 U.S. 89, 96 (1990)).  Masterson's argument for equitably tolling amounts to little more than a complaint that his prior attorneys did not raise the claims earlier.  The same argument could be made in every case in which a petitioner files a tardy and unexhausted claim.  *See Wallace v. Kato*, 549 U.S. 384, 396 (2007) ("Equitable tolling is a rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs.").  Masterson has simply shown nothing unique or rare about the untimely filing of claims eleven and fourteen. Claims eleven and fourteen are not available for judicial review.

2.    Procedural Bar

Alternatively, Respondent argues that the operation of Texas state procedural law forecloses federal habeas review of claims eleven and fourteen.  A federal habeas corpus action provides an important, but limited, examination of state criminal judgments.  Because "state courts are the principal forum for asserting constitutional challenges to state convictions," concerns for comity, federalism, and finality define the contours of federal habeas review. *Richter*, 562 U.S. at ___, 131 S. Ct. at 787; *see also Calderon v. Thompson*, 523 U.S. 538, 555-56 (1998).  Accordingly, procedural doctrines may limit what issues a federal habeas court may examine.

The AEDPA requires exhaustion of federal claims in the highest state court before federal habeas relief becomes available.  *See* 28 U.S.C. 2254(b)(1).  Even when a prisoner exhausts state remedies, *how* he has exhausted them determines the course of federal review. Federal practice limits review to those claims that are presented in compliance with state procedural law.  *See Dretke v. Haley*, 541 U.S. 386, 392 (2004); *Lambrix v. Singletary*, 520 U.S. 518, 523 (1997); *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  The procedural-default doctrine, which functions as "[a] corollary to the habeas statute's exhaustion requirement," *Haley*, 541 U.S. at 392-93, forecloses federal habeas review on claims that "a state court declined to hear because the prisoner failed to abide by a state procedural rule."  *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1316 (2012); *see also Lambrix*, 520 U.S. at 523; *Coleman*, 501 U.S. at 729.

Masterson raised claims eleven and fourteen for the first time in his successive state habeas application.  The Court of Criminal Appeals dismissed those claims under its abuse-of-the-writ doctrine, codified in article 11.071, Sec of the Texas Code of Criminal Procedure.  The Fifth Circuit has generally held that article 11.071, Sec § 5 is an adequate and independent state procedural bar to federal review.  *See Barrientes v. Johnson*, 221 F.3d 741, 759 (5th Cir. 2000); *Fuller v. Johnson*, 158 F.3d 903, 906 (5th Cir. 1998); *Emery v. Johnson*, 139 F.3d 191, 195-96 (5th Cir. 1997); *Fearance v. Scott*, 56 F.3d 633, 642 (5th Cir. 1995).  Adequate and independent state law prevents the Court from reaching claims eleven and fourteen.

A state-imposed procedural default is not an insurmountable barrier to federal review.  A federal petitioner may overcome the default of his claims if he can "demonstrate *cause* for the default and *actual prejudice* as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a *fundamental miscarriage of justice*."  *Coleman*, 501 U.S. at 750 (emphasis added).[17]   A petitioner shoulders the burden of overcoming the procedural hurdles.  *See McCleskey v. Zant*, 499 U.S. 467, 494-95 (1991).

Masterson argues that his state habeas counsel's failure to advance his barred claims constitutes cause and prejudice to overcome the procedural bar.  Masterson summarily states:

> The record before this Court proves beyond any doubt that both trial counsel and first habeas counsel's representation fell below an objective standard of reasonableness and the resulting prejudice was so serious as as to deprive Petitioner of a fair trial, as well as, the ability to mount an effective Constitutional challenge. The evidence available to counsel from the very beginning of the serious psychological and biological damage of Petitioner Masterson should have been investigated and presented to the jury.

---

[17]   Masterson does not argue that he is actually innocent.

43

(Docket Entry No. 78 at 34).  He concludes that "[t]he failure to do so gives Petitioner 'cause' to overcome any procedural bar and this Court may reach the merits of the claim."  (Docket Entry No. 78 at 35).

The cause test relies on the ineffective-assistance-of-counsel standard from *Strickland v. Washington*, 466 U.S. 668 (1984) to assess an attorney's efforts.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) ("Not just any deficiency in counsel's performance will do, however; the assistance must have been so ineffective as to violate the Federal Constitution."); *Murray v. Carrier*,  477 U.S. 478, 492 (1986) ("Attorney error short of ineffective assistance of counsel does not constitute cause[.]").  In *Martinez v. Ryan*, ___ U.S. ___, 132 S. Ct. 1309, 1320 (2012), the Supreme Court recently found that ineffective assistance by a state habeas attorney may amount to cause under some circumstances.  *See also Trevino v. Thaler*, ___ U.S ___, 133 S. Ct. 1911 (2013) (applying *Martinez* to cases arising from Texas courts).  To meet the cause exception under *Martinez*, an inmate must: (1) prove that his habeas attorney's representation fell below the standards established in *Strickland* and (2) show that his underlying ineffective-assistance claim "has some merit[.]"  *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1318; *see also Crutsinger v. Stephens*, ___ F. App'x ____, 2013 WL 5227078 at *6 (5th Cir. Sept. 18, 2013); *In re Sepulvado*, 707 F.3d 550, 556 n. 12 (5th Cir. 2013).

Masterson's allegations tersely fault state habeas counsel for not performing an adequate investigation or presenting meritorious arguments.  His briefing, however, does nothing more than observe that habeas counsel did not raise his now-barred claims.  Such perfunctory argument is insufficient to show cause.  *See Smith v. Murray*, 477 U.S. 527, 535 (1986) ("'[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise

44

the claim despite recognizing it, does not constitute cause for a procedural default.'") (quoting *Carrier*, 477 U.S. at 486-87). An effective attorney does not raise every nonfrivolous claim. In fact, the process of "'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective . . . advocacy." *Smith*, 477 U.S. at 536 (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)).

Because Masterson has not developed his *Martinez* arguments, the record does not disclose whether state habeas counsel strategically chose not to raise weak claims, could not establish a factual basis for the barred claims, decided to focus on stronger arguments, or was simply negligent. Under traditional *Strickland* principles, Masterson has not made an adequate showing that state habeas counsel performed deficiently. Further, Masterson's briefing does not indicate that the barred claims have "some merit." *Martinez*, ___ U.S. at ___, 132 S. Ct. at 1318. The Court has fully reviewed the record and the law with regard to each barred claim, as evidence by the alternative merits discussion below. Masterson has not shown that a reasonably effective attorney would not decide not to raise his barred grounds for relief.

Accordingly, Masterson's passing efforts to show cause are insufficient to overcome the operation of otherwise valid state law. In the interests of justice, however, the Court will briefly address Masterson's barred claims in the alternative.

### 3.    Alternative Merits Review

In his fourteenth claim, Masterson alleges that he has a life-long seizure disorder that occasionally causes him to black out or lose muscular control. Masterson argues that trial counsel should have investigated whether he suffered from a seizure disorder which "can include

45

blackouts, involuntary muscle responses, and lack of control of large skeletal muscle systems" as "a logical defense to the intent to kill."  (Docket Entry No. 53 at 115).  Masterson's fourteenth claim succinctly argues that "[g]iven the autoerotic and asphyxiation aspects of the crime which Mr. Masterson was charged with, a seizure during consensual asphyxiation in order to heighten orgasm would be a logical defense to the intent to kill."  (Docket Entry No. 53 at 112).  While somewhat unclear from his briefing, Masterson apparently contends that a reasonable attorney would have told the jury that Masterson had a seizure as he complied with the victim's request to engage in erotic asphyxiation.  Masterson supposes that this seizure then caused him either (1) to lose consciousness as the victim was strangled to death or (2) to spasm uncontrollably and thus accidentally strangle the victim.

Because Masterson first raised this claim on successive state review, the state courts did not have a full opportunity to consider his arguments. Yet even if the claim came before the Court in a procedurally actionable manner, it lacks a sturdy factual foundation.  The record does not contain any hint that Masterson lost consciousness or control of his body as the victim died. No physical evidence corroborates Masterson's belief that a seizure order impaired his ability to control his actions.   Crucially, Masterson twice explained what occurred as the victim died without hinting that he may have suffered a seizure as he strangled the victim.  Masterson has not reconciled his two accounts of the crime with his newly minted defensive theory.

The facts did not give trial counsel a predicate upon which to craft a seizure-disorder defense.   Trial counsel cannot have provided ineffective representation, and actual prejudice cannot have ensued, by not blaming the murder on a seizure.   Had Masterson had presented claim fourteen in a procedurally actionable manner, the Court would deny its merits.

Masterson's eleventh claim argues that trial counsel should have investigated whether he suffered from some "organic brain dysfunction, which could cause inability to control impulses or to reign in behavior which could have been presented to negate the intent to kill or to commit the underlying felony." (Docket Entry No. 53 at 112). Masterson derives his argument about brain dysfunction from Dr. Brown's report.  Dr. Brown, however, did not perform any psychological or neurological testing to identify organic brain dysfunction.[18]  Accordingly, the state habeas court found "speculative the February 4, 2004 habeas assertion of Jerome Brown PhD concerning the 'possible' presence of 'some type of brain anomaly or dysfunction.'"  State Habeas Record at 168.  Masterson has never verified whether or not he suffers from any brain disorder.  Without additional verification, the Court cannot find that trial counsel erred by not presenting evidence of brain dysfunction.  The state habeas court was not unreasonable in finding Masterson's unverified claim of organic brain damage to be speculative.  Accordingly, Masterson has not shown that trial counsel was deficient for not seeking the assistance of another expert at trial.

## II.  Sleeping Juror (claim three)

---

[18]     Dr. Brown mentions three reasons that led him to suspect that brain damage may have contributed to Masterson's lawlessness.  First, Dr. Brown noted that Masterson's drug use "[a]t times . . . has become so severe that he has experienced seizures. In this respect he estimated that he has had fifty to seventy-five separate seizure episodes when overdosing on drugs."  The severity of that abuse meant that "the possibility of neurological compromise must be considered."  State Habeas Record at 33  Second, "Mr. Masterson reports ongoing and continuing problems with severe headaches which have been occurring since he began using street drugs heavily at least since his midtwenties."  Masterson's "history of seizure activity together with the recurring headaches warrant further examination with neuropsychological testing and a brain scan. It is possible that some type of brain anomaly or dysfunction has been present for some time and prior to the offense."  State Habeas Record at 32-33.  Finally, Masterson seemed to act violently when provoked by external events, a tendency that "is often seen with individuals with brain tissue."  State Habeas Record at 34.  During federal review, this Court has authorized a neurologist to examine Masterson.  (Docket Entry No. 49).  Masterson has not argued that the results of that examination would corroborate Dr. Brown's suspicion that he suffered from organic brain dysfunction.

Masterson claims that a juror slept through a critical portion of the trial, thus violating his rights to a trial by jury and to due process.  On the afternoon of April 22, 2002, three expert witnesses testified, including Dr. Shrode.  The next morning, trial counsel moved for a mistrial because one of the jurors, Cynthia Franco, had allegedly been asleep during the testimony the previous afternoon:

> Mr. Loper:   Yes, Sir, Judge, at this time before we have begun for the day the Defense would move for a mistrial. Yesterday during the first Day of testimony in the case, April 22, 2002, both defense lawyers I think it would have been apparent to anybody else in the courtroom – that one of the jurors, Ms. Cynthia Franco  appeared to have been asleep throughout most of the testimony.
>
> The Court:   In the morning or afternoon or both?
>
> Mr. Loper:   This would have been, my recollection what I observed was in the afternoon, after lunch. And was not paying full attention to the testimony, and for those reasons we think that she's going to be unable to fairly deliberate upon the facts at the point in time that the jury begins its deliberations in this case.

Tr. Vol. 19 at 5.  Mr. Loper then called co-counsel to the stand.  From the subsequent colloquy, Masterson's attorneys established that they believed that Ms. Franco had been sleeping:

> Mr. Loper:   Would you state for the record what your observations were about her demeanor.
>
> Mr. Duer:   After we came back from lunch, I believe she was sitting in the middle seat on the front row, it appeared to me that she was asleep during part of the testimony in the afternoon.  Her eyes were closed, her chin was down on her chest, and it appeared to me that she was asleep, and I believe when I was looking at her I believe it was during the testimony of the medical examiner.
>
> Mr. Loper:   And what is your recollection as to how many occasions you noticed that Ms. Franco appeared to be sleeping during the testimony?
>
> Mr. Duer:   On two occasions, at least two occasions.

48

| Mr. Loper: | And did you and I at some point have some conversation between us about the fact of what both you and I had observed? |
|---|---|
| Mr. Duer: | Yes, we did. |

Tr. Vol. 19 at 6-7.  The trial court then immediately asked defense counsel: "Is there some reason why it wasn't brought to my attention?"  Tr. Vol. 19 at 7.  Mr. Loper responded: "If you're asking me, Judge, no, I don't know."  Tr. Vol. 19 at 7.

The trial court denied the motion.  The trial court also denied the defense's alternative motion to remove her from the jury as she would be "incapable of fairly deliberating the facts" because "she would [not] have heard them and would have to rely on the memory of others."  Tr. Vol. 19 at 7.  The prosecution then opined that "there was no evidence brought forth that Ms. Franco was actually sleeping.  She may have just had her eyes closed listening to the testimony."  Tr. Vol. 19 at 8.

Masterson claims that the trial court's refusal to grant a mistrial or remove Ms. Franco from the jury panel violated his constitutional rights.  Respondent contends that Masterson defaulted judicial consideration of this claim by not making a timely objection.  Alternatively, Respondent argues that this claim lacks merit.  For the reasons discussed below, the Court finds that habeas relief is not available on this claim.

## A.      Procedural Bar

Masterson raised this ground for relief on state habeas review.  The state habeas court found that he was "procedurally barred from advancing his habeas claim of alleged juror misconduct based on his untimely motion for mistrial, made a day after it 'appeared' to trial counsel that juror Franco allegedly slept during what counsel 'believed' was Shrode's

testimony." State Habeas Record at 169. Respondent argues that the state-imposed procedural bar forecloses federal review of Masterson's sleeping-juror claim.

The state habeas court based its procedural ruling on Texas' contemporaneous objection rule. Under Texas law, a criminal defendant only preserves objections for appellate review by making "a timely objection with specific grounds for the desired ruling[.]" *Livingston v. Johnson*, 107 F.3d 297, 311 (5th Cir. 1997). A timely objection is one made "at the earliest possible opportunity[.]" *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991). A contemporaneous objection "ensures that trial courts are provided an opportunity to correct their mistakes at the most convenient and appropriate time -- when the mistakes are alleged to have been made" *Hull v. State*, 67 S.W.3d 215, 217 (Tex. Crim. App. 2002). Thus, "Texas' contemporaneous objection rule furthers a valid state interest in that it allows the correction of trial-type errors at the time rather than requiring a new trial when counsel fails to bring errors to the state's attention until it is too late." *St. John v. Estelle*, 544 F.2d 894, 895 (5th Cir. 1977).

The Fifth Circuit "has consistently held that the Texas contemporaneous objection rule constitutes an adequate and independent state ground that procedurally bars federal habeas review of a petitioner's claims." *Fisher v. Texas*, 169 F.3d 295, 300 (5th Cir. 1999); *see also Cotton v. Cockrell*, 343 F.3d 746, 754 (5th Cir. 2003). Masterson argues that federal review is nonetheless available because:

> [a]t the time that Mr. Masterson objected there was more than sufficient time to place the alternate on the panel, or at the very least, have an inquiry into whether the juror was sleeping. To ignore the objection resulted in a constitutional deprivation for Mr. Masterson. Replacing the suspect juror with the alternate juror would not have delayed the trial. The sleeping juror was called to the trial

50

court's attention in a timely way, in time for the trial court to act on the defense objection.

(Docket Entry No. 10 at 10).

Federal law has long refused to reexamine whether a state court erred in applying its own procedural rules. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Federal habeas courts lack the power to correct errors in the application of state law or reconsider whether a state court improperly applied its own procedure. *See Smith v. Johnson*, 216 F.3d 521, 523 (5th Cir. 2000). If otherwise independent and adequate, this Court generally must honor a State's application of its own law. *See Barnes v. Thompson*, 58 F.3d 971, 974 n.2 (4th Cir. 1995) ("A basic tenet of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default, if based upon an adequate and independent state ground."). Because Masterson otherwise makes no effort to overcome the procedural bar, the Court cannot grant relief on Masterson's third claim.

## B.     Alternative Review of the Merits

When Masterson raised this claim on habeas review, the state habeas court alternatively found that his arguments lacked merit. Masterson submitted affidavits to the state habeas court, both of which replicated his arguments in the trial court. Both attorneys averred that Ms. Franco "appeared to be asleep during the testimony of the medical examiner." State Habeas Record at 24, 25. The state habeas court nevertheless found that Masterson had not provided a solid factual basis for his claim.

When trial counsel objected, he complained that "it 'appeared' to him that Franco slept during part of the afternoon testimony" and trial counsel "'believe[d]' it was during the testimony of the medical examiner."  State Habeas Record at 164.  The manner in which the defense brought the matter to the trial court's attention, however, prevented a timely ability to assess and rectify any problem.  Trial attorneys "must call any juror inattentiveness to the attention of the court when it is first noticed." *United States v. Rivera*, 295 F.3d 461, 470 (5th Cir. 2002).  Otherwise, an attorney may "sew[] a defect into the trial, and later claim its benefit." *United States v. Curry*, 471 F.2d 419, 422 (5th Cir. 1973).  Because Masterson waited until the next day to lodge an objection, the trial court could not make any contemporaneous observation of the allegedly sleeping juror.

While the trial court did not make a contemporaneous finding on whether a juror had actually been sleeping, the trial judge presided over the state habeas proceedings and, presumably relying both on the record and on personal recollection, concluded that "there is no evidence that juror Franco slept during [the medical examiner's] testimony on April 22, 2002." State Habeas Record at 164.[19]  The AEDPA affords these factual findings a presumption of correctness, *see* 28 U.S.C. §2254 (e)(1),  which is "especially strong" when the state trial judge and state habeas judge are one and the same. *See Barrientes*, 221 F.3d at 773-74 n. 26.[20]  Even if

---

[19]   The trial court's holding mirrored the prosecution's remark that "there was no evidence that [she] was actually sleeping."  Tr. Vol. 19 at 8.  The state habeas court also found that "a juror 'appearing' to sleep, i.e., having closed eyes, does not  establish that the juror was actually sleeping, and the Court further finds there is no evidence that juror Franco slept during Shrode's testimony on April 22, 2002."  State Habeas Record at 164.

[20]   The state habeas court also found that Masterson had not shown prejudice from any alleged inattentiveness.  "A sleeping juror does not violate a defendant's due process rights unless the defendant can show he was prejudiced to the extent that he did not receive a fair trial."  *United States v. Fernandez–Hernandez*, 652 F.3d 56, 74-75 (1st Cir. 2011).  The state habeas court found that the jury "was well aware of evidence

Masterson had presented this claim in a procedurally actionable manner, he has not shown an entitlement to federal habeas relief.

### III.  Lesser-Included Offense Instruction (claim four)

Masterson argues that the trial court violated his due process rights by not instructing the jury on the lesser-included offense of negligent homicide.   The guilt/innocence phase instructions allowed jurors to convict Masterson for capital murder, murder, manslaughter, aggravated assault, or robbery.   Clerk's Record at 293-96.   Before closing arguments, trial counsel argued that the evidence also raised the need for an instruction on criminally negligent homicide.  Tr. Vol. 20 at 4.  Under Texas law, criminally negligent homicide is a lesser included offense of murder.   *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992). Criminally negligent homicide involves causing the death of another by criminal negligence. TEX. CODE CRIM. PRO. §19.05.   "The key to criminal negligence is the failure of the actor to perceive the risk created by his conduct."   *Mendieta v. State*, 706 S.W.2d 651, 652 (Tex. Crim. App. 1986).  The trial court refused to give Masterson's requested instruction.

Masterson concedes that in his "confession [he] admitted to an intentional murder." (Docket Entry No. 53 at 65).   Masterson, however, argues that his own trial testimony "repudiated much of that confession[.]"   (Docket Entry No. 53 at 65). Because Masterson "should have been aware that his conduct could kill someone, but obviously was not – or at least

---

concerning intent and evidence of the [Masterson's] self-serving 'explanation" of the choking, regardless of the lapse of attention, if any, during [the medical examiner's] testimony."  State Habeas Record at 164.

was insufficiently aware of the risk to refuse to take the unjustifiable risk," [21] he now argues that *Beck v. Alabama*, 447 U.S. 625 (1980) required the trial court to give jurors the option of convicting him of criminally negligent homicide.  (Docket Entry No. 53 at 70).

*Beck* criticized the use of an all-or-nothing policy where a jury faced only two choices: either convict a defendant of a capital crime or release him into society.  *See Schad v. Arizona*, 501 U.S. 624, 647 (1991); *Spaziano v. Florida*, 468 U.S. 447, 455 (1984).  Under *Beck* and its progeny, "[a] lesser included offense charge serves to protect the jury (and, by extension, the criminal defendant) from the false dichotomy of choosing between convicting on the capital charges or outright acquittal when a 'third option' of a lesser included offense exists."  *Pippin v. Dretke*, 434 F.3d 782, 791 (5th Cir. 2005).

The Court of Criminal Appeals denied Masterson's *Beck* claim because the jurors here did not face "the dilemma of convicting for a greater offense in which the jury has reasonable doubt or releasing entirely from criminal liability a person the jury is convinced is a wrongdoer." *Masterson*, 155 S.W.3d at 171.  The jury charge several alternatives to capital murder, such as simple murder, manslaughter, and aggravated assault.  Each of those crimes would allow the jury to consider whether Masterson was responsible for the victim's death, but without holding him to capital murder's high level of intent.

---

[21]     In his testimony, Masterson said that the victim asked him if he had "ever choked anyone out before," apparently to heighten the sexual experience.  Tr. Vol. 19 at 127.  Masterson claimed that he initially told the victim "no" because "it scares him."  Tr. Vol. 19 at 127.  He nevertheless put the victim in a "sleeper hold" for "[a] couple minutes."  Tr. Vol. 19 at 128-29.  He stopped choking him after he "was making noises, grunting[,] gurgling or whatever it was."  Tr. Vol. 19 at 129.  Masterson left the room and, when he returned, he "knew he was dead then."  Tr. Vol. 19 at 129.

The Constitution does not require jury instructions on every lesser-included offense reasonably supported by the evidence. *See Schad*, 501 U.S. at 648. *Beck* only applies when "the jury is forced into an all-or-nothing choice between capital murder and innocence." *Spaziano*, 468 U.S. at 455. No constitutional violation occurs when the trial court provides jurors with the option of a lesser-included offense, even when it differs from his defensive theories. *See Johnson v. Puckett*, 176 F.3d 809, 818-19 (5th Cir. 1999); *Livingston*, 107 F.3d at 313; *Allridge v. Scott*, 41 F.3d 213, 220 (5th Cir. 1994); *Montoya v. Collins*, 955 F.2d 279, 285 (5th Cir. 1992). [22] Any extension of *Beck* beyond an all-or-nothing situation as presented in that case would require a new rule of constitutional law, thus rendering habeas relief unavailable under the non-retroactivity principle of *Teague v. Lane*, 489 U.S. 288, 301 (1989). *See Johnson*, 176 F.3d at 819.

Masterson's jury could give effect to the belief that he should be convicted, but not of capital murder. The jury here did not face the all-or-nothing dilemma condemned by *Beck* and, in fact, could have convicted Masterson of several alternative crimes. Masterson has not shown that the Court of Criminal Appeals' rejection of his *Beck* claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1). The Court will deny this claim.

## IV.    Masterson's Confession (claims five and six)

---

[22] "That is not to suggest that *Beck* would be satisfied by instructing the jury on just any lesser included offense, even one without any support in the evidence." *Schad*, 501 U.S. at 648 (citing *Roberts v. Louisiana*, 428 U.S. 325, 334-335 (1976)). Much of the same evidence Masterson marshals to show that a jury could have convicted him of criminally negligent homicide reasonably allowed for a jury instruction on the alternative offenses. For instance, the instructions would allow jurors to convict Masterson of manslaughter if the evidence showed that he "recklessly cause[d] the death of an individual." Clerk's Record at 294.

Masterson raises two claims challenging the admissibility and voluntariness of the statement he gave police officers.  Masterson claims that he twice invoked his right to counsel before finally confessing to the police.  Masterson also says that the police induced his confession through improper promises.  A review of the facts and the law shows that Masterson has not met the AEDPA standards to warrant habeas relief.

### A.    Background

Before trial, Masterson filed a motion to suppress his police statement.  Clerk's Record at 113-15.  The trial court held a suppression hearing from which a fuller factual picture about his confession emerged.  After the victim was murdered, Masterson drove his car to Georgia.  After leaving that vehicle with relatives, Masterson traveled to Florida.  Meanwhile, his nephew was arrested while in the stolen car.  The police found cocaine that Masterson had left inside.

Officer Eric Thoreson of the Marion County, Florida Sherriff's Office testified that he came across a stolen car near a trailer house on February 6, 2001.  Tr. Vol. 2 at 118.  The police found Masterson inside the trailer house.  Tr. Vol. 2 at 123.  They took him outside, handcuffed him, and read him his constitutional rights. Tr. Vol. 2 at 122.  Officer Thoreson later testified that Masterson did not ask for an attorney.  Tr. Vol. 2 at 126.  When Officer Thoreson told Masterson that they "were here in reference to the . . . stolen vehicle," Masterson answered that it "was the least of his worries."  Tr. Vol. 2 at 123.  Masterson told Officer Thoreson "to run his name in the computer and [he] would find out" why Masterson was unconcerned about the stolen vehicle.  Tr. Vol. 2 at 123.  The police confirmed that Masterson was wanted on a murder warrant out of Harris County, Texas.  Tr. Vol. 2 at 124.

56

The police then took Masterson to the police station.  At some point, Masterson appeared before a Florida magistrate.  Neither party in the suppression hearing presented a transcript or recording of Masterson's colloquy with the Florida judicial officer.

Officer David Null testified that he traveled to Florida on February 8, 2001 to speak with Masterson.  On February 9, 2001, he met alone with Masterson in the Marion County jail.  Masterson initially told Officer Null that "he'd like to talk with [him] about [the murder] and clear it up but he didn't think he could help [him] out because he wasn't in Houston at the time."  Tr. Vol. 2 at 59-60.  When Masterson agreed to talk, however, Officer Null read him his constitutional rights.  Tr. Vol. 2 at 60.  Officer Null specifically warned him of his right to counsel.  Tr. Vol. 2 at 60.  Masterson said he understood his rights, waived them, and then gave a statement.  Tr. Vol. 2 at 62.

Masterson initially denied being in Houston at the time of the victim's murder.  When Officer Null confronted him with the facts placing him in the area, "he admitted that yes, he had been here."  Tr. Vol. 2 at 62.  During the "course of the conversation," Masterson told Officer Null, who "didn't know [his nephew] was charged with driving a stolen car," that the drugs found in the vehicle were his.  Tr. Vol. 2 at 64.  Officer Null, however, testified that he did not make any promise to Masterson relating to his nephew:

> The State:      Did you ever offer [Masterson] anything with regard to his nephew
>                 in exchange for him giving you a statement in this case?
>
> Officer Null:   No, ma'am.
>
> The State:      Did you ever discuss that case?
>
> Officer Null:   We talked about [it], he said that there had been some dope in the
>                 car, and he said that the dope was his.

| The State: | Okay. |
|---|---|
| Officer Null: | And that it didn't belong to his nephew, and I think that's what his nephew had been charged with. |
| The State: | Did you again offer him anything, to do anything to help his nephew in any way if he were to talk to you about this case? |
| Officer Null: | I told him that if the dope was his and he wanted to admit the dope was his that I would let the people know that he was admitting that the dope, it was his dope. |

Tr. Vol. 2 at 63-64.  During later questioning, Officer Null clarified that Masterson "wanted to admit that that was his cocaine and he didn't want his nephew to get in any trouble," but said: "I told him I'd let the people know back there in Georgia let the investigators know that he was claiming that it was his[.]"  Tr. Vol. 2 at 92.   On cross-examination, Officer Null further clarified: "I don't believe I told [Masterson] that [his nephew] been charged with stealing the car, no, sir.  I would have told him that he had been arrested in the stolen car. . . . I don't even think that I knew about the drugs at this point.  I believe [Masterson's] the one that told me that."  Tr. Vol. 2 at 106.

Masterson did not immediately confess after talking about his nephew.  Tr. Vol. 2 at 92.  The interrogation continued, with Masterson still denying that he had killed the victim.  After much back and forth between Masterson and Officer Null, Masterson finally said: "okay[,] I did it."  Tr. Vol. 2 at 65.  Masterson then recounted how he had murdered the victim.  After completing his story, Officer Null had Masterson repeat his confession on audiotape.  At the beginning of the recording, Office Null again read Masterson his constitutional rights, which he waived.  Tr. Vol. 2 at 69. In Masterson's confession he admitted that his intent in going to the victim's apartment was to steal his car, not have sex.  Tr. Vol. 2 at 76-77.

The prosecution played audiotaped confession in the suppression hearing and at trial.  On the recording itself Masterson does not exert his right to counsel and Officer Null makes no explicit promise in return for his confession.

Masterson testified in the evidentiary hearing and provided a divergent account of the interrogations.  Masterson claimed that, when he went before a Florida magistrate before his interrogation with Officer Null, he invoked his right to counsel:

| | |
|---|---|
| Masterson: | . . . I went in front of a judge but it was on a tv camera, and . . . I asked 'em if I could get a lawyer, and they said I didn't need a lawyer, all I had to do was sign some papers and I told 'em how am I going to sign papers and I'm in a room that's miles away from the courthouse and they had the papers right there for me to sign for extradition. |
| Trial counsel: | Papers that you signed were in reference to extradition? |
| Masterson: | Yes, sir. |
| Trial counsel: | And you came to understand that extradition had to do with you being moved from that state back to this state to face the charges? |
| Masterson: | Yes, sir. |
| Trial counsel: | And when you asked them about whether you could get an attorney what was the answer that you received? |
| Masterson: | That they didn't -- that I didn't need an attorney, all I had to do was sign them papers. |

Tr. Vol. 2 at 145-46.  On cross-examination, Masterson clarified that he expected to have an attorney at that point because he previously "always had a lawyer when [he] signed extradition papers."  Tr. Vol. 2 at 157.  He also conceded that the magistrate was "reading [him his] rights for a robbery charge that happened there."  Tr. Vol. 2 at 158. Masterson claimed that he had also invoked his right to counsel with Officer Null:

Trial counsel: Do you remember the conversation that you had with Officer Null on February 9th?

Masterson:     Yes, sir.

Trial counsel: Okay.  What was the first thing that you and he talked about when you got together that day?

Masterson:     Huh, well, when he first came in there he said that he needed to ask me some questions and I asked him if I needed a lawyer.

Trial counsel: And what did he say when you asked if you needed a lawyer?

Masterson:     And he didn't say nothing.  He just ignored me like I didn't say anything.

Trial counsel: So he didn't answer you in any way?

Masterson:     He didn't answer me in any way.

Tr. Vol. 2 at 146.

Masterson also described how he understood that Officer Null had made promises regarding his nephew.  During their discussion, Masterson said that "they caught [his] nephew in the car, and that they found the dope bag in the car."  Tr. Vol. 2 at 149.  Masterson testified: "I asked 'em if they could get that took care of and he said that he's see that he could do," meaning "if I cooperated with him, he would help me out."  Tr. Vol. 2 at 149.  Masterson claimed that then confessed because "all [he] was really worried about at the time was getting [his] nephew out of trouble."  Tr. Vol. 2 at 150, 160-61.

The testimony from the evidentiary hearing left the trial court to decide whether Officer Null's or Masterson's account of the confessions was credible.  The trial court made oral findings and conclusions:

On the issue of the voluntariness of the statement, the record reflects that [Masterson] was warned after -- he was warned by the deputy in Florida once he

was taken into custody there in Ocala.   [Masterson] had been given those warnings and indicated that he understood and waived those rights. Officer Null once again read [Masterson] his warnings, and [Masterson] indicated he understood and waived those rights and gave the statement freely and voluntarily. It's also reflected on the tape itself that [Masterson] once again was read his rights by Officer Null and indicated that he understood those rights and was willing to make a statement and did so freely and voluntarily. There is no credible evidence to indicate that [Masterson] was ever promised anything to make this statement. The credible evidence shows that [Masterson] never asked for a lawyer, that he waived his rights and freely and voluntarily gave the statement to Officer Null and as such would be admissible before the jury.

Tr. Vol. 2 at 198.

On appeal, Masterson claimed that his statement was involuntary and inadmissible because he had invoked his right to counsel.  He also argued that he only confessed in response to promises by the police.  The Court of Criminal Appeals held:

> In reviewing a trial court's ruling on a motion to suppress, the appellate court should afford almost total deference to the trial court's determination of the historical facts, especially when that determination involves an evaluation of the credibility and demeanor of witnesses.  With respect to both of [Masterson's] claims, the trial court was free to believe Officer Null's testimony and disbelieve [Masterson's] testimony.

> With regard to whether an impermissible promise was made, Officer Null stated that he simply told [Masterson], if the drugs belonged to him and he wanted to admit to that, Null would pass along that admission.  In *Martinez v. State* [127 S.W.3d 792 (Tex. Crim. App. 2004)], we addressed a similar situation.  In that case, the police detective testified that he told the defendant that he needed to know who the drugs belonged to, and from that the defendant "could have gathered" that his father and brother would not be charged if the defendant "accepted responsibility."   We held that "the evidence supports the implied finding that no positive promise was ever made by the detective" to the defendant. In the present case, the police officer's statements were even more circumspect because he simply indicated that he was willing to pass along any information the defendant wanted to convey.  No positive promise was made.   Moreover, the evidence suggests that [Masterson] initiated the discussion regarding helping his nephew. "Having cast himself in the role of entrepreneur, [Masterson] cannot expect an appellate court to find implied 'promises' in official responses (to his overtures) that are ambiguous at best."

61

>Regarding [Masterson's] claim that he requested counsel, the trial court was within its discretion to believe Null's testimony that no counsel was requested. [Masterson] contends, however, that the trial court had no discretion to disbelieve [Masterson's] testimony about requesting counsel before the magistrate because the State never controverted that testimony. But the trial court has discretion to disbelieve testimony even if it is not controverted.  The trial court did in fact discount [Masterson's] testimony and was within its discretion to do so.

*Masterson*, 155 S.W.3d at 170-71 (footnotes omitted).

On federal review, Masterson renews his complaint that the police ignored his request for an attorney and made promised that invalidated the voluntariness of his confession.

## B.      Request for Counsel

Masterson claims that the admission of his confession into evidence violated this Fifth and Sixth Amendment rights because the police ignored his request for legal counsel in violation of *Edwards v. Arizona*, 451 U.S. 477 (1981).  "[T]he *Edwards* prophylactic rule . . . limits the ability of the police to initiate further questioning of a suspect in *Miranda* custody once the suspect invokes the right to counsel.*"  Howes v. Fields*, ___ U.S. ___, 132 S. Ct. 1181, 1190 (2012).  "[A] suspect who has 'invoked his right to have counsel present . . . is not subject to further interrogation by the authorities until counsel has been made available to him, unless [he] initiates further communication, exchanges, or conversations with the police.'"  *Berghuis v. Thompkins*, 560 U.S. 370, 405 (2010) (quoting *Maryland v. Shatzer*, ___ U.S. ___, 130 S. Ct. 1213, 1219 (2010)).  The fundamental holding of *Edwards* is that "when counsel is requested, interrogation must cease[.]"  *Minnick v. Mississippi*, 498 U.S. 146, 153 (1990); *see also Arizona v. Roberson*, 486 U.S. 675, 680 (1988); *Shea v. Louisiana*, 470 U.S. 51, 52 (1985).  The "'rigid' prophylactic rule [of *Edwards*] embodies two distinct inquiries.  First, courts must determine

whether the accused actually invoked his right to counsel.  Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Smith v. Illinois*, 469 U.S. 91, 95 (1984) (citations omitted).

Respondent provides several reasons why Masterson has not shown an entitlement to habeas relief on this claim: (1) no evidence supports Masterson's claim that he asked for legal assistance; (2) the colloquy before a Florida judicial officer did not trigger his Sixth Amendment rights with regard to the Texas murder offense; (3) his Sixth Amendment right to counsel had not yet attached for the Texas charges at the time of his interrogation; and (4) even if Masterson asked for counsel before the Florida judge, he repeatedly waived his rights afterward.  At its core, this claim fails because Masterson has not adduced competent evidence showing that he exercised his constitutional rights.

Masterson was the only source of the allegation that he had invoked his right to counsel.  No objective evidence corroborated Masterson's claim that he had asked for an attorney.  No recording captured Masterson's alleged invocation of his right to counsel.  Against Masterson's testimony, the state court had to consider Officer Null's testimony that Masterson never asked to speak with an attorney.  Tr. Vol. 2 at 64.  The trial court was left to decide who gave a credible account.  The trial court found that "[t]he credible evidence shows that [Masterson] never asked for a lawyer, that he waived his rights and freely and voluntarily gave the statement to Officer Null and as such would be admissible before the jury."  Tr. Vol. 2 at 198.

The AEDPA affords great deference to state fact findings.  *See* 28 U.S.C. § 2254(e)(1). A petitioner may only rebut such findings by bringing forth "clear and convincing evidence" to the contrary.  *See id*.  Masterson makes several arguments showing why he disagrees with the state findings, yet he has presented no evidence, much less that of a clear and convincing nature, to show that he invoked his right to counsel.  All Masterson's arguments boil down to questions of credibility, an issue the AEDPA soundly leaves to the state courts absent a high showing. Accordingly, Masterson has not shown that the state court was unreasonable in finding no violation of his right to counsel.  The Court will deny his claim that the State violated his right to counsel.

## C.    Promises

Masterson claims that he only confessed because the police promised to help absolve his nephew of drug charges.  As he argues in his amended petition,

> before the formal statement began and even before Mr. Masterson admitted to any participation in murder, Mr. Masterson asked for the officer's help in seeing that charges against his nephew were dropped. Mr. Masterson was particularly concerned that his young nephew not be prosecuted for the drugs found in the stolen car, because the drugs belonged to Mr. Masterson.  The officer said he would do what he could to help.

(Docket Entry No. 53 at 75).  Masterson claims that this promise rendered his statement involuntary.

Two elements comprise a valid waiver of the right to remain silent under *Miranda*: "(1) the relinquishment of the right must be 'voluntary in the sense that it was the product of a free and deliberate choice'; and (2) the waiver must be made with 'full awareness of the right being

64

abandoned' and the consequences of doing so." *Soffar v. Cockrell*, 300 F.3d 588, 592 (5th Cir. 2002) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). "[C]ertain promises, if not kept, are so attractive that they render a resulting confession involuntary." *Streetman v. Lynaugh*, 812 F.2d 950, 957 (5th Cir. 1987); *see also Morris v. Thaler*, 425 F. App'x 415, 420 (5th Cir. 2011); *United States v. Rogers*, 906 F.2d 189, 192 (5th Cir. 1990).

Masterson argues that this case requires the Court to decide whether the police officer or the suspect's interpretation of a promise governs whether his confession is voluntary.[23] Masterson claims that he "gave his statement in exchange for the officer's promise, whether the officer thought they had struck a bargain or not." (Docket Entry No. 53 at 76). However, Masterson's own testimony about why he confessed was contradictory. At the hearing, Masterson said he confessed because of a promise, yet he also testified that he gave his confession to Officer Null because he "might as well" get the death penalty. Tr. Vol. 2 at 160. Further, at trial Masterson conceded that no one forced or threatened him into confessing. Tr. Vol. 19 at 167.

---

[23]     Masterson argues:

This issue is to a certain extent one of first impression, which is this: Is the question of whether a promise was given to induce a confession to be analyzed from the defendant's point of view, or the police officer's? Even if an officer didn't intend his promise to induce the confession, if the defendant nevertheless subjectively gave his confession in exchange for the promise, was the confession involuntary? The answer, based on previous case law, is yes. The whole concept of voluntariness is obviously from the suspect's point of view. Why did he give his confession? Was it freely given, or in exchange for something? In this case, Mr. Masterson believed that he had to confess in order to save his nephew from being punished for a crime he hadn't committed. The officer may have testified that that was not his intention, but he also testified that he didn't know why Mr. Masterson confessed. The only evidence on the issue came from Mr. Masterson himself, and the trial court's finding didn't directly address that issue. Nor did the opinion from the Court of Criminal Appeals.

(Docket Entry No. 53 at 79).

Given the facts, the state court was not unreasonable in that Officer Null "simply indicated that he was willing to pass along any information the defendant wanted to convey. No positive promise was made." *Masterson*, 155 S.W.3d at 171.  Masterson has not provided any convincing evidence, other than his own testimony that the state courts discounted, that the police made a promise that induced him to confess.  Accordingly, Masterson has not shown that the state courts were unreasonable for denying this claim.

## V.      Sufficiency of the Evidence (claim seven)

Masterson argues that insufficient evidence supported his death sentence.   The punishment phase instructions asked the jury to decide whether "there is a probability that . . . Masterson would commit criminal acts of violence that would constitute a continuing threat to society." Clerk's Record at 314.  According to Masterson, his "own testimony probably insured his receiving a death sentence, because he testified that he would do what it took to protect himself and his property in prison if he received a life sentence, so that he would undoubtedly get into violent conflicts." (Docket Entry No. 53 at 89).[24]  The prosecution's cross-examination characterized his testimony as having said that "you think the jury should answer the special issues in such a way that you get the death penalty, right?"  Masterson responded, "If they're following the law, yes." Tr. Vol. 22 at 99.

---

[24]      Specifically, Masterson told jurors that

they have to answer . . . am I going to be a future danger?  Am I going to protect myself by any means necessary? Yes, I am. That makes me a future danger, yes, I am.  You found me guilty, you must believe I'm guilty. And if you send me to prison, for life, the chances are, in the Texas Department of Corrections the chances are I'm going to have to defend myself, and like I said, I will defend myself, whether it's against a guard or inmate or anybody else by any means necessary.

Tr. Vol. 22 at 84-85.

Given his extreme propensity for violence, however, Masterson now argues that he "will never be released into free society, and would spend his time in prison under such constraints that he would not be allowed to pose any threats to society."  (Docket Entry No. 53 at 89). According to this argument, his background would place him in a penological category in where he could not commit future violent acts.   Thus, Masterson's seventh claim argues that the evidence was insufficient to support the jury's answer to the future-dangerousness special issue.

Under *Jackson v. Virginia*, 443 U.S. 307 (1979), a reviewing court affirms a jury's decision if, when considering all of the evidence in a light most favorable to the prosecution, any rational trier of fact could have returned a verdict unfavorable to the defendant.  In habeas sufficiency-of-the-evidence claims, the constitutionally deferential *Jackson* standard converges with the statutorily mandated federal habeas standards to create a most daunting burden for federal petitioners. *See Garcia v. Carey*, 395 F.3d 1099, 1103 (9th Cir. 2005) (noting that the AEDPA "adds a second level of deference" to the Jackson standard); *Torres v. Mullin*, 317 F.3d 1145, 1151 (10th Cir. 2003) ("[The] AEDPA ha[s] added an additional degree of deference to state courts' resolution of sufficiency of the evidence questions.").   The Court must decide whether the state court reasonably applied the prosecution-friendly *Jackson* analysis.

The Court of Criminal Appeals resolved Masterson's insufficiency-of-the-evidence claim on direct appeal as follows:

> [Masterson] argues that, given the obvious threat he poses, prison officials would place him in lockdown to protect guards and other inmates from him. In addition, [Masterson] argues that the parole authorities would never parole such a dangerous person. He concludes that he does not in fact constitute a future danger because the authorities will act to neutralize his ability to threaten others.

67

> [Masterson's] argument appears to be that he is so dangerous that he is not dangerous. His contention is ingenious but unpersuasive. If accepted, it would stand the capital punishment scheme on its head, giving relief to the most dangerous offenders. We will not speculate, for legal sufficiency purposes, about the effectiveness of the prison and parole authorities' methods of protecting society from those who are intent on committing future criminal acts of violence. Point of error five is overruled.

*Masterson*, 155 S.W.3d at 174.

Masterson has not shown that the state court's rejection of his *Jackson* claim was unreasonable. Masterson had an extensive criminal history involving auto theft, criminal mischief, burglary, and theft. The jury heard about Masterson's violent tendencies, including his threats to prison guards while incarcered. Masterson expressed no remorse for the victim's death. Masterson himself predicted that he would last no longer than one month in prison before committing a criminal act of violence. Tr. Vol. 22 at 48. Masterson's argument asks the Court to find that no rational juror would reject his theory that the harsh strictures of prison life would keep him from acting on his violent propensities, threats, and predictions. Masterson's argument fails to overcome the AEDPA's deference to the integrity of state court judgments. The Court will deny this claim.

## VI. Order of Closing Arguments (claim eight)

Before trial, the defense moved for permission to be the last to speak before the jury retired for deliberations. In his motion, Masterson argued: "Generally the State is permitted to make the concluding argument to the jury. *This is so because they have the burden of proof. However on Special Issue Number 2 regarding mitigation there is no burden of proof.* Therefore Defendant requests permission of this honorable Court to make the concluding remarks to the

jury." Clerk's Record at 156 (emphasis added). The trial court summarily denied Masterson's request. Clerk's Record at 158. The punishment closing arguments followed the traditional practice of the State arguing last. Masterson contends that the trial court violated his Sixth Amendment right to effective assistance of counsel by refusing his request to conclude the closing arguments.

Masterson's federal petition repeats the same arguments he made before trial. Two fundamental errors underlie Masterson's theory. First, Masterson did not explicitly have the burden of proof with regard to mitigating evidence. The Fifth Circuit has recognized that Texas law places "[n]o burden of proof . . . for either the state or the defendant to disprove or prove the mitigating evidence. Thus, each juror individually and subjectively determines what evidence, if any, is sufficient to mitigate against the imposition of the death penalty." *Woods v. Cockrell*, 307 F.3d 353, 359 (5th Cir. 2002) (citing *Colella v. State*, 915 S.W.2d 834, 844 (Tex. Crim. App. 1995)); *see also Prystash v. State*, 3 S.W.3d 522, 535 (Tex. Crim. App. 1999). However, the practical reality of trial anticipates that a capital defendant will adduce mitigating evidence, implicitly placing on the defense a burden to present mitigating evidence and to convince the jury of its significance. *See Lawton v. State*, 913 S.W.2d 542, 557 (Tex. Crim. App. 1995) ("[T]he burden is implicitly placed upon appellant to produce and persuade the jury that circumstances exist which mitigate against the imposition of death in his case."). Still, the Court of Criminal Appeals held on direct appeal that "nothing about the mitigation special issue, which imposes a burden of proof on neither party," allows the defense to argue last. Masterson, 155 S.W.3d at 175.

69

Second, and more importantly, the order of closing argument does not flow from the allocation of burdens, but from state statutory law.  Under Article 36.07 of the Texas Code of Criminal Procedure, "[t]he order of argument may be regulated by the presiding judge; but the State's counsel shall have the right to make the concluding address to the jury."  Thus, Texas law "makes mandatory the State's right to conclude arguments at the guilt-innocence phase of the trial" giving a trial court "no choice but to deny [a defendant's] motion to conclude the argument."  *Martinez v. State*, 501 S.W.2d 130, 132 (Tex. Crim. App. 1973).  Masterson has not pointed to any federal constitutional provision or case holing that a trial court must afford the defense the opportunity to close out punishment-phase arguments.  As Masterson must show that the state court's rejection of his habeas claim was "'contrary to, or involved an unreasonable application of, clearly established Federal law'" before habeas relief becomes available, 28 U.S.C. §2254(d)(1), his failure to identify any Supreme Court precedent overriding Texas law disentitles him to federal habeas relief.  The Court will deny this claim.

## VII.   The Effect of the Jury's Answers to the Special Issue Questions (claims nine and ten)

Masterson raises two claims relating to the jury instructions, both arguing that Texas law impeded the jury's full understanding of their role and the effect of their decisions.  The Court of Criminal Appeals summarily denied both claims on direct appeal.  As discussed below, federal law has regularly and conclusively rejected those constitutional claims.

### A.   Texas' 12-10 Rule

The trial court's instructions said that any answer to Texas' special issues which could result in Masterson receiving a death sentence must be unanimous, but that ten or more jurors

would have to agree to any answer supporting a life sentence.  Clerk's Record at 310.  The trial court fashioned those instructions after TEX. CODE CRIM. PRO. art. 37.071 §2(f), commonly called either the "10-12" or "12-10" Rule.  *See Resendiz v. State*, 112 S.W.3d 541, 548 (Tex. Crim. App. 2003); *Prystash*, 3 S.W.3d at 536.  Masterson argues that *Mills v. Maryland*, 486 U.S. 367 (1988), required that jurors be informed that any failure to answer the special issues would lead to a life sentence.

The Supreme Court in *Mills* Court "held invalid capital sentencing schemes that require juries to disregard mitigating factors not found unanimously."  *Beard v. Banks*, 542 U.S. 406, 408 (2004); *see also Smith v. Spisak*, 558 U.S. 139, 148 (2010); *McKoy v. North Carolina*, 494 U.S. 433, 439-440 (1990); *Druery v. Thaler*, 647 F.3d 535, 542-43 (5th Cir. 2011).[25]  Because the Constitution mandates that jurors be able to consider mitigating evidence, *see Lockett v. Ohio*, 438 U.S. 586, 604 (1978), *Mills* held that jury instructions requiring a unanimous finding on the defendant's mitigating evidence are an unconstitutional "barrier to the sentencer's consideration of all mitigating evidence."  *Mills*, 486 U.S. at 375.

The Fifth Circuit has also repeatedly held that Texas' 12-10 rule does not run afoul of *Mills*.  *See Parr v. Thaler*, 481 F. App'x 872, 878(5th Cir. 2012); *Druery v. Thaler*, 647 F.3d

---

[25]     The Supreme Court has described the *Mills* decision as follows:

> In *Mills*] we reversed a death sentence imposed under Maryland's capital punishment scheme because the jury instructions and verdict form created "a substantial probability that reasonable jurors . . . well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." We reasoned that allowing a "holdout" juror to prevent the other jurors from considering mitigating evidence violated the principle established in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), that a sentencer may not be precluded from giving effect to all mitigating evidence.

*McKoy v. North Carolina*, 494 U.S. 433, 439–440 (1990); *see also Druery*, 647 F.3d at 542–43.

71

535,  542-43 (5th Cir. 2011); *Greer v. Thaler*, 380 F. App'x 373, 389 (5th Cir. 2010); *Miller v. Johnson*, 200 F.3d 274, 288 (5th Cir. 2000); *Alexander v. Johnson*, 211 F.3d 895, 897 n. 5 (5th Cir. 2000); *Woods v. Johnson*, 75 F.3d 1017, 1036 (5th Cir. 1996); *Webb v. Collins*, 2 F.3d 93, 96 (5th Cir. 1993).  The Fifth Circuit holds that "the instruction at issue is wholly dissimilar to that involved in *Mills*," *Woods*, 75 F.3d at 1036, because "all jurors can take into account any mitigating circumstance."  *Jacobs v. Scott*, 31 F.3d 1319, 1329 (5th Cir. 1994).  "One juror cannot preclude the entire jury from considering a mitigating circumstance."  *Jacobs*, 31 F.3d at 1329.  Here, in particular, the jury instructions explicitly told jurors that they "need not agree on what particular evidence supports an affirmative finding on Special Issue No. 2."  Clerk's Record at 310.

Masterson "concedes that [his "12-10" Rule] claim has been continually rejected by the Texas Court of Criminal Appeals and federal courts."  (Docket Entry No. 53 at 96).  As *Teague v. Lane*, 489 U.S. 288 (1989) prevents the creation of new constitutional law on habeas review, this Court cannot grant relief on Masterson's 12-10 Rule.  Additionally, in light of federal precedent, Masterson cannot show that the state court's summary denial of his claim was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).

**B.     The Effect of Possible Juror Deadlock**

Masterson argues that the instructions should have informed jurors what would happen if they failed to reach an unanimous agreement on either special issue.  Under Texas law, "[i]f the jury . . . is unable to answer any [special issue] issue . . . the court shall sentence the defendant to confinement in the institutional division of the Texas Department of Criminal Justice for life."

TEX. CODE CRIM. PRO. art. 37.071 §2(g).  Texas law, however, also stated that "[t]he court, the attorney representing the state, the defendant, or the defendant's counsel may not inform a juror or a prospective juror of the effect of a failure of a jury to agree on [the special] issues[.]"  TEX. CODE CRIM. PRO. art. 37.071 §2(a)(1).  Masterson argues that "[t]his statutorily-required ignorance on the part of the jury violates the Eighth and Fourteenth Amendments to the Constitution, because it creates pressure on uninformed jurors who might vote for life instead to vote with the majority for death."  (Docket Entry No. 53 at 105).

The non-retroactivity principle established in *Teague v. Lane*, 489 U.S. 288 (1989), bars this Court from granting relief on Masterson's jury-deadlock claim.  The Fifth Circuit has previously addressed virtually indistinguishable claims found them to violate *Teague*.  *See Roach v. Quarterman*, 220 F. App'x 270, 276-77 (5th Cir. 2007); *Alexander*, 211 F.3d at 897; *Davis v. Scott*, 51 F.3d 457, 466 (5th Cir. 1995); *Webb*, 2 F.3d at 95-96.  Finding support in the Supreme Court case of *Jones v. United States*, 527 U.S. 373 (1999), the Fifth Circuit recognizes that the Constitution creates no right to instruct a jury on potential deadlock.  *See Alexander*, 211 F.3d at 897 n.5.  Masterson fails to distinguish the binding federal precedent rejecting the merits of this claim.  Habeas relief, therefore, is unavailable on Masterson's jury deadlock claim.

## CERTIFICATE OF APPEALABILITY

The AEDPA prevents appellate review of a habeas petition unless the district or circuit courts certify specific issues for appeal.  *See* 28 U.S.C. § 2253(c); FED. R. APP. PRO. Rule 22(b).  Masterson has not yet requested that this Court grant him a Certificate of Appealability ("COA"), though this Court can consider the issue *sua sponte*.  *See Alexander*, 211 F.3d at 898.

A court may only issue a COA when "the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Clear and binding precedent forecloses relief on Masterson's claims. Under the appropriate standard, Masterson has not shown that this Court should authorize appellate consideration of any claim. This Court will not certify any issue for review by the Fifth Circuit.

## CONCLUSION

For the reasons described above, the Court finds that Masterson has not shown entitlement to federal habeas relief. Accordingly, the Court **GRANTS** Respondent's Motion for Summary Judgment and **DENIES** Masterson's habeas petition. The Court **DENIES WITHOUT PREJDUICE** any other pending motions. No Certificate of Appealability will issue in this case.

SIGNED on this 28th day of February, 2014.

_____

Kenneth M. Hoyt
United States District Judge